THOMAS E. PATTERSON (CA Bar No. 130723)
MICHAEL L. TUCHIN (CA Bar No. 150375)
DAVID M. GUESS (CA Bar No. 238241)
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California  90067-6049
Telephone:       (310) 407-4052
Facsimile:       (310) 407-9090
Reorganization Counsel for
Debtors and Debtors in Possession

LENARD E. SCHWARTZER (NV Bar No. 0399)
JEANETTE E. McPHERSON (NV Bar No. 5423)
SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada  89146-5308
Telephone:       (702) 228-7590
Facsimile:       (702) 892-0122
Local Bankruptcy Counsel for
Debtors and Debtors in Possession

MARK SHINDERMAN (CA Bar No. 136644)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California  90017
Telephone:       (213) 892-4411
Facsimile:       (213) 593-2801
Special Counsel for Official Committee of Creditors Holding
Unsecured Claims

KAARAN E. THOMAS (NV Bar No. 7193)
RYAN WORKS (NV Bar No. 9224)
McDONALD CARANO WILSON LLP
2300 West Sahara Avenue, Suite 1000
Las Vegas, Nevada  89102
Telephone:       (702) 873-4100
Facsimile:       (702) 873-9966
Counsel for Official Committee of Creditors Holding
Unsecured Claims

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Chapter 11 |
| LAKE AT LAS VEGAS JOINT VENTURE, LLC<br>☒ Affects this Debtor | Case No. 08-17814-LBR |
| LLV-1, LLC<br>☒ Affects this Debtor | Case No. 08-17815-LBR |
| LLV HOLDCO, LLC<br>☒ Affects this Debtor | Case No. 08-17817-LBR |
| LAKE LAS VEGAS PROPERTIES, L.L.C.<br>☒ Affects this Debtor | Case No. 08-17820-LBR<br>Case No. 08-17822-LBR |
| LLV FOUR CORNERS, LLC<br>☒ Affects this Debtor | Case No. 08-17825-LBR |
| NORTHSHORE GOLF CLUB, L.L.C.<br>☒ Affects this Debtor | Case No. 08-17827-LBR<br>Case No. 08-17830-LBR |
| P-3 AT MONTELAGO VILLAGE, LLC<br>☒ Affects this Debtor | Case No. 08-17832-LBR<br>Case No. 08-17835-LBR |
| THE GOLF CLUB AT LAKE LAS VEGAS, LLC<br>☒ Affects this Debtor | Case No. 08-17837-LBR<br>Case No. 08-17841-LBR |
| MARINA INVESTORS, L.L.C.<br>☒ Affects this Debtor | Case No. 08-17842-LBR<br>Case No. 08-17844-LBR |
| THE VINEYARD AT LAKE LAS VEGAS, L.L.C.<br>☒ Affects this Debtor | Case No. 08-17845-LBR |
| LLV VHI, L.L.C.<br>☒ Affects this Debtor | **Jointly Administered Under Case No. BK-S-08-17814-LBR** |
| TCH DEVELOPMENT, L.L.C.<br>☒ Affects this Debtor | **THIRD AMENDED CHAPTER 11 PLAN OF** |
| TC TECHNOLOGIES, L.L.C.<br>☒ Affects this Debtor | **REORGANIZATION PROPOSED BY LAKE AT LAS VEGAS JOINT VENTURE, LLC AND ITS JOINTLY-ADMINISTERED** |
| SOUTHSHORE GOLF CLUB, L.L.C.<br>☒ Affects this Debtor | **CHAPTER 11 AFFILIATES AND THE OFFICIAL COMMITTEE OF CREDITORS HOLDING UNSECURED** |
| NEVA HOLDINGS, L.L.C.<br>☒ Affects this Debtor | **CLAIMS (DATED JUNE 17, 2010)** |
| ☒ AFFECTS ALL DEBTORS<br>                       Debtors. | **(AFFECTS ALL DEBTORS)** |

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

# **TABLE OF CONTENTS**

**Page**

I.    DEFINITIONS AND RULES OF CONSTRUCTION ........................................................1

    A.    Definitions ...........................................................................................................1

    B.    Rules of Construction. .......................................................................................30

II.    DESIGNATION OF CLASSES AND TREATMENT OF CLAIMS AND

    INTERESTS ....................................................................................................................31

    A.    Summary and Classification of Claims and Interests. ......................................31

    B.    Allowance and Treatment of Unclassified Claims (Administrative Claims and

        Priority Tax Claims). .........................................................................................32

        1.    Administrative Claims. ........................................................................32

            a.    Allowance of Administrative Claims...................................... 32

            b.    Treatment of Administrative Claims. ..................................... 33

        2.    Priority Tax Claims. .............................................................................35

    C.    Classification and Treatment of Classified Claims and Interests. .............................35

        1.    Class 1 (Pre-Petition Lender Claims). ..................................................35

        2.    Class 2 (LID Acquisition Claim). ........................................................36

        3.    Class 3 (Nevada State Bank and Gamma 4C LLC Claims)...................36

            a.    Class 3A ................................................................................ 36

            b.    Class 3B ................................................................................ 37

        4.    Class 4 (Senior Mechanics' Lien Claims) ...........................................37

        5.    Class 5 (Other Secured Claims)............................................................39

        6.    Class 6 (Priority Claims, other than Priority Tax Claims).............................40

        7.    Class 7 (General Unsecured Claims) ....................................................41

        8.    Class 8 (Phase II Landowner Claims)...................................................42

        9.    Class 9 (T-16 Improvement Vendor Claims)........................................43

        10.    Class 10 (Interests)...............................................................................44

            a.    Classes 10A, 10B, 10C, 10E and 10J.................................... 45

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

i

b.    Classes 10D, 10F, 10G, 10H, 10I, 10K, 10L, 10M, 10N, and

10O..................................................................................................45

III.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................45

A.    Assumption of Executory Contracts and Unexpired Leases.......................................45

1.    Assumption of Agreements...................................................................45

2.    Cure Claims. ........................................................................................46

3.    Objections to Assumption....................................................................46

4.    Resolution of Claims Relating to Assumed Agreements.......................47

B.    Rejection of Executory Contracts and Unexpired Leases...........................................47

1.    Rejected Agreements. ...........................................................................47

2.    Special Provision for Recorded "Development CC&Rs".....................47

3.    Bar Date for Rejection Damage Claims................................................48

C.    Deferment of the Assumption or Rejection of Certain Contracts....................48

D.    Post-Petition Contracts and Leases. ...................................................................49

IV.    MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN............................49

A.    Substantive Consolidation. ...................................................................................49

B.    Exit Facility/Pump Station Loan...............................................................................49

C.    Funding of the Plan.................................................................................................50

D.    Creation of the Creditor Trust and Appointment of the Creditor Trustee. ..................50

1.    Management of the Creditor Trust........................................................50

2.    Funding of the Creditor Trust. .............................................................51

3.    Powers and Duties.................................................................................51

4.    Terms of Loan to Creditor Trust...........................................................53

5.    Distribution of Litigation Proceeds......................................................53

6.    The Termination of the Creditor Trust..................................................54

7.    Additional Provisions of the Creditor Trust Agreement.......................54

E.    Creation of the Falls Improvement Trust and Appointment of the

Falls Improvement Trustee. ..................................................................................54

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

1. Management of the Falls Improvement Trust.................................................55

2. Funding of the Falls Improvement Trust. ................................................56

3. The T-16 Improvement Project Manager. ...............................................57

4. The Pre-Petition Lender LID Contribution.............................................57

5. Powers and Duties.................................................................................58

6. The T-16 Improvement MAC Payments. ...............................................60

7. The Termination of the Falls Improvement Trust...................................60

8. Additional Provisions of the Falls Improvement Trust Agreement.................60

9. No Effect on T-12 LID or T-16 LID....................................................62

F. Revesting of Assets...........................................................................................63

G. Preservation/Revesting of Rights of Action/No Waiver of Claims. ...........................63

H. Objections to Claims........................................................................................66

I. Distribution of Property Under the Plan. ...............................................................66

1. Manner of Payments Under the Plan. ....................................................67

2. No *De Minimis* Distributions. .............................................................67

3. No Distribution With Respect to Disputed Claims.................................67

4. Distributions to Pre-Petition Lenders and DIP Lenders. .......................67

5. Delivery of Distributions and Undeliverable/Unclaimed Distributions. .........67

a. Delivery of Distributions in General.............................................. 67

b. Undeliverable and Unclaimed Distributions.......................................68

c. Estimation of Disputed Claims for Distribution Purposes..................69

J. Cancellation of Interests. .................................................................................69

K. Full Satisfaction. .............................................................................................69

L. D&O Liability Policy.......................................................................................69

M. Reserved...........................................................................................................70

N. Compliance with Tax Requirements.................................................................70

O. Setoff, Recoupment and Other Rights. ...........................................................70

P. Conditions to Effectiveness. ............................................................................70

iii

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

1.  Conditions. ................................................................70

2.  Waiver of Conditions. ..............................................72

Q.  Authorization of Entity Action. ........................................72

V.  THE REORGANIZED DEBTORS ..............................................72

A.  Managers. ........................................................................72

B.  Operating Agreement. ....................................................73

C.  Issuance and Distribution of New Membership Interests and New Warrants in Reorganized LLV Holdco. ..........................................73

D.  Periodic Reporting. .........................................................73

E.  Employee Benefit Plans. ................................................73

VI.  OTHER PLAN PROVISIONS ..................................................74

A.  Exculpation:  No Liability for Solicitation or Prosecution of Confirmation. .............74

B.  Releases by, and Among, the Debtors, the Creditors' Committee, Present Management, Credit Suisse, the DIP Lenders, and the Pre-Petition Lenders ..............74

C.  Additional Plan Releases. ...............................................75

1.  Optional Opt-Out Releases. ...................................75

a.  Post-June 22, 2007 Restructuring and Bankruptcy Releases. ..............75

b.  Pre-June 22, 2007 Pre-Petition Lender Releases. ..............................76

c.  Pre-June 22, 2007 Credit Suisse Releases. ........................................76

d.  Phase II Landowner Releases. ................................................76

e.  T-16 Improvement Vendor Releases. ................................................77

2.  Agent Reciprocal Releases. ...................................77

a.  Post-June 22, 2007 Restructuring and Bankruptcy Releases. ..............77

b.  Pre-June 22, 2007 Pre-Petition Lender Releases. ..............................77

c.  Phase II Landowner Releases. ................................................77

d.  T-16 Improvement Vendor Releases. ................................................78

D.  Indemnification of Present Management. ........................................78

E.  Revocation of Plan/No Admissions. ..............................................80

iv

F.      Modifications of the Plan....................................................................81

G.      Dissolution of Creditors' Committee. ...............................................81

H.      No Effect on TOUSA Supplement to Settlement and Release Agreement or

        Dorfinco Stipulation and Order. ........................................................82

I.      Exemption from Certain Transfer Taxes. ...........................................82

J.      Successors and Assigns.......................................................................82

K.      Saturday, Sunday or Legal Holiday....................................................82

L.      Headings. ............................................................................................83

M.      Governing Law. ..................................................................................83

N.      Form of Agreements and Documents. ................................................83

VII.    EFFECT OF CONFIRMATION OF THE PLAN ............................................83

A.      Discharge and Injunction. ..................................................................83

B.      Payment of U.S. Trustee Fees.............................................................85

C.      Retention of Jurisdiction.....................................................................85

VIII.   RECOMMENDATION AND CONCLUSION..................................................87

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

## LIST OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION |
| --- | --- |
| A | Reorganized Debtors' Board of Managers |
| B | Operating Agreements for Reorganized LLV Holdco, the Other Reorganized Debtors, and LLV LID Loan Holder |
| C | *Reserved* |
| D | Exit Facility Credit Agreement |
| E | Creditor Trust Agreement |
| F | Phase II Landowner Settlement Agreement |
| G | Mechanics' Lien Note |
| H | Initial Creditor Trustee and Creditor Trust Board of Advisors |
| I | Potential Defendants in Insider Actions |
| J | Falls Improvement Trust Agreement |
| K | Schedules of Assumed Agreements (with Cure Amounts), Rejected Agreements and Deferred Agreements |
| L | Initial Falls Improvement Trustee and Falls Improvement Trust Board of Advisors |
| M | Falls Improvement Trust Credit Agreement |
| N | X-West Approved Model |
| O | Atalon Management Agreement |
| P | New Warrants in Reorganized LLV Holdco |
| Q | Pump Station Credit Agreement |
| R | T-16 Improvement Vendor Settlement Agreements |

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

This Plan of Reorganization is proposed by Lake at Las Vegas Joint Venture, LLC and its jointly-administered chapter 11 affiliates, the debtors and debtors in possession in the above-captioned chapter 11 cases and the Official Committee of Creditors Holding Unsecured Claims:

## I.

### DEFINITIONS AND RULES OF CONSTRUCTION

**A.    Definitions.**

In addition to such other terms as are defined elsewhere in the Plan, the following terms (which appear in the Plan as capitalized terms) have the following meanings as used in the Plan:

**"503(b)(9) Claim"** means an Administrative Claim arising under 11 U.S.C. § 503(b)(9).

**"Administrative Claim"** means a Claim for administrative costs or expenses entitled to priority under Bankruptcy Code section 507(a)(2) or (b).

**"Allowed"** or **"Allowed _____ Claim"** means:

(a)    with respect to a Claim arising prior to the Petition Date (including a 503(b)(9) Claim):

(i)    Either:  (1) a proof of Claim was timely filed; or (2) a proof of Claim is deemed timely filed either under Bankruptcy Rule 3003(b)(1)-(2) or by a Final Order; and

(ii)    Either:  (1) the Claim is not a Disputed Claim; or (2) the Claim is allowed by a Final Order or under the Plan; and

(b)    with respect to a Claim arising on or after the Petition Date, a Claim that has been allowed pursuant to Section II.B of the Plan.

Unless otherwise specified in the Plan, an Allowed Claim does not include interest on the Claim accruing after the Petition Date.  Moreover, any portion of a Claim that is satisfied, released or waived during the Cases is not an Allowed Claim.

**"Alternative Claim Treatment"** means, as to any Class of General Unsecured Claims rejecting the Plan, the following treatment:

Holders of Allowed General Unsecured Claims in such Class will receive their Pro Rata share of (i) the reorganization value, if any, of the Estate against which such General Unsecured Claims are Allowed, after the satisfaction of the DIP Facility, Pre-Petition Lender Claims, LID Acquisition Claim, Senior Mechanics' Lien Claims, Other Secured Claims, Administrative

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

1

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Claims, Priority Tax Claims, and Priority Claims, to the extent each of the foregoing is Allowed as secured or priority Claims against such Debtor or its property.  For these purposes, Pro Rata is determined as if the Pre-Petition Lenders' and other Secured Creditors' unsecured deficiency Claims were Allowed unsecured Claims in such Class.  The holders of Allowed General Unsecured Claims in a Class rejecting the Plan will nonetheless receive their Pro Rata portion of the Class 7 Net Litigation Proceeds Share but will not receive any portion of the Reorganized Debtors' $1,000,000 contribution from the Creditor Trust.  The Pro Rata portion of the foregoing $1,000,000 contribution not distributed to holders of Allowed General Unsecured Claims, if any, because they are receiving the Alternative Claim Treatment shall be retained by the Creditor Trust.

**"Alternative Interest Treatment"** means, as to any Class of Interests in a Debtor where the Class of General Unsecured Claims against such Debtor rejects the Plan:

Holders of Interests in such Debtor will receive and retain no value under the Plan and such Interests will be cancelled on the Effective Date without payment of any consideration.  On the Effective Date, New Membership Interests in such Reorganized Debtor will be issued and distributed to the DIP Lenders and contributed by the DIP Lenders to Reorganized LLVJV.  Thereafter, such Reorganized Debtor may be merged into Reorganized LLVJV on or after the Effective Date.

**"Associated Released Parties"** means, with respect to a specified entity, its officers, directors, agents, employees, advisors and professionals acting in their capacity as such, representatives, shareholders, partners, parents, affiliates, members, managers, predecessors and successors, past and present; provided, however, that Associated Released Parties excludes any person or entity, and their affiliates, successors and assigns, identified on Exhibit I and any other person or entity (with the exception of Present Management) that, with respect to the Debtors, held any of the foregoing interests or relationships or acted or served in any of the foregoing capacities prior to January 2, 2008.

**"Atalon"** means The Atalon Group, LLC, a Nevada limited liability company.

**"Atalon Management Agreement"** means the agreement to be executed by the Reorganized Debtors and Atalon pursuant to which Atalon will provide asset management services to and for the benefit of the Reorganized Debtors following the Effective Date.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

A term sheet describing the material terms of the Atalon Management Agreement is attached as Exhibit O to the Plan.  A final form of the Atalon Management Agreement shall be Filed by the Exhibit Filing Date and, upon such Filing, shall become Exhibit O to the Plan.

**"Avoidance Actions"** means all claims and causes of action held by any Debtor or its Estate that arise pursuant to sections 544-553 of the Bankruptcy Code, excluding (i) the Insider Actions, (ii) causes of action against Credit Suisse, in any capacity, the DIP Agent, the Pre-Petition Agent or any lenders under any of the Pre-Petition Credit Agreements or the DIP Facility, and (iii) causes of actions against the Associated Released Parties of Credit Suisse, the DIP Agent, the Pre-Petition Agent or the lenders described in clause (ii) of this definition.

**"Ballot"** means the ballot to vote to accept or reject the Plan.

**"Ballot Tabulator"** means Kurtzman Carson Consultants LLC, or any other entity designated by the Debtors to tabulate Ballots.

**"Ballot Deadline"** means the deadline established by the Court for the delivery of executed Ballots to the Ballot Tabulator.

**"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as the same may be amended from time to time to the extent applicable to the Cases.

**"Bankruptcy Rules"** means, collectively, (a) the Federal Rules of Bankruptcy Procedure and (b) the local rules of the Court, as applicable in the Cases.

**"Business Day"** means a day that is not a Saturday, Sunday, or legal holiday.

**"Carmel"** means Carmel Land & Cattle Company.

**"Carmel Settlement Condition"** means Carmel either (i) executes a Phase II Landowner Settlement Agreement that provides that it and certain designated parties, acceptable to the Debtors and the DIP Agent, agree not to take action or avoid acting, with the intent or for the purpose of causing a T-16 Improvement MAC Event, or (ii) otherwise agrees to be bound by the terms of such Agreement on terms acceptable to the Debtors and the DIP Agent, including the agreement to convey the P-40 Pump Station and surrounding real estate, in either case, prior to the Effective Date or such later date as the Reorganized Debtors and the Falls Improvement Trustee jointly determine, but in no event later than sixty (60) days following the Effective Date.

3

**"Cases"** means the Debtors' cases under chapter 11 of the Bankruptcy Code.

**"Claim"** means a claim — as Bankruptcy Code section 101(5) defines the term "claim" — against one or more of the Debtors or one or more of the Debtors' property.

**"Class"** means a class of Claims or Interests as classified in Section II.C.

**"Class 7 Net Litigation Proceeds Share"** has the meaning ascribed to it in Section IV.D.5.

**"Class 8 Net Litigation Proceeds Share"** has the meaning ascribed to it in Section IV.D.5.

**"Class 9 Net Litigation Proceeds Share"** the meaning ascribed to it in Section IV.D.5.

**"Community"** means the Lake Las Vegas Resort, a 3,592-acre master-planned residential development and resort community located within the boundaries of the City of Henderson.

**"Confirmation Date"** means the date of entry of the Confirmation Order.

**"Confirmation Order"** means an order of the Court, in form and substance satisfactory to the Debtors, the Creditors' Committee, DIP Agent and the Pre-Petition Agent, confirming the Plan.

**"Court"** means the United States Bankruptcy Court for the District of Nevada, Southern Division, or any other court that exercises jurisdiction over the Cases.

**"Credit Agreement Filing Date"** means the last Business Day that is at least fourteen (14) days prior to the last date for timely objecting to the confirmation of the Plan.

**"Credit Suisse"** means, collectively, Credit Suisse AG, Cayman Islands Branch f/k/a/ Credit Suisse, Cayman Islands Branch, Credit Suisse Securities (USA) LLC and any predecessors of the foregoing entities, including Credit Suisse First Boston.

**"Creditor Trust"** means the trust to be established on the Effective Date pursuant to the Plan, and governed pursuant to the Creditor Trust Agreement.

**"Creditor Trust Agreement"** means the agreement pursuant to which the Creditor Trust will be formed, implemented and governed. A substantially final form of the Creditor Trust Agreement is attached as <u>Exhibit E</u> to the Plan. Any revisions or amendments thereto shall be filed by the Exhibit Filing Date and, upon such Filing, shall thereupon become Exhibit E to the Plan.

**"Creditor Trust Assets"** means all of the following:

(a)    the Avoidance Actions and Insider Actions and the proceeds thereof, which shall be deemed assigned to the Creditor Trust on the Effective Date;

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

(b)        a contribution of $1,000,000 by the Reorganized Debtors on or as soon as reasonably practicable after the Effective Date, which is to be distributed to the holders of Allowed Class 7 Claims pursuant to the Plan and which shall not be used for any other purposes, including the costs and expenses of the Creditor Trust;

(c)        a contribution of not less than $500,000 by the Reorganized Debtors to fund the expense of investigating, objecting to, and adjusting General Unsecured Claims and Phase II Landowner Claims and other expenses of the Creditor Trust; and

(d)        the loan proceeds under the Creditor Trust Loan.

Notwithstanding the foregoing, with respect to clause (b) above, the Pro Rata portion of such $1,000,000 contribution not distributed to holders of Allowed General Unsecured Claims, if any, because they are receiving the Alternative Claim Treatment shall be retained by the Creditor Trust and may be applied to any authorized Creditor Trust expenses, and any unused portion of the amounts in clauses (c) and (d) above shall be returned to the Reorganized Debtors.

**"Creditor Trust Loan"** means one or more loans from the Reorganized Debtors in an initial amount of up to $1,400,000 or loans or other types of financing from a third party made to the Creditor Trust to fund the Insider Actions and/or the Avoidance Actions.

**"Creditor Trustee"** means the trustee of the Creditor Trust.  Larry Lattig shall be the initial Creditor Trustee.

**"Creditors' Committee"** means the official committee of creditors holding unsecured claims appointed in the Cases under Bankruptcy Code section 1102 by the U.S. Trustee.

**"Cure Claims"** means the right to payment of cash or the distribution of other property (as the parties may agree or the Court may order), as necessary to cure defaults under an executory contract or unexpired lease of the Debtors, or as otherwise required by Bankruptcy Code section 365(b) as a condition of assumption, so that the Reorganized Debtors may assume the contract or lease pursuant to Bankruptcy Code section 1123(b)(2).

**"Debtors"** means, collectively, (i) Lake at Las Vegas Joint Venture, LLC, a Nevada limited liability company, (ii) LLV-1, LLC, a Nevada limited liability company, (iii) LLV Holdco, LLC, a Delaware limited liability company, (iv) Lake Las Vegas Properties, L.L.C., a Nevada limited liability

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE:  (310) 407-4000

5

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

company, (v) LLV Four Corners, LLC, a Nevada limited liability company, (vi) NorthShore Golf Club, L.L.C., a Nevada limited liability company, (vii) P-3 at MonteLago Village, LLC, a Nevada limited liability company, (viii) The Golf Club at Lake Las Vegas, LLC, a Nevada limited liability company, (ix) Marina Investors, L.L.C., a Delaware limited liability company, (x) The Vineyard at Lake Las Vegas, L.L.C., a Nevada limited liability company, (xi) LLV VHI, L.L.C., a Nevada limited liability company, (xii) TCH Development, L.L.C., a Nevada limited liability company, (xiii) TC Technologies, L.L.C., a Delaware limited liability company, (xiv) SouthShore Golf Club, L.L.C., a Nevada limited liability company, and (xv) Neva Holdings, L.L.C., a Nevada limited liability company.

**"Deferred Agreements"** means any agreement listed on Exhibit K that is designated as "Deferred."

**"Development CC&R"** means any declaration of development covenants, conditions and restrictions by and between a Debtor and any third-party entity (excluding any governmental entity), and includes all such agreements designated as Development CC&Rs on Exhibit K.

**"DIP Agent"** means Credit Suisse AG, Cayman Islands Branch, f/k/a/ Credit Suisse, Cayman Islands Branch in its capacity as collateral agent and administrative agent under the DIP Facility.

**"DIP Facility"** means that certain debtor-in-possession financing facility, by and between the DIP Agent and certain of the Debtors, as approved by the Court pursuant to that certain *Order (I) Authorizing the Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing the Debtors' Limited Use of Cash Collateral Pursuant to 11 U.S.C. § 363, and (III) Granting Adequate Protection to Existing Lenders Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364* [Docket No. 234], and as amended from time to time.

**"DIP Lender Solicitation"** means a special solicitation to the DIP Lenders providing each DIP Lender an opportunity to elect not to provide the opt-out releases set forth in Section VI.C of the Plan.

**"DIP Lenders"** means the lenders under the DIP Facility.

**"Disallowed"** or **"Disallowed Claim"** means a Claim, or any portion thereof, that:  (a) is not listed on the Debtors' Schedules, or is listed therein as contingent, unliquidated, disputed, or in an amount equal to zero, and whose holder has failed to timely file a proof of Claim; or (b) has been disallowed pursuant to order of the Court.

6

**"Disbursing Agent"** means the Reorganized Debtors, the Creditor Trust, the Falls Improvement Trust, the DIP Agent or the Pre-Petition Agent, as applicable, or any entity employed or retained by any of the foregoing to serve as disbursing agent under the Plan.

**"Discharged Liabilities"** has the meaning ascribed to it in Section VII.A of the Plan.

**"Disclosure Statement"** means the disclosure statement to accompany the Plan, as it subsequently may be modified or amended, and all exhibits thereto.

**"Disputed Claim"** means (i) with respect to a Claim arising before the Petition Date (including a 503(b)(9) Claim), a Claim, or any portion thereof, as to which a proof of Claim has been filed or is deemed filed under Bankruptcy Rule 3003(b), and an objection or complaint with respect to such Claim (a) has been timely filed; and (b) has not been overruled or adjudicated against the objector by the Court pursuant to a Final Order or withdrawn, and (ii) with respect to an Administrative Claim, a Claim as to which a party in interest has objected within, if applicable, the time fixed for making such objection.

**"Effective Date"** means the first Business Day (a) that is at least fourteen (14) days after the Confirmation Date; (b) on which no stay of the Confirmation Order is in effect; and (c) on which the conditions set forth in Section IV.P.1 have been satisfied or waived by the Debtors and the DIP Agent.

**"Estates"** means the estates created in the Cases under 11 U.S.C. § 541.

**"Exhibit Filing Date"** means May 11, 2010, at noon Pacific daylight savings time.

**"Exit Facility"** means a senior secured revolving credit facility provided by some or all of the DIP Lenders in an initial amount of $24,000,000 designed to permit the Reorganized Debtors to continue their operations, to permit the Reorganized Debtors' to satisfy their Plan obligations on and after the Effective Date, to provide the Reorganized Debtors a source of funds with which to advance the Falls Improvement Trust Loan, and to provide a source for the Reorganized Debtors to advance the Creditor Trust Loan.  The Exit Facility also includes the right of participating lenders under the Exit Facility to receive their Pro Rata share of 5% of the New Membership Interests in Reorganized LLV Holdco on account of such participation.

**"Exit Facility Documents"** means the financing documents with respect to the Exit Facility. A term sheet describing the principal terms of the Exit Facility Documents is attached as <u>Exhibit D</u> to

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

the Plan. A final form of the Exit Facility Documents shall be Filed by the Credit Agreement Filing Date and, upon such Filing, shall become Exhibit D to the Plan. A commitment letter containing the principal terms of the Exit Facility will be obtained, and a related budget will be prepared, no later than April 2, 2010, at which time such commitment letter and such budget will be Filed.

**"Falls Improvement Trust**" or **"T-16 Improvement Trust"** means the trust to be established on the Effective Date pursuant to the Plan, and governed pursuant to the Falls Improvement Trust Agreement if the Phase II Landowner Settlement Condition is satisfied.

**"Falls Improvement Trust Agreement"** or **"T-16 Improvement Trust Agreement"** means the agreement pursuant to which the Falls Improvement Trust will be formed, implemented and governed. A substantially final form of the Falls Improvement Trust Agreement is attached as Exhibit J to the Plan. Any revisions or amendments thereto shall be filed by the Exhibit Filing Date and, upon such Filing, shall thereupon become Exhibit J to the Plan.

**"Falls Improvement Trust Assets"** or **""T-16 Improvement Trust Assets"** means all of the following:

(a)    the Debtors' T-16 Improvement Payment Rights and the proceeds thereof, which shall be deemed assigned to the Falls Improvement Trust on the Effective Date;

(b)    the loan proceeds under the X-West Loan and, if applicable, the X-West Supplemental Loan, X-East Loan and Remainder Segments Loan, including, if the T-16 Improvement MAC Event occurs, the T-16 Improvement MAC Payments;

(c)    if the Carmel Settlement Condition has not occurred, the loan proceeds under the Supplemental Pump Station Financing;

(d)    the benefit of the Pre-Petition Lender LID Contribution;

(e)    the sum of $80,000 to compensate and reimburse the expenses of the Falls Improvement Trustee through the completion of the X-West Approved Model; and

(f)    all of the Creditors' Committee's rights and interests in the LID Acquisition Litigation.

**"Falls Improvement Trust Credit Agreement"** or **"T-16 Improvement Trust Credit Agreement"** means the credit agreement pursuant to which the Reorganized Debtors will provide the Falls Improvement Trust with the Falls Improvement Trust Loan if the Phase II Landowner

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Settlement Condition is satisfied.  A term sheet describing the principal terms of the Falls Improvement Trust Credit Agreement is attached as <u>Exhibit M</u> to the Plan.  A final form of the Falls Improvement Trust Credit Agreement shall be Filed by the Credit Agreement Filing Date and, upon such Filing, shall become Exhibit M to the Plan.

**"Falls Improvement Trust Loan"** or **"T-16 Improvement Trust Loan"** means, collectively, (i) the X-West Loan and, if the Carmel Settlement Condition is not satisfied, the X-West Supplemental Loan, (ii) if the X-East Conditions are satisfied, the X-East Loan, and (iii) if the Remainder Segments Conditions are satisfied, the Remainder Segments Loan.

**"Falls Improvement Trustee"** or **"T-16 Improvement Trustee"** means the trustee of the Falls Improvement Trust.  Andrewglen Holdings, LLC shall be the initial Falls Improvement Trustee.

**"Filed"** means duly and properly filed with the Court and reflected on the Court's official docket.  **"File," "Files,"** and **"Filing"** are all conjugations of Filed.

**"Final Order"** means an order or judgment of the Court entered on the Court's official docket, or an order or judgment made in accordance with Article VI hereof or pursuant to the terms of the Creditor Trust Agreement or the Falls Improvement Trust Agreement by a court of competent jurisdiction:

    (a)    that has not been reversed, rescinded, stayed, modified, or amended;

    (b)    that is in full force and effect; and

    (c)    with respect to which:  (1) the time to appeal or to seek review, remand, rehearing, or a writ of certiorari has expired and as to which no timely-filed appeal or petition for review, rehearing, remand, or writ of certiorari is pending; or (2) any such appeal or petition has been withdrawn, dismissed or resolved by the highest court to which the order or judgment was timely appealed or from which review, rehearing, remand, or a writ of certiorari was timely sought.

Notwithstanding the foregoing, the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules may be filed with respect to any such order shall not prevent such order from being a "Final Order."

**"General Unsecured Claim"** means a Claim that is not secured by a lien on property of the Estates or subject to a right of setoff pursuant to section 553 of the Bankruptcy Code and that is not an

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Administrative Claim, a Priority Claim, or a Priority Tax Claim.  "General Unsecured Claims" includes unsecured deficiency Claims of holders of Secured Claims, but, except with respect to the Pre-Petition Lender Class 7J Claims, does not include any unsecured claims of the Pre-Petition Lenders.

"**Gross Pre-Petition Lender Claims**" means the Claims held by the Pre-Petition Agent and/or the Pre-Petition Lenders on the Effective Date under the Pre-Petition Credit Facility, inclusive of any and all adequate protection claims and Claims for participating cash flow or other participating interest.  As of the Petition Date the Gross Pre-Petition Lender Claims included the principal amount of approximately $622,000,000 and accrued but unpaid interest of approximately $4,400,000.  The Gross Pre-Petition Lender Claims are Allowed Claims.

"**Impair**" or "**Impaired**" has meaning ascribed to it in section 1124 of the Bankruptcy Code.

"**Insider Actions**" means the claims and causes of action held by any Debtor or its Estate against the persons or entities, and their affiliates, successors and assigns, who are listed on Exhibit I to the Plan, including those claims and causes of action listed on Exhibit 7 to the Disclosure Statement against such persons or entities, excluding only claims and causes of action against any such person or entity that are expressly released pursuant to the Plan.  Any revisions or amendments thereto shall be filed by the Exhibit Filing Date and, upon such Filing, shall thereupon become Exhibit I to the Plan.

"**Intercompany Claims**" means all Claims (whether arising from contract, tort or otherwise) held by any of the Debtors against any other Debtor, whether or not a proof of Claim is filed or deemed filed pursuant to Bankruptcy Code section 501 in any of the Cases.

"**Interest**" means the interest, whether or not asserted, of any holder of an equity security of the Debtors, as defined in Bankruptcy Code section 101(17), and includes all membership interests and other ownership interests in the Debtors, options, warrants and other instruments or right to participate in the profits of the Debtors or their operations, and rights to acquire or receive any of the foregoing interests.

"**LID Acquisition**" means LID Acquisition, LLC.

"**LID Acquisition Claim**" means the Secured Claim asserted by LID Acquisition against LLV-1 relating to the T-16 LID.

"**LID Acquisition Litigation**" means the litigation commenced by LLVJV, LLV-1 and the

10

Creditors' Committee against LID Acquisition in an adversary proceeding pending before the Court styled *Lake at Las Vegas Joint Venture, LLC, et al., v. LID Acquisition, LLC (In re Lake at Las Vegas Joint Venture, LLC, et al.)*, Case No. ADV-S-09-01031-LBR.

**"LID Acquisition Settlement Event"** means the existence of a Final Order approving any settlement of the LID Acquisition Litigation whereby LID Acquisition, LLC agrees to fully release its security interests and liens in the Debtors' T-16 Improvement Payment Rights and T-12 Improvement Payment Rights and the proceeds thereof.

**"LLV Four Corners"** means LLV Four Corners, LLC, a Nevada limited liability company, one of the above-captioned debtors and debtors in possession.

**"LLV LID Loan Holder"** means LLV LID Loan Holder, LLC, a newly-formed subsidiary of Reorganized LLV Holdco.

**"LLVJV"** means Lake at Las Vegas Joint Venture, LLC, a Nevada limited liability company, one of the above-captioned debtors and debtors in possession.

**"LLV-1"** means LLV-1, LLC, a Nevada limited liability company, one of the above-captioned debtors and debtors in possession.

**"Mechanics' Lien"** means an enforceable, properly perfected, unavoidable lien or security interest in property granted pursuant to applicable state law to, or for the benefit of, those who have supplied labor or materials that improve such property.

**"Mechanics' Lien Claim"** means a Claim secured by a Mechanics' Lien.

**"Mechanics' Lien Note"** means a note issued to, or for the benefit of, a holder of a Senior Mechanics' Lien Claim.

All Mechanics' Lien Notes shall have the following principal terms:

(a)     Principal Face Amount:  The amount of such holder's Allowed Senior Mechanics' Lien Claim determined in accordance with section 506(b) of the Bankruptcy Code.

(b)     Interest:  The interest rate will be the Prime Rate of interest on the Effective Date plus 2% per annum, with interest to be paid quarterly.  All interest shall accrue as simple interest.

(c)     Amortization.  Not amortized.

(d)     Maturity Date:  December 31, 2012.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

(e)    Prepayment Penalty:  None.

(f)    Issuer:  The issuer(s) of each Mechanics' Lien Note shall be the Reorganized Debtor(s) whose predecessor(s)-in-interest's property was subject to the Mechanics' Lien held by such holder.

A substantially final form of the Mechanics' Lien Note is attached as <u>Exhibit G</u> to the Plan. Any revisions or amendments thereto shall be filed by the Exhibit Filing Date and, upon such Filing, shall thereupon become Exhibit G to the Plan.

**"MPOA"** means the Lake Las Vegas Master Property Owners' Association.

**"Net Litigation Proceeds"** means the actual cash proceeds of the Avoidance Actions and Insider Actions less (i) all expenses, fees and obligations incurred in generating such proceeds, including all attorneys' fees and expenses, expert witness fees and expenses and court costs and (ii) amounts necessary to repay any Creditor Trust Loan.

**"Net T-16 Improvement Payment Proceeds"** means the actual cash proceeds of the T-16 Improvement Payment Rights less all post-Effective Date expenses incurred in generating such proceeds, including the costs and expenses incurred by the Falls Improvement Trust (including litigation and other costs related to the T-16 LID Bond and LID Acquisition and the repayment of any indebtedness incurred by the Falls Improvement Trust) in excess of the initial distribution to fund the Falls Improvement Trust and the cost and expense of compensating entities that provide goods or services from and after the Effective Date for the purpose of completing construction of the T-16 LID segments.

**"New Membership Interests"** means the membership interests in Reorganized LLV Holdco, Reorganized LLVJV, Reorganized LLV-1, Reorganized LLV Four Corners, and Reorganized Vineyard.

The New Membership Interests will have the following attributes:

(a)    <u>Authorization and Issuance</u>.  The Operating Agreement will authorize the issuance of New Membership Interests, subject to further amendment after the Effective Date.

(b)    <u>Rights</u>.  The New Membership Interests shall have such rights with respect to dividends, liquidations, voting, and other matters as are set forth in the Operating Agreement and as

otherwise provided by applicable law.

(c)        Listing.  The New Membership Interests will not be listed for trading on any national securities exchange or on any automated quotation system.

**"New Warrants"** means the warrant certificates pursuant to which Pre-Petition Lenders will receive the right to acquire New Membership Interests in Reorganized LLV Holdco on or before the occurrence of certain dates or events.  A substantially final form of the New Warrants is attached as Exhibit P to the Plan.  Any revisions or amendments thereto shall be filed by the Exhibit Filing Date and, upon such Filing, shall thereupon become Exhibit P to the Plan.

**"Non-Ordinary Course Administrative Claim"** means any Administrative Claim, other than Ordinary Course Administrative Claims, 503(b)(9) Claims, Professional Fee Claims, Cure Claims, or U.S. Trustee Fees.

**"Operating Agreements"** means the operating agreement of Reorganized LLV Holdco, the other Reorganized Debtors and LLV LID Loan Holder.  A substantially final form of the Operating Agreements is attached as Exhibit B to the Plan.  Any revisions or amendments thereto shall be filed by the Exhibit Filing Date and, upon such Filing, shall thereupon become Exhibit B to the Plan.

**"Optional Released Persons"** means those persons identified in Sections VI.C.1.a. - e. of this Plan.

**"Ordinary Course Administrative Claims"** means Administrative Claims based upon liabilities that the Debtors incur in the ordinary course of their business for goods and services and that are unpaid as of the Effective Date.  Ordinary Course Administrative Claims do not include Professional Fee Claims, 503(b)(9) Claims, Cure Claims, U.S. Trustee Fees, tort claims, or other non-contractual claims upon which civil liability may be based that arose after the Petition Date but prior to the Effective Date.

**"Other Secured Claims"** means Secured Claims against one or more of the Debtors, including Secured Tax Claims, and excluding Claims arising under the DIP Facility, Pre-Petition Lender Claims, the LID Acquisition Claim, and Senior Mechanics' Lien Claims.

**"P-40 Pump Station"** means that certain P-40 Pump Station as identified as segment W-12 under the terms of the T-16 LID, and any and all associated real and personal property.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

1   **"Petition Date"** means July 17, 2008.

2   **"Phase I"** means the section of the Community commonly referred to as "Phase I," as

3   depicted on the map attached as <u>Exhibit 3</u> to the Disclosure Statement.

4   **"Phase II"** means the section of the Community commonly referred to as "Phase II," as

5   depicted on the map attached as <u>Exhibit 3</u> to the Disclosure Statement.

6   **"Phase II Landowner"** means any of the following entities that has timely made the Phase II

7   Landowner Claims Election: Carmel, Coleman-Toll Limited Partnership, CW Capital Fund One, LLC,

8   Pleasant Valley Investments LLC, Strategic Capital LLV LLC, and Woodside Provence, LLC.

9   **"Phase II Landowner Claim"** means the Claim of a Phase II Landowner.

10   **"Phase II Landowner Claims Election"** means the timely election by Carmel, Coleman-Toll

11   Limited Partnership, CW Capital Fund One, LLC, Pleasant Valley Investments LLC, Strategic Capital

12   LLV LLC, or Woodside Provence, LLC to have its Claim classified as a Phase II Landowner Claim.

13   <u>How to Make the Phase II Landowner Claims Election</u>.  A Phase II Landowner that has

14   entered into the Phase II Landowner Settlement Agreement no later than May 12, 2010 shall be

15   deemed to have timely made the Phase II Landowner Claims Election, and no further or other action

16   by such entity shall be required; <u>provided</u>, <u>however</u>, that the last day for Carmel to make the Phase II

17   Landowner Claims Election shall be the last day for satisfaction of the Carmel Settlement Condition.

18   <u>Other Terms and Conditions of the Phase II Landowner Claims Election</u>.  By making the

19   Phase II Landowner Claims Election, a Phase II Landowner (i) releases and forever discharges

20   (a) the Debtors, (b) the Reorganized Debtors, (c) Atalon and Present Management, (d) the Creditors'

21   Committee, (e) members of the Creditors' Committee in their capacity as such, (f) Credit Suisse, the

22   Pre-Petition Agent and the DIP Agent, (g) any DIP Lender or Pre-Petition Lender that provides a

23   mutual release, and (h) with respect to the entities described in (c), (d), (f), and (g), their Associated

24   Released Parties from any and all Released Claims (excepting only such claims and obligations

25   solely arising out of, or expressly preserved by, the Plan or the Phase II Landowner Settlement

26   Agreement), and (ii) releases any and all liens or security interests held by such Phase II Landowner

27   against property of the Estates or landowners within the Community.  By making the Phase II

28

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Landowner Claims Election, a Phase II Landowner also becomes obligated to execute all documentation reasonably requested by the Reorganized Debtors to implement this paragraph.

The making of a Phase II Landowner Claims Election shall have no bearing on the amount of any Phase II Landowner Claim that is ultimately Allowed or Disallowed.

**"Phase II Landowner Settlement Agreement"** means the settlement agreement entered into by and between the Debtors, the Creditors' Committee and the Phase II Landowners. A substantially final form of the Phase II Landowner Settlement Agreement is attached as <u>Exhibit F</u> to the Plan.  Any revisions or amendments thereto shall be filed by the Exhibit Filing Date and, upon such Filing, shall thereupon become Exhibit F to the Plan.

**"Phase II Landowner Settlement Condition"** means that Coleman-Toll Limited Partnership, Pleasant Valley Investments LLC, Strategic Capital LLV LLC, and Woodside Provence, LLC have each timely made the Phase II Landowner Claims Election.

**"Phase III"** means the section of the Community commonly referred to as "Phase III," as depicted on the map attached as <u>Exhibit 3</u> to the Disclosure Statement.

**"Plan"** means this "Third Amended Chapter 11 Plan of Reorganization Proposed by Lake at Las Vegas Joint Venture, LLC and its Jointly-Administered Chapter 11 Affiliates and the Official Committee of Creditors Holding Unsecured Claims (Dated June 17, 2010)" as it subsequently may be further modified or amended.

**"Pre-Petition Agent"** means Credit Suisse in its capacities as Collateral Agent, Administrative Agent, Syndication Agent, Sole Arranger, Sole Bookrunner, Fronting Bank, Paying Agent and original Lender and any other non-participating Lender capacity, as applicable, under or related to the Pre-Petition Credit Agreements.

**"Pre-Petition Credit Agreements"** means (i) that certain Credit Agreement dated as of November 1, 2004, by and among Lake at Las Vegas Joint Venture, a general partnership and LLV-1, as Borrowers, the lenders listed therein, as Lenders, and the Pre Petition Agent, as subsequently modified or amended, (ii) that certain Second Lien Credit Agreement dated as of November 1, 2004, by and among Lake at Las Vegas Joint Venture, a general partnership and LLV-1, as Borrowers, the lenders listed therein, as Lenders, and the Pre-Petition Agent, as subsequently

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

modified or amended; (iii) that certain Amended and Restated Credit Agreement, dated as of May 4, 2005, by and among Lake at Las Vegas Joint Venture, a general partnership and LLV-1, as Borrowers, the lenders listed therein, as Lenders, and the Pre Petition Agent, as subsequently modified or amended, and (iv) the Pre-Petition Credit Facility.

**"Pre-Petition Credit Facility"** means that certain Amended and Restated Credit Agreement (originally dated as of May 4, 2005) dated as of June 22, 2007, by and among LLVJV and LLV-1, as Borrowers, the lenders listed therein, as Lenders, and the Pre Petition Agent, as subsequently modified or amended by those certain amendments dated as of September 24, 2007, October 22, 2007, November 14, 2007, December 26, 2007, January 2, 2008, January 23, 2008 and June 20, 2008.

**"Pre-Petition Lenders"** means the lenders under the Pre-Petition Credit Facility and, for purposes of the indemnification and release provisions of the Plan, any entity that is currently, or ever was, a lender under any of the Pre-Petition Credit Agreements.

**"Pre-Petition Lender Claims"** means the Gross Pre-Petition Lender Claims exclusive of the Pre-Petition Lender LID Contribution and the Pre-Petition Lender Class 7J Claims; provided, however, that if the LID Acquisition Settlement Event occurs on or before the Effective Date, Pre-Petition Lender Claims shall mean the Gross Pre-Petition Lender Claims without any deduction.

**"Pre-Petition Lender Class 7J Claims"** means the unsecured claims of the Pre-Petition Lenders against The Vineyard at Lake Las Vegas, L.L.C., a Nevada limited liability company, one of the above-captioned debtors and debtors in possession.

**"Pre-Petition Lender LID Contribution"** means, collectively, (i) a portion of the Gross Pre-Petition Lender Claims in the amount of $50,000,000, (ii) all right, title and interest of the Pre-Petition Agent and the Pre-Petition Lenders to receive payments from the T-16 LID as a result of their valid, enforceable and properly perfected liens and security interests in the Debtors' T-16 Improvement Payment Rights, and (iii) the Pre-Petition Agent's and the Pre-Petition Lender's liens and security interests in the Debtors' T-16 Improvement Payment Rights. The Pre-Petition Lender LID Contribution shall not alter, impair or diminish the distributions or the entitlements to distributions of the Pre-Petition Lenders under the Plan and shall not entitle the Falls Improvement

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Trust to share in any distribution made to Class 1 under the Plan or to share in any other benefits or rights granted under the Plan to the holders of Pre-Petition Lender Claims

**"Pre-Petition Lender Net Litigation Proceeds Share"** means 80% of the Net Litigation Proceeds allocable to the Pre-Petition Lenders under Section IV.D.5 of the Plan.

**"Present Management"** means, either individually or collectively, depending on the context, (i) Frederick Chin, President & CEO of the Debtors, (ii) James Coyne, Senior Vice President and Chief Operating Officer of the Debtors, (iii) Robert La Forgia, Executive Vice President Finance and Treasurer of the Debtors, (iv) Keith Mosley, Vice President, General Counsel and Secretary of the Debtors, and (v) Kirk Brynjulson, Vice President of Land Development of the Debtors.

**"Prime Rate"** means the prime rate (the base rate on corporate loans at large U.S. money center commercial banks) as published in the Money Rates section of the Wall Street Journal.

**"Priority Claim"** means an Allowed Claim entitled to priority against any Estate under Bankruptcy Code sections 507(a)(4), 507(a)(5), or 507(a)(7).

**"Priority Tax Claim"** means an Allowed Claim entitled to priority against one or more of the Estates under Bankruptcy Code section 507(a)(8), and excludes any Claims for taxes attributable to the period after the Petition Date.

**"Professional Fee Claim"** means a Claim under Bankruptcy Code sections 327, 328, 330, 331, 503, or 1103 for compensation for professional services rendered or expenses incurred during the pendency of the Cases for which one or more of the Estates is liable for payment. A Professional Fee Claim also includes a Claim of an entity designated as "Ordinary Course Professional" pursuant to the Court's *Order Authorizing Debtors and Debtors in Possession to Employ and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business* [Docket No. 406], for compensation for services rendered or expenses incurred during the pendency of the Cases for which one of ore more of the Estates is liable.

**"Pro Rata"** means proportionately so that the ratio of (a) the amount of consideration distributed on account of a particular Allowed Claim to (b) the Allowed Claim, is the same as the ratio of (x) the amount of consideration available for distribution on account of Allowed Claims in

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

the Class or Classes which share in the relevant consideration distributed to (y) the amount of all Allowed Claims of the Class or Classes that will share in the relevant consideration distributed.

**"Pump Station Credit Agreement"** means the credit agreement pursuant to which Credit Suisse or its designee will provide the Falls Improvement Trust with the Pump Station Loan.  A term sheet describing the principal terms of the Pump Station Credit Agreement is attached as Exhibit Q to the Plan.  A final form of the Pump Station Credit Agreement shall be Filed by the Credit Agreement Filing Date and, upon such Filing, shall become Exhibit Q to the Plan.

**"Pump Station Loan"** means a loan of up to $5 million made by Credit Suisse or a designee to the Falls Improvement Trust pursuant to the terms of the Pump Station Credit Agreement to provide the Falls Improvement Trust with the funding necessary, as part of the Supplemental Pump Station Financing, together with the $5 million to be lent by the Reorganized Debtors to the Falls Improvement Trust, and in conjunction with the proceeds from the T-16 LID, to commence and complete the construction of the Substitute P-40 Pump Station in accordance with the X-West Approved Model if the Carmel Settlement Condition is not satisfied.

**"Rejection Damage Claim"** means a Claim arising under Bankruptcy Code section 365 from the rejection by any of the Debtors of a lease or contract.

**"Released Claims"** means any and all claims, obligations, demands, actions, suits, judgments, causes of action, liabilities, costs, expenses and damages of any kind whatsoever (including those arising under the Bankruptcy Code or nonbankruptcy law, and those that can be asserted by the Debtors, their Estates or the Creditors' Committee), in law, equity or otherwise, whether known or unknown, liquidated or unliquidated, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act, omission, transaction, event or other occurrence, in connection with, relating to or arising from: (a) the Cases, the management or operation of the Debtors, the formulation and pursuit of the Plan and the negotiation and documentation of the Exit Facility, (b)(i) the DIP Facility, the Pre-Petition Credit Agreements and any other pre-petition credit agreements, lending, financing or contractual arrangements related to any portion of the Community in which the Pre-Petition Agent and the Debtors or any of their predecessors was or is a party, (ii) any transactions, dividends, distributions, fees, reimbursements, payments, or refinancings contemplated by such credit

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

1  agreements or arrangements or related thereto, and (iii) the management or operation of the Debtors

2  prior to the Effective Date (including the period prior to the Petition Date), (c) any act, omission,

3  transaction, event or other occurrence taking place on or prior to the Effective Date (including the

4  period prior to the Petition Date) in any way relating to the Debtors, their predecessors or their

5  affiliates, or to the Cases, or (d) any claim or cause of action that was, or that could have been, raised

6  in the litigation filed by the Creditors' Committee against Credit Suisse individually and as agent for

7  the Pre-Petition Lenders in the United States Bankruptcy Court for the District of Nevada, Adversary

8  Proceeding No. 09-01198.  Released Claims shall not include any Insider Actions.

9  **"Remainder Segments"** means those segments of the T-16 LID that are not in X-East or in

10  X-West, as identified more particularly in Exhibit 3 to the Disclosure Statement.

11  **"Remainder Segments Approved Model"** means the set of financial projections to

12  complete segments of the T-16 LID located in the Remainder Segments portion of the T-16 LID as

13  approved in writing by the Phase II Landowners owning land in, or adjacent to, the Remainder

14  Segments and the Reorganized Debtors.  Any Remainder Segments Approved Model shall include

15  an appropriate amount for the cost of outside bond counsel, engineering services, the City of

16  Henderson's engineering review, and a consultant retained by the board of advisors of the

17  Falls Improvement Trust to monitor issues related to the development of the Remainder Segments.

18  The Remainder Segments Approved Model may be modified from time to time so long as each

19  modified Remainder Segments Approved Model is approved in writing by the Phase II Landowners

20  owning land in, or adjacent to, Remainder Segments and the Reorganized Debtors.

21  **"Remainder Segments Conditions"** means (i) the agreement on a Remainder Segments

22  Approved Model which projects that the obligations of the Remainder Segments Loan (assuming all

23  interest is paid in kind) incurred to develop the Remainder Segments included within the Remainder

24  Segments Approved Model will be satisfied in cash in full upon completion of the Remainder

25  Segments provided for in the Remainder Segments Approved Model prior to the 60-month

26  cumulative maturity of the X-West Loan, the X-East Loan and the Remainder Segments Loan,

27  (ii) the Remainder Segments Approved Model projects that the available sources of funding after

28  repayment of the Remainder Segments Loan in full are sufficient to complete the Remainder

19

Segments provided for in the Remainder Segments Approved Model, (iii) all outstanding obligations related to the X-West Loan (other than obligations arising under the Supplemental Pump Station Financing) have been satisfied in cash in full, (iv) the Phase II Landowner Settlement Condition is satisfied, and (v) no T-16 Improvement MAC Event has occurred.

**"Remainder Segments Loan"** means the term loan made to the Falls Improvement Trust, if the Remainder Segments Conditions are satisfied, pursuant to the Falls Improvement Trust Credit Agreement, in conjunction with the proceeds from the T-16 LID, to provide the Falls Improvement Trust with the funding necessary to commence and complete all construction within the Remainder Segments in accordance with the Remainder Segments Approved Model up to the maximum available commitment under the Falls Improvement Trust Credit Agreement (excluding the Supplemental Pump Station Financing).

**"Reorganized Debtors"** means the Debtors, as revested with all property of the Estates in accordance with the terms of the Plan, on the Effective Date.

**"Reorganized LLV Four Corners"** means LLV Four Corners, as revested with all property of its Estate in accordance with the terms of the Plan, on the Effective Date.

**"Reorganized LLV Holdco"** means LLV Holdco, LLC, a Delaware limited liability company, one of the above-captioned debtors and debtors in possession, as revested with all property of its Estate in accordance with the terms of the Plan, on the Effective Date.

**"Reorganized LLVJV"** means LLVJV, as revested with all property of its Estate in accordance with the terms of the Plan, on the Effective Date.

**"Reorganized LLV-1"** means LLV-1, as revested with all property of the LLV-1 Estate in accordance with the terms of the Plan, on the Effective Date.

**"Reorganized Vineyard"** means The Vineyard at Lake Las Vegas, L.L.C., a Nevada limited liability company, one of the above-captioned debtors and debtors in possession, as revested with all property of its Estate in accordance with the terms of the Plan, on the Effective Date.

**"Requisite DIP Lenders"** means "Requisite Lenders" as defined in the DIP Credit Agreement dated July 17, 2008 (as amended) governing the DIP Facility.

**"Requisite Pre-Petition Lenders"** means "Requisite Lenders" as defined in the Pre-Petition

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Credit Facility.

**"Schedule of Assumed Agreements"** means the schedule of executory contracts and unexpired leases that the Debtors will assume on the Effective Date, together with proposed amount of Cure Claims. A substantially final form of the Schedule of Assumed Agreements is set forth in <u>Exhibit K</u> to the Plan. Any revisions or amendments thereto shall be filed by the Exhibit Filing Date and, upon such Filing, shall thereupon be set forth in Exhibit K to the Plan.

**"Schedule of Deferred Agreements"** means the schedule of executory contracts and unexpired leases that the Debtors will defer assuming or rejecting until the one-year anniversary of the Effective Date. A substantially final form of the Schedule of Deferred Agreements is set forth in <u>Exhibit K</u> to the Plan. Any revisions or amendments thereto shall be filed by the Exhibit Filing Date and, upon such Filing, shall thereupon be set forth in Exhibit K to the Plan.

**"Schedule of Rejected Agreements"** means the schedule of executory contracts and unexpired leases that the Debtors will reject on the Effective Date. A substantially final form of the Schedule of Rejected Agreements is set forth in <u>Exhibit K</u> to the Plan. Any revisions or amendments thereto shall be filed by the Exhibit Filing Date and, upon such Filing, shall thereupon be set forth in Exhibit K to the Plan.

**"Schedules"** means the Schedules of Assets and Liabilities Filed by the Debtors, as such Schedules may have been, or may subsequently be, amended before the Effective Date.

**"Secured Claim"** means a Claim that is secured by a lien on the property of one or more of the Estates or that is subject to a right of setoff under section 553 of the Bankruptcy Code. A Claim is a Secured Claim only to the extent of the value of the holder of such Claim's interest in the collateral that is property of one or more of the Estates or to the extent of the amount subject to setoff, as applicable, as determined under Bankruptcy Code section 506(a). As a consequence, an Allowed Claim that is secured by a lien on property of one or more of the Estates shall be treated as a General Unsecured Claim, and not as a Secured Claim, <u>unless</u>: (i) the liens or security interests that secure such Allowed Secured Claim are senior in priority to the liens and security interests that secure the Pre-Petition Lender Claims and the DIP Facility; and (ii) the assets securing such Allowed Secured Claim are owned by one or more of the Debtors as of Effective Date.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

**"Secured Claims Treatment"** means the following treatment:

Unless such holder agrees to other treatment, on or as soon as reasonably practicable after the Effective Date, a holder of a Secured Claim receiving this treatment shall receive, at the option of the Debtor against whose Estate such holder holds its Secured Claim:

(a)     cash in the allowed amount of such Secured Claim;

(b)     the return of the collateral securing such Secured Claim; or

(c)         (i)     the cure of any default, other than a default of the kind specified in Bankruptcy Code section 365(b)(2) that Bankruptcy Code section 1124(2) requires to be cured, with respect to such Secured Claim, without recognition of any default rate of interest or similar penalty or charge, and upon such cure, no default shall exist;

(ii)     the reinstatement of the maturity of such Secured Claim as the maturity existed before any default, without recognition of any default rate of interest or similar penalty or charge; and

(iii)     its unaltered legal, equitable, and contractual rights with respect to such Secured Claim.

Any defenses, counterclaims, rights of offset or recoupment of the Debtors or the Estates with respect to such Secured Claim shall vest in and inure to the benefit of the Reorganized Debtors.

On the Effective Date, conditioned upon the receipt of the amount determined by the Court to be necessary to pay such Secured Claim in full (unless such other treatment is agreed to or provided for as set forth above) such holder of such Secured Claim shall release (and by the Confirmation Order shall be deemed to release) all liens against property of the Estates.

**"Secured Tax Claim"** means a governmental unit's Secured Claim for unpaid taxes.

**"Senior Mechanics' Lien Claim"** means an Allowed Claim secured by a Mechanics' Lien on property of one or more of the Estates that is senior in priority to the liens and security interests that secure the Pre-Petition Lender Claims and the DIP Facility; provided, however, an asserted Mechanic's Lien Claim shall be treated as a General Unsecured Claim (and then solely against the Estate(s) of the Debtor(s) with whom the holder of such Allowed Claim contracted), and not as a Senior Mechanics' Lien Claim, if (i) the liens or security interests that secure such Allowed

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Mechanics' Lien Claim are not senior in priority to the liens and security interests that secure the Pre-Petition Lender Claims and the DIP Facility; or (ii) the assets securing such Allowed Mechanics' Lien Claim are not owned by one or more of the Debtors as of Effective Date.

**"Settlement"** means, collectively, the settlements and compromises provided for in the Phase II Landowner Settlement Agreement, T-16 Improvement Vendor Settlement Agreement and implicit in each of the terms of this Plan, between and among the Debtors, their Estates, the Creditors' Committee, the Phase II Landowners, the T-16 Improvement Vendors, Credit Suisse, the DIP Agent, the DIP Lenders, the Pre-Petition Agent and the Pre-Petition Lenders.  As part of the settlement implicit in the Plan, the Pre-Petition Lenders, who hold pre-petition claims in excess of $626,000,000 and additional substantial administrative priority adequate protection claims each of which is secured by liens on substantially all of the assets of the Debtors, and the DIP Lenders, who hold administrative priority claims and superpriority liens in the amount $127,000,000 secured by senior liens on substantially all of the assets of the Debtors, are receiving equity in the Reorganized Debtors and releases under the Plan in lieu of exercising remedies related to their liens and claims and at the same time providing for substantial financing for the continued operations of the Community, including funding the MPOA, providing both contributions and loans to the Falls Improvement Trust and the Creditor Trust for the benefit of unsecured creditors, funding a distribution for Class 7 creditors, the remapping of Phase II and providing the financing to develop the T-16 LID so that the Phase II Landowners can ultimately develop their projects and the T-16 Improvement Vendors can receive an approximately 40% distribution on their Claims regardless of whether they have liens on Estate assets or third party assets (such as the Phase II Landowners' properties).

**"Substitute P-40 Pump Station"** means a pump station in lieu of the P-40 Pump Station within the T-16 LID that complies with the applicable specifications of the T-16 LID.

**"Supplemental Pump Station Financing"** means up to an additional $10 million in funding for the purpose of constructing the Substitute P-40 Pump Station in accordance with the X-West Approved Model if the Phase II Landowner Settlement Condition is satisfied and the Carmel Settlement Condition is not satisfied, of which $5 million will be advanced to the Falls Improvement Trust by the Reorganized Debtors pursuant to the X-West Supplemental Loan and $5 million will be

23

lent directly by Credit Suisse or its designee to the Falls Improvement Trust pursuant to the terms of the Pump Station Loan.

**"T-12 Improvement Payment Rights"** means all right, title and interest to receive from the T-12 LID Bond Trustee the purchase price of segments of the T-12 LID, subject to any and all valid, enforceable and properly perfected liens or security interests in such right, title and interest.

**"T-12 LID**" means the City of Henderson, Nevada, Local Improvement District No. T-12 (Lake Las Vegas North Shore).

**"T-12 LID Acquisition Agreement"** means that certain Acquisition Agreement by and between the City of Henderson, Nevada and Lake at Las Vegas Joint Venture, a Nevada general partnership, dated as of May 1, 1998.

**"T-12 LID Bond Trustee"** means the trustee under the indenture pursuant to which the bonds relating to the T-12 LID were issued, including all successors and assigns, as set forth or designated in the T-12 LID Acquisition Agreement.

**"T-16 Improvement MAC Event"** means that either (i) the T-16 LID Bond Trustee has transferred the remaining amounts allocated to fund acquisitions under the T-16 LID Acquisition Agreement for the purpose of redeeming a portion of the T-16 LID Bonds such that the funds constituting the T-16 Improvement Payment Rights are not available to the Reorganized Debtors, LLV LID Loan Holder or the Falls Improvement Trust and the T-16 LID Bond Trustee has notified the Reorganized Debtors or the Falls Improvement Trust of that event, or (ii) the Falls Improvement Trustee has determined in the exercise of his or her fiduciary duty, and notified the Reorganized Debtors in writing, that there is no reasonable likelihood of successfully establishing that the T-16 Improvement Payment Rights may be received and used by the Falls Improvement Trust through its senior lien or other interest in the T-16 Improvement Payment Rights irrespective of other liens on the T-16 Improvement Payment Rights, including those asserted by LID Acquisition; provided, however, that neither of such occurrences shall be a T-16 Improvement MAC Event if it was caused by (x) the acts or failures to act by any Phase II Landowner (or any affiliate thereof, or, in the case of Carmel, the certain designated related entities referred to in the definition of "Carmel Settlement Condition") taken, or avoided being taken, with the intent or for the purpose of causing

24

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

1  what would otherwise be a T-16 Improvement MAC Event or (y) the failure by any Phase II

2  Landowner to timely pay its assessments in respect of the T-16 LID or its property taxes.

3  **"T-16 Improvement MAC Payments"** means the Reorganized Debtors' and Credit Suisse's

4  or its designee's funding from the Falls Improvement Trust Credit Agreement and the Pump Station

5  Credit Agreement to the Falls Improvement Trust in the event of a T-16 Improvement MAC Event

6  of $8 million less (i) the aggregate of all amounts distributed to holders of Class 9 Claims pursuant

7  to the Plan, but excluding, as applicable, any distributions on account of the Class 9 Net Litigation

8  Proceeds Share, and (ii) (x) the aggregate of all amounts advanced to the Falls Improvement Trust

9  pursuant to the Falls Improvement Trust Credit Agreement and the Pump Station Credit Agreement

10  less (y) the aggregate of all payments made to holders of Allowed Class 9 Claims pursuant to

11  clause (A)(x) of Section II.C.9.

12  **"T-16 Improvement Payment Rights"** means all right, title and interest to receive from the

13  T-16 LID Bond Trustee the purchase price of segments of the T-16 LID, subject to any and all valid,

14  enforceable and properly perfected liens or security interests in such right, title and interest.

15  **"T-16 Improvement Project Manager"** means the entity that shall provide services to and

16  for the benefit of the Falls Improvement Trust in overseeing and managing the completion of the

17  X-West Approved Model, the X-East Approved Model and the Remainder Segments Approved

18  Model.  Reorganized LLV-1 shall be the initial T-16 Project Manager.

19  **"T-16 Improvement-Related Claim"** means a Claim for the provision of goods and

20  services to, or for the benefit of, one or more of the Debtors prior to the Petition Date to the extent

21  such goods and services were for the purpose of a T-16 LID construction project.

22  **"T-16 Improvement Vendor"** means the entities listed in <u>Exhibit 9</u> to the Disclosure

23  Statement, as it may be amended prior to the Ballot Deadline in the Debtors' sole discretion.  The

24  T-16 Improvement Vendor Claims of the T-16 Improvement Vendors making the T-16 Improvement

25  Vendor Claims Election will be Allowed T-16 Improvement Vendor Claims in the amounts set forth

26  in the respective T-16 Improvement Vendor Settlement Agreements.   An entity is a

27  T-16 Improvement Vendor only with respect to its T-16 Improvement-Related Claim.  To the extent

28  it has other claims or rights, those other claims and rights are subject to the treatment described in

25

the Plan applicable to such other claims or rights.

**"T-16 Improvement Vendor Claims"** mean the T-16 Improvement-Related Claims of T-16 Improvement Vendors that have timely made the T-16 Improvement Vendor Claims Election.

**"T-16 Improvement Vendor Claims Election"** means the timely election by a T-16 Improvement Vendor to have its Claim classified as a T-16 Improvement Vendor Claim.

How to Make the T-16 Improvement Vendor Claims Election.  A T-16 Improvement Vendor that has entered into the T-16 Improvement Vendor Settlement Agreement no later than May 12, 2010 shall be deemed to have made the T-16 Improvement Vendor Claims Election, and no further or other action by such entity shall be required.

Other Terms and Conditions of the T-16 Improvement Vendor Claims Election.  By making the T-16 Improvement Vendor Claims Election, a holder of a T-16 Improvement Vendor Claim releases and forever discharges the T-16 Improvement Vendor Released Persons from all Released Claims that relate in any way to a T-16 Improvement-Related Claim or any other Claim arising out of the provision of goods or services to or for the benefit of the T-16 LID (excepting only such claims and obligations arising solely out of the Plan or as are expressly preserved by the Plan). To that end, with respect to the foregoing Released Claims, a holder of a T-16 Improvement Vendor Claim expressly waives and relinquishes any and all provisions, rights and benefits conferred by section 1542 of the California Civil Code, which provides that "[a] general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."  Further, with respect to the foregoing Released Claims, a holder of a T-16 Improvement Vendor Claim expressly waives and relinquishes, to the fullest extent permitted by law, the provisions, rights and benefits of any law of the United States or of any state or territory of the United States or any other applicable jurisdiction (including any such provision of Nevada or New York law), or any principle of common law or equity which is similar, comparable or equivalent to section 1542 of the California Civil Code.  In addition to the foregoing, by making the T-16 Improvement Vendor Claims Election, a holder of a T-16 Improvement Vendor Claim releases or, at the request of the Reorganized Debtors, assigns to the Reorganized Debtors any and all liens or

security interests (if any) it holds that arise out of its T-16 Improvement-Related Claim or any other claim arising out of the provision of goods or services to or for the benefit of the T-16 LID, including liens against all land within the Community. By making the T-16 Improvement Vendor Claims Election, a holder of a T-16 Improvement Vendor Claim also becomes obligated to execute all documentation reasonably requested by the Reorganized Debtors to implement this paragraph.

"**T-16 Improvement Vendor Released Persons**" means, collectively, (a) the Debtors, (b) the Reorganized Debtors, (c) the Creditors' Committee, (d) members of the Creditors' Committee in their capacity as such, (e) Credit Suisse, the Pre-Petition Agent and the DIP Agent, (f) any DIP Lender or Pre-Petition Lender that provides a mutual release, (g) each of the Phase II Landowners, provided that they enter into a Phase II Landowner Settlement Agreement with the Debtors, (h) Present Management, (i) Atalon, and (j) with respect to each of the foregoing, their Associated Released Parties.

"**T-16 Improvement Vendor Settlement Agreement**" means the settlement agreement entered into by and between the Debtors, the Creditors Committee, and the T-16 Improvement Vendors. A substantially final form of the T-16 Improvement Vendor Settlement Agreement is attached as <u>Exhibit R</u> to the Plan. Any revisions or amendments thereto shall be filed by the Exhibit Filing Date and, upon such Filing, shall thereupon become Exhibit R to the Plan.

"**T-16 LID**" means the City of Henderson, Nevada, Local Improvement District No. T-16 (The Falls at Lake Las Vegas).

"**T-16 LID Acquisition Agreement**" means that certain Acquisition Agreement by and between the City of Henderson, Nevada and LLV-1, dated as of April 12, 2005.

"**T-16 LID Bonds**" means the bonds issued under the indenture relating to the financing of the T-16 LID.

"**T-16 LID Bond Trustee**" means the trustee under the indenture pursuant to which the T-16 LID Bonds were issued, including all successors and assigns, as set forth or designated in the T-16 LID Acquisition Agreement.

"**Unimpair**" or **Unimpaired**" means, with respect a class of claims or interests, treatment of the claims or interests of such class in a manner that avoids the designation of such class as Impaired.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

**"Unsecured Beneficiaries Net Litigation Proceeds Share"** means 20% of the Net Litigation Proceeds.

**"U.S. Trustee"** means the Office of the United States Trustee for the District of Nevada.

**"U.S. Trustee Fees"** means fees or charges assessed against the Estates pursuant to 28 U.S.C. § 1930.

**"X-East"** means those segments of the T-16 LID that are not in X-West or the Remainder Segments, as identified more particularly in Exhibit 3 to the Disclosure Statement.

**"X-East Approved Model"** means the set of financial projections to complete segments of the T-16 LID located in the X-East portion of the T-16 LID approved in writing by the Phase II Landowners owning land in, or adjacent to, X-East and the Reorganized Debtors.  Any X-East Approved Model shall include an appropriate amount for the cost of outside bond counsel, engineering services, the City of Henderson's engineering review, and a consultant retained by the board of advisors of the Falls Improvement Trust to monitor issues related to the development of the X-East segments of the T-16 LID.  The X-East Approved Model may be modified from time to time so long as each modified X-East Approved Model is approved in writing by board of advisors of the Falls Improvement Trust and the Phase II Landowners owning land in, or adjacent to, X-East and the Reorganized Debtors.

**"X-East Conditions"** means (i) the agreement on an X-East Approved Model which projects that the obligations of the X-East Loan (assuming all interest is paid in kind) incurred to develop the X-East segments included within the X-East Approved Model will be satisfied in cash in full upon completion of the X-East segments provided for in the X-East Approved Model prior to the 60-month cumulative maturity of the X-West Loan and the X-East Loan, (ii) the X-East Approved Model projects that the available sources of funding after repayment of the X-East Loan in full are sufficient to complete the X-East segments provided for in the X-East Approved Model, (iii) all outstanding obligations related to the X-West Loan (other than obligations arising under the Supplemental Pump Station Financing) have been satisfied in cash in full, (iv) the Phase II Landowner Settlement Condition has been satisfied, and (v) no T-16 Improvement MAC Event has occurred.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067-6049
Telephone:  (310) 407-4000

"**X-East Loan**" means the term loan made to the Falls Improvement Trust, if the X-East Conditions are satisfied, pursuant to the Falls Improvement Trust Credit Agreement, in conjunction with the proceeds from the T-16 LID, to provide the Falls Improvement Trust with the funding necessary to commence and complete all construction within X-East in accordance with the X-East Approved Model up to the maximum available commitment under the Falls Improvement Trust Credit Agreement (excluding the Supplemental Pump Station Financing).

"**X-West**" means those segments of the T-16 LID that are not in X-East or the Remainder Segments, as identified more particularly in Exhibit 3 to the Disclosure Statement.

"**X-West Approved Model**" means the set of financial projections to complete the segments of the T-16 LID located in the X-West portion of Phase II, approved in writing by the Falls Improvement Trustee, the Reorganized Debtors and, to the extent the projections are applicable to the Substitute P-40 Pump Station, Credit Suisse or its designee.  Any X-West Approved Model shall include an appropriate amount for the cost of outside bond counsel, engineering services, the City of Henderson's engineering review, and a consultant retained by the board of advisors of the Falls Improvement Trust to monitor issues related to the development of the X-West segments of the T-16 LID.  The X-West Approved Model may be modified from time to time after the Effective Date so long as each modified X-West Approved Model is approved in writing by the board of advisors for the Falls Improvement Trust, the Falls Improvement Trustee, the Reorganized Debtors and, to the extent applicable to the Substitute P-40 Pump Station, Credit Suisse or its designee.  The X-West Approved Model shall make provision for the construction of the Substitute P-40 Pump Station on land owned by the Reorganized Debtors if the Carmel Settlement Condition is not satisfied.  A substantially final form of the X-West Approved Model that will apply if the Carmel Settlement Condition is not satisfied is attached as Exhibit N to the Plan.  Any revisions or amendments thereto shall be filed by the Exhibit Filing Date and, upon such Filing, shall thereupon become Exhibit N to the Plan.

"**X-West Loan**" means the term loan, exclusive of the X-West Supplemental Loan, if the Phase II Landowner Settlement Condition is satisfied, made to the Falls Improvement Trust pursuant to the Falls Improvement Trust Credit Agreement, in conjunction with the proceeds from the T-16 LID, to provide the Falls Improvement Trust with the funding necessary to commence and

29

complete all construction within X-West in accordance with the X-West Approved Model up to the maximum available commitment under the Falls Improvement Trust Credit Agreement (excluding the Supplemental Pump Station Financing).

**"X-West Supplemental Loan"** means up to $5 million of the $10 million in Supplemental Pump Station Financing for the purpose of constructing the Substitute P-40 Pump Station in accordance with the X-West Approved Model if the Carmel Settlement Condition is not satisfied and the Phase II Landowner Settlement Condition is satisfied, to be advanced by the Reorganized Debtors to the Falls Improvement Trust.

**B.      Rules of Construction.**

1.      The rules of construction in Bankruptcy Code section 102 apply to the Plan to the extent not inconsistent herewith.

2.      Bankruptcy Rule 9006(a) applies when computing any time period under the Plan.

3.      A term that is used in the Plan and that is not defined in the Plan has the meaning attributed to that term, if any, in the Bankruptcy Code or the Bankruptcy Rules.

4.      The definition given to any term or provision in the Plan supersedes and controls any different meaning that may be given to that term or provision in the Disclosure Statement.

5.      Whenever it is appropriate from the context, each term, whether stated in the singular or the plural, includes both the singular and the plural.

6.      Any reference to a document or instrument being in a particular form or on particular terms means that the document or instrument will be substantially in that form or on those terms.  No material change to the form or terms may be made after the Confirmation Date without the consent of any party materially adversely affected.

7.      Any reference to an existing document means the document as it has been, or may be, amended or supplemented.

8.      Unless otherwise indicated, the phrase "under the Plan" and similar words or phrases refer to the Plan in its entirety rather than to only a portion of the Plan.

9.      Unless otherwise specified, all references to Sections or Exhibits are references to the Plan's Sections or Exhibits.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

10.    The words "herein," "hereto," "hereunder," and other words of similar import refer to the Plan in its entirety rather than to only a particular portion hereof.

11.    Each provision of the Plan that conditions an act on the consent or approval of the DIP Agent or Pre-Petition Agent shall be deemed to require that the Requisite DIP Lenders or the Requisite Pre-Petition Lenders, as applicable, give their respective agent their consent, approval, authorization or direction to consent to or to approve such act.  The final form of each agreement, exhibit or document provided for in the Plan shall be subject to the consent or approval of the DIP Agent or Pre-Petition Agent, as applicable, and shall be deemed to require that the Requisite DIP Lenders or the Requisite Pre-Petition Lenders, as applicable, give their respective agent their consent, approval, authorization or direction to consent to or to approve such document, exhibit or agreement under the Plan.

## II.

## DESIGNATION OF CLASSES AND TREATMENT OF CLAIMS AND INTERESTS

### A.    <u>Summary and Classification of Claims and Interests</u>.

This Section classifies Claims and Interests — except for Administrative Claims and Priority Tax Claims, which are not classified — for all purposes, including voting, confirmation, and distribution under the Plan.  A Claim or Interest is classified in a Class only to the extent that the Claim or Interest falls within the Class description.  To the extent that part of the Claim or Interest falls within a different Class description, the Claim or Interest is classified in that different Class.

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, NO DISTRIBUTIONS WILL BE MADE AND NO RIGHTS WILL BE RETAINED ON ACCOUNT OF ANY CLAIM THAT IS NOT AN ALLOWED CLAIM.**

The treatment in the Plan is in full and complete satisfaction of the legal, contractual, and equitable rights (including any liens) that each entity holding an Allowed Claim or an Interest may have in or against the Debtors, the Estates, or their respective property.  This treatment supersedes and replaces any agreements or rights those entities may have in or against the Debtors, the Estates, or their respective property.  All distributions in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claim, as determined for federal income tax purposes, and thereafter, to the remaining portion of such Allowed Claim, if any.

31

**B.**    **Allowance and Treatment of Unclassified Claims (Administrative Claims and Priority Tax Claims).**

    **1.**    **Administrative Claims.**

        **a.**    **Allowance of Administrative Claims.**

**Allowance of Ordinary Course Administrative Claims:**   An entity holding an Ordinary Course Administrative Claim may, but need not, File a motion or request for payment of its Claim. The Reorganized Debtors or any other party in interest may File an objection to an Ordinary Course Administrative Claim in their discretion.  Unless a party in interest objects to an Ordinary Course Administrative Claim, such Claim will be an Allowed Claim in accordance with the terms and conditions of the particular transaction that gave rise to the Claim.

**Allowance of Professional Fee Claims:**   Unless otherwise expressly provided in the Plan, a Professional Fee Claim will be an Allowed Claim only if, and to the extent that:

    (i)     on or before sixty (60) days after the Effective Date, the entity holding such Professional Fee Claim both Files with the Court a final fee application or a motion requesting allowance of the fees and reimbursement of expenses and serves the application or motion on the Reorganized Debtors and the U.S. Trustee; and

    (ii)     the Court determines it is an Allowed Claim.

    The Reorganized Debtors or any other party in interest may File an objection to such application or motion by no later than thirty (30) days after the Filing and service of such application or motion. Entities holding Professional Fee Claims that do not timely File and serve a fee application or motion for allowance of a Professional Fee Claim will be forever barred from asserting those Claims against the Debtors, the Reorganized Debtors, the Estates, or their respective property.

**Allowance of Cure Claims:**   Cure Claims shall be allowed in accordance with the procedures set forth in Section III.A.2 below.

**Allowance of Non-Ordinary Course Administrative Claims:**   Unless otherwise expressly provided in the Plan, Non-Ordinary Course Administrative Claims will be Allowed Claims only if:

    (i)     on or before sixty (60) days after the Effective Date, the entity holding such Non-Ordinary Course Administrative Claim both Files with the Court a motion requesting allowance of

the Non-Ordinary Course Administrative Claim and serves the motion on the Reorganized Debtors and the U.S. Trustee; and

(ii)      the Court determines it is an Allowed Claim.

The Reorganized Debtors or any other party in interest may File an objection to such motion within thirty (30) days after the expiration of the deadline for the Filing of a Non-Ordinary Course Administrative Claim set forth in subparagraph (i), above (*i.e.*, within ninety (90) days after the Effective Date), unless such time period for Filing such objection is extended by the Court.  Entities holding Non-Ordinary Course Administrative Claims that do not timely File and serve a request for payment will be forever barred from asserting those Claims against the Debtors, the Reorganized Debtors, the Estates, or their respective property.

**Allowance of 503(b)(9) Claims:**  Unless otherwise expressly provided in the Plan, 503(b)(9) Claims will be Allowed Claims only if:

(i)      on or before sixty (60) days after the Effective Date, the entity holding such 503(b)(9) Claim both Files with the Court a motion requesting allowance of the 503(b)(9) Claim and serves the motion on the Reorganized Debtors and the U.S. Trustee; and

(ii)      the Court determines it is an Allowed Claim.

The Reorganized Debtors or any other party in interest may File an objection to such motion within thirty (30) days after the expiration of the deadline for the Filing of a 503(b)(9) Claim set forth in subparagraph (i), above (*i.e.*, within ninety (90) days after the Effective Date), unless such time period for Filing such objection is extended by the Court.  Entities holding 503(b)(9) Claims that do not timely File and serve a request for payment will be forever barred from asserting those Claims against the Debtors, the Reorganized Debtors, the Estates, or their respective property.

### b.      Treatment of Administrative Claims.

**Treatment of Allowed Ordinary Course Administrative Claims:**  Unless otherwise agreed, Allowed Ordinary Course Administrative Claims will be paid by the Reorganized Debtors in accordance with the terms and conditions of the particular transaction that gave rise to the Allowed Claim.

**Treatment of Professional Fee Claims:**  Unless otherwise agreed, an Allowed Professional Fee Claim will be paid by the Reorganized Debtors within ten (10) days after the date on which the Court determines such Claim is an Allowed Claim.

**Treatment of Cure Claims:**  The Debtors will pay the Allowed amounts of Cure Claims to the non-Debtor parties to the executory contracts or unexpired leases in accordance with Section III.A.2 below.

**Treatment of U.S. Trustee Fees Under 28 U.S.C. § 1930:**  The Reorganized Debtors will pay to the U.S. Trustee all fees due and owing under 28 U.S.C. § 1930 on the Effective Date.

**Treatment of Non-Ordinary Course Administrative Claims:**  Unless the entity holding a Non-Ordinary Course Administrative Claim Allowed by the Court agrees to different treatment, the Reorganized Debtors will pay the full amount of such Allowed Non-Ordinary Course Administrative Claim, without interest, on the later of:  (i) ten (10) days after the Effective Date, or (ii) ten (10) days after the date on which the Court determines such Claim is an Allowed Claim.

**Treatment of 503(b)(9) Claims:**  Unless the entity holding a 503(b)(9) Claim allowed by the Court agrees to different treatment, the Reorganized Debtors will pay the full amount of such Allowed 503(b)(9) Claim, without interest, on the later of: (i) ten (10) days after the Effective Date, or (ii) ten (10) days after the date on which the Court determines such Claim is an Allowed Claim.

**Treatment of Claims Under the DIP Facility:**  The DIP Lenders will receive, on the Effective Date, in full and final satisfaction of their Claims under the DIP Facility, including Claims for participating cash flow or other participating interest (i) their Pro Rata share of 94% of the New Membership Interests in Reorganized LLV Holdco, subject to dilution upon exercise of the New Warrants, (ii) 100% of the New Membership Interests in Reorganized LLVJV and Reorganized LLV-1, which the DIP Lenders shall contribute to Reorganized LLV Holdco, (iii) 100% of the New Membership Interests in Reorganized Vineyard, which the DIP Lenders shall contribute to Reorganized LLVJV, and (iv) 100% of the New Membership Interests in Reorganized LLV Four Corners, which the DIP Lenders shall contribute to Reorganized LLVJV and Reorganized LLV-1 such that Reorganized LLVJV receives 27.32% of such New Membership Interests and Reorganized LLV-1 receives 72.68% of such New Membership Interests.  Any portion of the DIP Facility that has

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

not been expended by the Effective Date shall be retained by the Reorganized Debtors and treated as capital contributed to Reorganized LLV Holdco by the DIP Lenders and the Pre-Petition Lenders, and the DIP Lenders and the Pre-Petition Lenders shall have no claim or recourse to such unexpended remaining proceeds.

### 2.     Priority Tax Claims.

Unless otherwise agreed, the Reorganized Debtors will pay to an entity holding an Allowed Priority Tax Claim the full amount of the Allowed Priority Tax Claim, plus interest calculated at the federal judgment rate, in equal, amortized, annual installments beginning on the first anniversary of the Petition Date that falls on a date following the occurrence of the Effective Date and, thereafter, on each anniversary of the Petition Date through the fifth anniversary of the Petition Date.

### C.     Classification and Treatment of Classified Claims and Interests.

### 1.     Class 1 (Pre-Petition Lender Claims).

**Classification:**   Class 1 consists of Pre-Petition Lender Claims, including any Secured Claims, Administrative Claims and Priority Claims against the following Debtors: (i) Lake at Las Vegas Joint Venture, LLC, (ii) LLV-1, LLC, (iii) LLV Holdco, LLC (iv) Lake Las Vegas Properties, L.L.C., (v) NorthShore Golf Club, L.L.C., (vi) P-3 at MonteLago Village, LLC, (vii) The Golf Club at Lake Las Vegas, LLC, (viii) Marina Investors, L.L.C., (ix) LLV VHI, L.L.C., (x) TCH Development, L.L.C., (xi) TC Technologies, L.L.C., (xii) SouthShore Golf Club, L.L.C., and (xiii) Neva Holdings, L.L.C.

**Impairment:**        ☒     Impaired        ☐     Unimpaired

**Voting Rights:**  Class 1 is entitled to vote on the Plan.

**Treatment:**  Holders of Allowed Class 1 Claims will receive, in full and final satisfaction of their Allowed Class 1 Claims, their Pro Rata share of (i) 1% of the New Membership Interests in Reorganized LLV Holdco, (ii) the New Warrants, and (iii) the Pre-Petition Lender Net Litigation Proceeds Share.  In addition, each member of Class 1 shall be deemed to have made its Pro Rata share of the Pre-Petition Lender LID Contribution, if applicable.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

2.      **Class 2 (LID Acquisition Claim).**

**Classification:**  Class 2 consists of the LID Acquisition Claim.

**Impairment:**    ☐   Impaired      ☒   Unimpaired

**Voting Rights:**   Class 2 is not entitled to vote on the Plan because this Class is Unimpaired and therefore deemed to accept the Plan.

**Treatment:**  The Debtors dispute that the Class 2 Claim is an Allowed Secured Claim.  If Allowed, the holder of the Class 2 Claim will receive the Secured Claims Treatment.

3.      **Class 3 (Nevada State Bank and Gamma 4C LLC Claims)**

**Classification:**   Class 3 (and each subclass of Class 3) consists of the following Claims held on the Effective Date by the below-named creditor against the applicable Debtor, as set forth in the chart below:

| Plan Subclass | Creditor/Claimant | Debtor Against Which Claims Are Asserted |
|---|---|---|
| 3A | Nevada State Bank | Lake at Las Vegas Joint Venture, LLC |
| 3B | Gamma 4C LLC | Lake at Las Vegas Joint Venture, LLC |

a.      **Class 3A**

**Impairment:**      ☒   Impaired      ☐   Unimpaired

**Voting Rights:**  Class 3A is entitled to vote on the Plan.

**Treatment:**  Class 3A Claims consist of Claims held by Nevada State Bank on the Effective Date that are secured by certain real property owned by a limited liability company in which LLV Four Corners holds a membership interest.  Holders of Allowed Class 3A Claims will receive a note issued by Reorganized LLVJV which has the following principal terms:

a.      Principal Face Amount:  The amount of such holders' Allowed Class 3A Claims shall be no greater than the value of such holders' interest in the collateral securing such Claims.

b.      Interest:  The interest rate will be the Prime Rate of interest on the Effective Date plus 2% per annum, with interest to be paid quarterly.  All interest shall accrue as simple interest.

c.      Amortization.  Not amortized.

36

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067-6049
Telephone: (310) 407-4000

d.      Maturity Date:  December 31, 2012.

e.      Prepayment Penalty:  None.

f.      Security:  The note shall be secured by the same collateral that secured the Allowed Class 3A Claims prior to the Effective Date.

g.      Non-Recourse:  The note shall be non-recourse to Reorganized LLVJV, and the holders shall have recourse only against the collateral.

**b.      Class 3B**

**Impairment:**      ☐    Impaired      ☒    Unimpaired

**Voting Rights:**  Class 3B is entitled to vote on the Plan.

**Treatment:**  Class 3B Claims consist of Claims held by Gamma 4C LLC on the Effective Date that are secured by certain real property owned by a limited liability company in which LLV Four Corners holds a membership interest.  The treatment of the Class 3B Claims shall be set forth in that certain *Stipulated Adequate Protection Order Concerning Deeds of Trust Held by Gamma4C Against Real Property Commonly Known as 1600 Lake Las Vegas Pkwy* [Docket No. 2341], by and between Gamma 4C LLC and LLVJV, which is incorporated by reference as if set forth fully herein.

**4.      Class 4 (Senior Mechanics' Lien Claims)**

**Classification:**  Class 4 (and each subclass of Class 4) consists of the following asserted Senior Mechanics' Lien Claims held by the below-named creditor against the applicable Debtor, as set forth in the chart below:

| Plan Subclass | Creditor/Claimant | Debtor Against Which Senior Mechanics' Lien Claim Is Asserted |
|---|---|---|
| 4A | Bombard Electric, LLC | Lake at Las Vegas Joint Venture, LLC |
| 4B | Commercial Roofers, Inc. | Lake at Las Vegas Joint Venture, LLC |
| 4C | Consolidated Mechanical Contractors | Lake at Las Vegas Joint Venture, LLC |
| 4D | Culinary Staffing Service of Las Vegas, LLC | Lake at Las Vegas Joint Venture, LLC |
| 4E | Dynamic Plumbing | Lake at Las Vegas Joint Venture, LLC |
| 4F | Hart Howerton, Inc. | Lake at Las Vegas Joint Venture, LLC |

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

| 4G | Henderson Floor Coverings, Inc. d/b/a Cloud Carpet & Draperies | Lake at Las Vegas Joint Venture, LLC |
|---|---|---|
| 4H | Lake Las Vegas Marina, LLC | Lake at Las Vegas Joint Venture, LLC |
| 4I | Lake Las Vegas Electric | Lake at Las Vegas Joint Venture, LLC |
| 4J | Las Vegas Paving Corp. | Lake at Las Vegas Joint Venture, LLC |
| 4K | Peridian International, Inc. | Lake at Las Vegas Joint Venture, LLC |
| 4L | Scott Zemp Masonry Inc. | Lake at Las Vegas Joint Venture, LLC |
| 4M | Stanley Consultants, Inc. | Lake at Las Vegas Joint Venture, LLC |
| 4N | Tracy & Ryder Landscape, Inc. | Lake at Las Vegas Joint Venture, LLC |
| 4O | WRG Design, Inc. | Lake at Las Vegas Joint Venture, LLC |
| 4P | Cummins Rocky Mountain LLC | LLV-1, LLC |
| 4Q | Danville Land Investments, LLC | LLV-1, LLC |
| 4R | Las Vegas Paving Corp. | LLV-1, LLC |
| 4S | Norris Design, Inc. | LLV-1, LLC |
| 4T | Peridian International, Inc. | LLV-1, LLC |
| 4U | Slater Hanifan Group | LLV-1, LLC |
| 4V | Stanley Consultants Inc. | LLV-1, LLC |
| 4W | TOUSA Homes, Inc. | LLV-1, LLC |
| 4X | West Coast Turf | SouthShore Golf Club, L.L.C. |
| 4Y | Other Senior Mechanics' Lien Claims | Any Debtor |

**Impairment:**  ☒  Impaired        ☐  Unimpaired

**Voting Rights:**  Classes 4A - 4Y are entitled to vote on the Plan.

**Treatment:**  Unless a holder agrees to other treatment, and subject to each holder's right, if any, to make a T-16 Improvement Vendor Claims Election, each holder of an Allowed Claim in Classes 4A - 4Y shall receive, in the sole discretion of the Reorganized Debtors, the following treatment on or before the later of:  (a) ten (10) days after the Effective Date; and (b) ten (10) days after the date on which such Senior Mechanics' Lien Claim becomes an Allowed Claim:  either (i) the Secured Claims

38

Treatment, or (ii) a Mechanics' Lien Note.  In the event such holder receives a Mechanics' Lien Note, such holder will retain its statutory lien and the Mechanics' Lien Note shall set forth the payment terms with respect to such lien.  Further, if the holder of a Mechanics' Lien Claim is entitled to make a T-16 Improvement Vendor Claims Election with respect to its Mechanics' Lien Claim, and timely makes such election, then such entity shall hold a Class 9 Claim (without any requirement that it establish that it holds a Senior Mechanics' Lien Claim) and receive the treatment accorded to Class 9 Claims, and not receive the treatment accorded to Senior Mechanics' Lien Claims.

### 5.     Class 5 (Other Secured Claims)

**Classification**:  Class 5 (and each subclass of Class 5) consists of Other Secured Claims asserted against the applicable Debtor on the chart below:

| Plan Subclass | Debtor Against Which Other Secured Claim Is Asserted |
|---|---|
| 5A | Lake at Las Vegas Joint Venture, LLC |
| 5B | LLV-1, LLC |
| 5C | LLV Holdco, LLC |
| 5D | Lake Las Vegas Properties, L.L.C. |
| 5E | LLV Four Corners, LLC |
| 5F | NorthShore Golf Club, L.L.C. |
| 5G | P-3 at MonteLago Village, LLC |
| 5H | The Golf Club at Lake Las Vegas, LLC |
| 5I | Marina Investors, L.L.C. |
| 5J | The Vineyard at Lake Las Vegas, L.L.C. |
| 5K | LLV VHI, L.L.C. |
| 5L | TCH Development, L.L.C. |
| 5M | TC Technologies, L.L.C. |
| 5N | SouthShore Golf Club, L.L.C. |
| 5O | Neva Holdings, L.L.C. |

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

**Impairment:**  ☐    Impaired    ☒    Unimpaired

**Voting Rights:**  Classes 5A - 5O are not entitled to vote on the Plan because these Classes are Unimpaired and therefore deemed to accept the Plan.

**Treatment:**  Holders of Allowed Claims in Classes 5A - 5O will receive the Secured Claims Treatment.

### 6.    Class 6 (Priority Claims, other than Priority Tax Claims)

**Classification**:  Class 6 (and each subclass of Class 6) consists of Priority Claims (other than Priority Tax Claims) asserted against the applicable Debtor on the chart below:

| Plan Subclass | Debtor Against Which Priority Claim Is Asserted |
|---|---|
| 6A | Lake at Las Vegas Joint Venture, LLC |
| 6B | LLV-1, LLC |
| 6C | LLV Holdco, LLC |
| 6D | Lake Las Vegas Properties, L.L.C. |
| 6E | LLV Four Corners, LLC |
| 6F | NorthShore Golf Club, L.L.C. |
| 6G | P-3 at MonteLago Village, LLC |
| 6H | The Golf Club at Lake Las Vegas, LLC |
| 6I | Marina Investors, L.L.C. |
| 6J | The Vineyard at Lake Las Vegas, L.L.C. |
| 6K | LLV VHI, L.L.C. |
| 6L | TCH Development, L.L.C. |
| 6M | TC Technologies, L.L.C. |
| 6N | SouthShore Golf Club, L.L.C. |
| 6O | Neva Holdings, L.L.C. |

**Impairment:**  ☐    Impaired    ☒    Unimpaired

**Voting Rights:**  Classes 6A - 6O are not entitled to vote on the Plan because these Classes are Unimpaired and therefore deemed to accept the Plan.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

**Treatment:**  Holders of Allowed Claims in Classes 6A - 6O will receive the following treatment: The legal, equitable, and contractual rights of holders of Priority Claims are unaltered by the Plan. Unless such holder agrees to other treatment, on or as soon as reasonably practicable after the Effective Date, a holder of a Priority Claim shall receive, in full satisfaction of its Priority Claim, cash in the full amount of such Priority Claim on or before the latest of:  (a) ten (10) days after the Effective Date; (b) ten (10) days after the date on which such Priority Claim becomes an Allowed Claim; and (c) the date on which such Priority Claim first becomes due and payable in accordance with its terms.  To the extent that a Priority Claim is not paid on the Effective Date, if otherwise due and payable in accordance with its terms on or prior to such date, then the Priority Claim will accrue interest at the federal judgment interest rate from the Effective Date through the date of payment of such Priority Claim, which interest shall be paid at the time the Priority Claim is paid.

### 7.    Class 7 (General Unsecured Claims)

**Classification**:  Class 7 (and each subclass of Class 7) consists of General Unsecured Claims (including, as to Class 7J, the Pre-Petition Lender Class 7J Claims, but not including, as to all subclasses of Class 7, Phase II Landowner Claims, T-16 Improvement Vendor Claims or the deficiency Claims of the Pre-Petition Lenders) asserted against the applicable Debtor on the chart below.  The Plan provides for the benefits of the Settlement for Class 7 and provides also that each subclass of Class 7 that votes to accept the Plan thereby consents to the substantive consolidation of the Estates in accordance with the terms of Section IV.A of the Plan.

| Plan Subclass | Debtor Against Which General Unsecured Claim Is Asserted |
|---|---|
| 7A | Lake at Las Vegas Joint Venture, LLC |
| 7B | LLV-1, LLC |
| 7C | LLV Holdco, LLC |
| 7D | Lake Las Vegas Properties, L.L.C. |
| 7E | LLV Four Corners, LLC |
| 7F | NorthShore Golf Club, L.L.C. |
| 7G | P-3 at MonteLago Village, LLC |

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

| 7H | The Golf Club at Lake Las Vegas, LLC |
|----|----|
| 7I | Marina Investors, L.L.C. |
| 7J | The Vineyard at Lake Las Vegas, L.L.C. |
| 7K | LLV VHI, L.L.C. |
| 7L | TCH Development, L.L.C. |
| 7M | TC Technologies, L.L.C. |
| 7N | SouthShore Golf Club, L.L.C. |
| 7O | Neva Holdings, L.L.C. |

**Impairment:**    ☒    Impaired       ☐    Unimpaired

**Voting Rights:**  Classes 7A - 7O are entitled to vote on the Plan.

**Treatment:**  For each of Classes 7A - 7O that accepts the Plan, holders of Allowed Claims in the accepting Class will each receive their Pro Rata share of (i) the $1,000,000 contributed to the Creditor Trust for the benefit of holders of Class 7 Claims; and (ii) the Class 7 Net Litigation Proceeds Share; <u>provided</u>, <u>however</u>, that if such a holder of a claim in Class 7A, 7B or 7J is entitled to make a Phase II Landowner Claims Election or a T-16 Improvement Vendor Claims Election, and such holder timely makes such election, then such holder shall be deemed to have accepted the Plan and to hold, as applicable, a Claim in Class 8 (if the Phase II Landowner Claims Election was made) or a Claim in Class 9 (if the T-16 Improvement Vendor Claims Election was made); and, <u>provided</u>, <u>further</u>, that, pursuant to the Settlement, any distribution to the Pre-Petition Lenders on account of their Pre-Petition Lender Class 7J Claims shall be distributed Pro Rata to all other holders of General Unsecured Claims.  For each of Classes 7A - 7O that rejects the Plan, holders of Allowed Claims a rejecting Class will receive the Alternative Claim Treatment, and the Alternative Claim Treatment shall not be calculated on a substantively consolidated basis.

<b>8.    Class 8 (Phase II Landowner Claims)</b>

**Classification:**  Class 8 consists of Claims of the Phase II Landowners that have timely made the Phase II Landowner Claims Election.

**Impairment:**    ☐    Impaired       ☒    Unimpaired

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

**Voting Rights:**  By virtue of making the Phase II Landowner Claims Election, a holder of a Class 8 Claim is deemed to accept the Plan.

**Treatment:**  Holders of Allowed Claims in Class 8 will receive and retain no value under the Plan and shall not receive payment of any consideration, other than (i) such benefits as are provided by the Phase II Landowner Settlement Agreement, including, but not limited to, adjustment of the lot lines; (ii) benefits as third-party beneficiaries from the build-out of the Falls Improvement Trust; and (iii) their Pro Rata share of the Class 8 Net Litigation Proceeds Share.

### 9.    Class 9 (T-16 Improvement Vendor Claims)

**Classification:**  Class 9 consists of Claims of the T-16 Improvement Vendors that have timely made the T-16 Improvement Vendor Claims Election:

**Impairment:**    ☐    Impaired    ☒    Unimpaired

**Voting Rights:**  By virtue of making the T-16 Improvement Vendor Claims Election, a holder of a Class 9 Claim is deemed to accept the Plan.

**Treatment:**  The Claims in Class 9 are deemed Allowed for purposes of their treatment as T-16 Improvement Vendor Claims in the amounts set forth in their T-16 LID Improvement Vendor Settlement Agreements.  Each Holder of an Allowed Claim in Class 9 will receive:

(a)    its Pro Rata share of the Class 9 Net Litigation Proceeds Share, and

(b)    (i)    40% of the amounts owed to it, as specifically set forth in its T-16 LID Improvement Vendor Settlement Agreement, on account of goods or services provided to the Debtors with respect to the T-16 LID prior to the Petition Date with respect to which the Falls Improvement Trust is entitled to receive payments, and

(ii)    10% of the amounts owed to it, as specifically set forth in its T-16 LID Improvement Vendor Settlement Agreement, on account of goods or services provided to the Debtors with respect to the T-16 LID prior to the Petition Date with respect to which the Falls Improvement Trust is not entitled to receive payments.

Payment pursuant to subsection (b) will be made as follows:

(A)    If no T-16 Improvement MAC Event has then occurred, payments shall be made to holders of Class 9 Claims by the Falls Improvement Trust within thirty (30) days of receipt

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

43

by the Falls Improvement Trust of cash payments under the T-16 LID Acquisition Agreement for the T-16 LID segment to which such holder's T-16 Improvement Vendor Claim relates; provided, however, that (x) if the Carmel Settlement Condition is not satisfied, then the distribution on account of the T-16 Improvement Vendor Claims in respect of the P-40 Pump Station will be paid within thirty (30) days after the last day to satisfy the Carmel Settlement Condition; and (y) T-16 Improvement Vendor Claims in respect of works of improvement in X-East or the Remainder Segments shall be paid within thirty (30) days after completion of X-West pursuant to the X-West Approved Model unless there is, at that time, an X-East Approved Model or a Remainder Segments Model, as applicable.

(B)     If a T-16 Improvement MAC Event has occurred, the Plan distributions on account of Allowed Class 9 Claims (excluding the Class 9 Net Litigation Proceeds Share) not theretofore made shall be made by the Falls Improvement Trust within thirty (30) days after the T-16 Improvement MAC Payment is received by the Falls Improvement Trust.

### 10.    Class 10 (Interests)

**Classification**:  Class 10 (and each subclass of Class 10) consists of Interests asserted against the applicable Debtor on the chart below:

| Plan Subclass | Debtor Against Which Interest Is Asserted |
|---|---|
| 10A | Lake at Las Vegas Joint Venture, LLC |
| 10B | LLV-1, LLC |
| 10C | LLV Holdco, LLC |
| 10D | Lake Las Vegas Properties, L.L.C. |
| 10E | LLV Four Corners, LLC |
| 10F | NorthShore Golf Club, L.L.C. |
| 10G | P-3 at MonteLago Village, LLC |
| 10H | The Golf Club at Lake Las Vegas, LLC |
| 10I | Marina Investors, L.L.C. |
| 10J | The Vineyard at Lake Las Vegas, L.L.C. |
| 10K | LLV VHI, L.L.C. |

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

44

| 10L | TCH Development, L.L.C. |
|-----|-------------------------|
| 10M | TC Technologies, L.L.C. |
| 10N | SouthShore Golf Club, L.L.C. |
| 10O | Neva Holdings, L.L.C. |

### a.    Classes 10A, 10B, 10C, 10E and 10J

**Impairment:** ☒  Impaired    ☐  Unimpaired

**Voting Rights:** Classes 10A, 10B, 10C, 10E and 10J are not entitled to vote on the Plan because these Classes are deemed to reject the Plan.

**Treatment:** Holders of Interests in Classes 10A, 10B, 10C, 10E and 10J will receive and retain no value under the Plan and such Interests will be cancelled on the Effective Date without payment of any consideration.

### b.    Classes 10D, 10F, 10G, 10H, 10I, 10K, 10L, 10M, 10N, and 10O

**Impairment :** ☐  Impaired    ☒  Unimpaired

**Voting Rights:** Classes 10D, 10F, 10G, 10H, 10I, 10K, 10L, 10M, 10N, and 10O are not entitled to vote on the Plan because these Classes are Unimpaired and therefore deemed to accept the Plan.

**Treatment:** Holders of Interests in Classes 10D, 10F, 10G, 10H, 10I, 10K, 10L, 10M, 10N, and 10O will retain their Interests notwithstanding the occurrence of the Effective Date. Notwithstanding the foregoing, if a Class of General Unsecured Claims against a Debtor rejects the Plan, then holders of Interests against that same Debtor will receive the Alternative Interest Treatment.

## III.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption of Executory Contracts and Unexpired Leases.

#### 1.    Assumption of Agreements.

On the Effective Date, the Reorganized Debtors shall assume all executory contracts and unexpired leases of the Debtors listed on the Schedule of Assumed Agreements.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

45

The Debtors, with the consent of the DIP Agent, reserve the right to amend the Schedule of Assumed Agreements at any time prior to the Effective Date to: (a) delete any executory contract or unexpired lease and provide for its rejection under the Plan or otherwise, or (b) add any executory contract or unexpired lease and provide for its assumption under the Plan. The Debtors will provide notice of any amendment to the Schedule of Assumed Agreements to the party or parties to any agreement affected by the amendment.

The Confirmation Order will constitute a Court order approving the assumption, on the Effective Date, of all executory contracts and unexpired leases identified on the Schedule of Assumed Agreements.

### 2. Cure Claims.

Exhibit K contains a list of proposed amounts of Cure Claims for all contracts or leases scheduled to be assumed. The Reorganized Debtors shall pay Allowed Cure Claims on or before ten (10) days following the Effective Date, or on such other terms as the parties to each such executory contract or unexpired lease may otherwise agree. In the event of a dispute regarding (a) the amount of any Cure Claim, (b) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, if applicable, or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(l) of the Bankruptcy Code shall be made promptly when an order resolving the dispute and approving the assumption becomes a Final Order. Pending a Final Order resolving such a dispute, the applicable lease or contract shall be neither assumed nor rejected, and the Reorganized Debtors may, no later than ten (10) days following a Final Order resolving such dispute, elect to reject the lease or contract subject to the dispute.

### 3. Objections to Assumption.

Any entity who is a party to an executory contract or unexpired lease that will be assumed under the Plan and that objects to such assumption or the amount of the Debtors' proposed Cure Claim must File with the Court and serve upon interested parties a written statement and supporting declaration stating the basis for its objection. This statement and declaration must be Filed and served by no later than ten (10) days prior to the Confirmation Hearing. Any entity that fails to timely File

46

and serve such a statement and declaration will be deemed to waive any and all objections to the proposed assumption of its contract or lease and the amount of the Debtors' proposed Cure Claim. In the absence of a timely objection by an entity who is a party to an executory contract or unexpired lease, the Confirmation Order shall constitute a conclusive determination as to the amount of any cure and compensation due under the executory contract or unexpired lease, and that the Reorganized Debtors have demonstrated adequate assurance of future performance with respect to such executory contract or unexpired lease. If the Debtors amend Exhibit K, then any entity that is a party to an executory contract or unexpired lease that is affected by the amendment shall have fourteen (14) days from the giving of notice of any such amendment to object to the amendment.

**4.    Resolution of Claims Relating to Assumed Agreements.**

In accordance with the procedures set forth in Section III.A.2 relating to the payment of the Cure Claims with respect to executory contracts or unexpired leases that will be assumed under the Plan payment of the Cure Claim shall be deemed to satisfy, in full, any pre-petition or post-petition arrearage or other Claim asserted in a filed proof of Claim or listed in the Schedules, irrespective of whether the amount of the Cure Claim is less than the amount set forth in such proof of Claim or the Schedules. Upon the tendering of the payment of the Cure Claim, any such Claim with respect to such agreement shall be disallowed, without further order of the Court or action by any party.

**B.    Rejection of Executory Contracts and Unexpired Leases.**

**1.    Rejected Agreements.**

On the Effective Date, the Debtors will reject all executory contracts and unexpired leases set forth on the Schedule of Rejected Agreements as well as all executory contracts and unexpired leases neither set forth on the Schedule of Assumed Agreements nor the Schedule of Rejected Agreements nor the Schedule of Deferred Agreements. The Confirmation Order will constitute a Court order approving the rejection, on the Effective Date, of the executory contracts and unexpired leases not previously assumed or deferred under the Plan.

**2.    Special Provision for Recorded "Development CC&Rs".**

The rejection of any Development CC&R shall relieve the Debtors and the Reorganized Debtors (together with their successors and assigns) of any obligation with respect to (i) the

47

construction or funding of any work of improvement to or for the benefit of any other person provided for under such Development CC&R, (ii) the operation or maintenance of any reception or information center, and (iii) the indemnification of any person, but the rejection shall not affect the enforceability of any other properly-recorded covenant, restriction, easement or grant of right or privilege by or between the parties to the Development CC&R.

### 3.    Bar Date for Rejection Damage Claims.

Any Rejection Damage Claim or other Claim for damages arising from the rejection of an executory contract or unexpired lease under the Plan must be Filed and served upon counsel to the Reorganized Debtors within thirty (30) days after the mailing of notice of the occurrence of the Effective Date.  Any such Claims that are not timely Filed and served will be forever barred and unenforceable against the Debtors, the Reorganized Debtors, the Estates, and their respective property, and entities holding these Claims will be barred from receiving any distributions under the Plan on account of such untimely Claims.

### C.    Deferment of the Assumption or Rejection of Certain Contracts.

The decision with respect to the assumption or rejection of the executory contracts listed in the Schedule of Deferred Agreements shall be deferred until no later than the one-year anniversary of the Effective Date.  On or before such date, the applicable Reorganized Debtor shall File and serve a notice of assumption or rejection on the counterparty to the applicable contract, together with the proposed amount of the Cure Claim.  Any objection to the proposed assumption or to the proposed amount of the Cure Claim, if the contract is being assumed, shall be Filed within thirty (30) days following service of the notice of assumption and shall otherwise comply with the provisions of Section III.A.3 hereof.  The provisions of Section III.A.4 shall apply to any Cure Claims.  If the contract is being rejected, the provisions of Section III.B shall apply, and any Claim arising out of the rejection must be filed within thirty (30) days of the service of the notice of rejection.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

**D.**     **Post-Petition Contracts and Leases.**

Except as expressly provided in the Plan or the Confirmation Order, all contracts, leases, and other agreements that the Debtors entered into after the Petition Date will be retained by the Reorganized Debtors.

**IV.**

**MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN**

**A.**     **Substantive Consolidation.**

As of the Effective Date, solely for the purposes of the Plan, the assets, claims, and affairs of the Debtors and their Estates shall be substantively consolidated.  However, if a subclass of Class 7 for a particular Debtor votes to reject the Plan, then the Estate of that Debtor shall not be substantively consolidated with the Estates of the other Debtors unless the Debtors can otherwise establish lawful grounds for substantive consolidation at the hearing on confirmation notwithstanding the rejection by such subclass of Class 7.  As a result of the substantive consolidation, on the Effective Date, all property, rights, and claims of the substantively consolidated Debtors and their Estates, and all Claims against the substantively consolidated Debtors and their Estates shall be deemed pooled for purposes of allowance, treatment, and distributions under the Plan and multiple proofs of Claim on account of any Claim upon which any of the substantively consolidated Debtors are co-obligors or guarantors or otherwise may be contingently liable shall, without necessity of objection by any party, be deemed to constitute a single proof of Claim entitled to a single satisfaction from the substantively consolidated Estates in accordance with the terms of the Plan; the duplicative Claims being otherwise deemed disallowed.  Further, as a result of this substantive consolidation, all Intercompany Claims between substantively consolidated Debtors shall be cancelled without being entitled to any distribution under the Plan.

**B.**     **Exit Facility/Pump Station Loan.**

On the Effective Date, the Reorganized Debtors will consummate the transactions contemplated in the Exit Facility Documents and the Pump Station Credit Agreement.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

C.    **Funding of the Plan**.

Obligations required to be satisfied in cash under the Plan on and after the Effective Date will be satisfied from the Reorganized Debtors' cash on hand, including the remaining proceeds of the DIP Facility, the lease or sale of assets, revenues, and the proceeds of the Exit Facility.

D.    **Creation of the Creditor Trust and Appointment of the Creditor Trustee**.

The Confirmation Order shall approve, effective on the Effective Date, the Creditor Trust Agreement, the establishment of the Creditor Trust and the appointment of the Creditor Trustee. The Creditor Trust will be organized for the primary purpose of liquidating and distributing assets transferred to it including pursuing and prosecuting the Avoidance Actions and the Insider Actions. The activities of the Creditor Trust shall be reasonably necessary to, and consistent with, accomplishing that purpose. The Creditor Trust's liquidation of the assets transferred to it shall not be unreasonably prolonged and its liquidating purpose shall not become so obscured by business activities that its declared purpose of liquidation is lost or abandoned. The Creditor Trust will have no objective to continue or engage in the conduct of trade or business, except to the extent reasonably necessary to, or consistent with, its liquidating purpose.

1.    **Management of the Creditor Trust.**

The Creditor Trust Agreement shall provide for the appointment of one (1) person to act as the Creditor Trustee to administer the Creditor Trust. After the earliest of (i) the expiration of the initial Creditor Trustee's first two-year term, (ii) his or her resignation, or (iii) his or her removal by the board of advisors for cause, then the board of advisors for the Creditor Trust shall select the successor and all subsequent Creditor Trustees; provided, however, that in the case of (i), the board may re-appoint the then serving Creditor Trustee. The Creditor Trustee shall serve without any bond and shall act in accordance with the Creditor Trust Agreement and the Plan. The Creditor Trustee shall be entitled to receive, on a monthly basis, payment of reasonable fees and reimbursement of reasonable expenses, without further Court approval, from the assets of the Creditor Trust, in accordance with the Creditor Trust Agreement.

The Creditor Trustee shall, among other things, have responsibility for formulating and implementing strategy with respect to the pursuit of Insider Actions and Avoidance Actions.

50

There also will be a board of advisors for the Creditor Trust, which will initially consist of two (2) representatives selected by the Pre-Petition Lenders and one (1) representative selected by the Creditors' Committee.  The Creditor Trust Agreement shall provide a mechanism for appointing successor members of the board of advisors of the Creditor Trust.  Among other things, the board of advisors shall consult with the Creditor Trustee as to strategy with respect to Avoidance Actions and Insider Actions and will have approval rights with respect to certain actions taken by the Creditor Trustee with respect thereto, including their settlement, release, transfer or abandonment.

The initial Creditor Trustee and the board of advisors for the Creditor Trust are identified on Exhibit H to the Plan.  Any changes thereto shall be Filed by the Exhibit Filing Date and, upon its Filing, shall become Exhibit H to the Plan.

### 2.    Funding of the Creditor Trust.

The Creditor Trust will be funded on or as soon as reasonably practicable following the Effective Date with the Creditor Trust Assets.

For federal income tax purposes, a transfer of assets to the Creditor Trust for the benefit of holders of Allowed Claims is treated as a transfer of assets to such holders to the extent that such holders are beneficiaries of the Creditor Trust.  The transfer will be treated as a deemed transfer to such holders followed by a deemed transfer by such holders to the Creditor Trust.  Such holders will be treated as the grantors and deemed owners of the Creditor Trust.  The Reorganized Debtors and Creditor Trustee shall jointly determine the valuations of the transferred property by the Creditor Trustee.  Such valuations shall be binding on the beneficiaries of the Creditor Trust, and must be used for all federal income tax purposes.

### 3.    Powers and Duties.

The Creditor Trust shall have the following rights, powers and duties:

a.    hold all of the Creditor Trust Assets:  the Creditor Trust shall have full right, power and discretion to manage such property and execute, acknowledge and deliver any and all instruments as may be appropriate or necessary, as determined by the Creditor Trust in its discretion;

b.    make interim and final distributions of the Creditor Trust Assets to the holders of beneficial interests in the Creditor Trust pursuant to the terms of the Plan;

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067-6049
Telephone: (310) 407-4000

51

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

c.    file objections to General Unsecured Claims and Phase II Landowner Claims;

d.    administer the collection, prosecution, settlement, assignment, conveyance or abandonment of the Avoidance Actions and Insider Actions;

e.    file all tax and regulatory forms, returns, reports and other documents required with respect to the Creditor Trust;

f.    file suit or any appropriate motion for relief in the Court or in any other court of competent jurisdiction to resolve any claim, disagreement, conflict or ambiguity in connection with the exercise of its rights, powers or duties; and

g.    borrow funds under the Creditor Trust Loan or borrow such other funds as the Creditor Trust Agreement permits.

In connection with the above, the Creditor Trust and the Creditor Trustee shall, from the Effective Date, be a representative of the Estates, pursuant to Bankruptcy Code section 1123, appointed for the purposes of, among other things, pursuing the Avoidance Actions and the Insider Actions. In furtherance of that objective, the Creditor Trustee shall have the rights of a trustee under Bankruptcy Code section 1106 as it relates to the Avoidance Actions and the Insider Actions. The Creditor Trust shall have the full power and authority, either in its name or in any of the Debtors' names, to commence, if not already commenced, prosecute, settle, assign, convey and abandon any action related to the Avoidance Actions or the Insider Actions, subject to the approval rights of the board of advisors set forth in the Creditor Trust Agreement. The Creditor Trust shall be authorized to retain professionals without Court approval (which may include existing professionals retained by the Debtors, the Reorganized Debtors or the Creditors' Committee, and which need not be "disinterested"). The reasonable professional fees (including any contingency fees), expenses and costs of such professionals are to be paid out of the assets of the Creditor Trust.

The Creditor Trust may retain a firm to prosecute all Avoidance Actions held by the Creditor Trust and may elect to retain a specialized firm to prosecute Avoidance Actions where the aggregate amount sought from affiliated parties does not exceed $500,000, subject to the discretion of the Creditor Trust's board of advisors and the Creditor Trustee.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

**4.      Terms of Loan to Creditor Trust.**

To the extent that the Creditor Trust obtains a Creditor Trust Loan, then:

a.      the Creditor Trust may not enter into any settlement without the consent of the applicable lender unless the applicable Creditor Trust Loan is paid in full or the terms of the settlement provide for the immediate payment in full of the applicable Creditor Trust Loan; and

b.      the applicable lender will be entitled to repayment of the loan with appropriate interest and other incentives, all of which are to be negotiated with either the Debtors, if prior to the Effective Date, or the Creditor Trustee (subject to the approval of the board of advisors for the Creditor Trust), if after the Effective Date, out of the gross recovery to the Creditor Trust and before any distributions or payments to any other parties in interest (other than potentially the counsel pursuing the applicable action).

**5.      Distribution of Litigation Proceeds.**

The Net Litigation Proceeds shall be distributed as follows:

a.      The Pre-Petition Lender Net Litigation Proceeds Share (80% of the Net Litigation Proceeds) shall be distributed first to the Pre-Petition Agent for application to the indemnification obligations under the Pre-Petition Credit Facility and the DIP Facility, and second to the Pre-Petition Lenders on account of their Pre-Petition Lender Claims.

b.      The Unsecured Beneficiaries Net Litigation Proceeds Share (20% of the Net Litigation Proceeds) shall be distributed as follows: (x) 50% Pro Rata to holders of Allowed Class 7 Claims, (y) 25% Pro Rata to holders of Allowed Class 8 Claims, and (z) 25% Pro Rata to holders of Allowed Class 9 Claims; provided, however, that if the Pump Station Loan is outstanding or the T-16 Improvement MAC Payments have been made, then pursuant to the Phase II Landowner Settlement Agreement and T-16 Improvement Vendor Settlement Agreement, (a) 10% of the Class 8 creditors' share and 10% of the Class 9 creditors' share of the first $3 million of the Unsecured Beneficiaries Net Litigation Proceeds Share, and (b) 50% of the Class 8 creditors' share and 50% of the Class 9 creditors' share of the Unsecured Beneficiaries Net Litigation Proceeds Share over the first $3 million of the Unsecured Beneficiaries Net Litigation Proceeds Share will be collaterally assigned to the lender under the Pump Station Loan, until the Pump Station Loan is repaid.  The

53

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

aggregate distributions to holders of Class 7 Claims, Class 8 Claims and Class 9 Claims are referred to as, respectively, the "Class 7 Net Litigation Proceeds Share," the "Class 8 Net Litigation Proceeds Share," and the "Class 9 Net Litigation Proceeds Share".

### 6.    The Termination of the Creditor Trust.

The Creditor Trust shall be irrevocable.  The Creditor Trust shall terminate when the Creditor Trustee has performed all of its duties under the Plan and the Creditor Trust Agreement, including the final distribution of all the property of the Creditor Trust in respect of holders of beneficial interests in the Creditor Trust, which date shall not be more than five (5) years and one (1) month after the Effective Date; provided, however, the Court may, upon good cause shown, order the Creditor Trust to remain open so long as shall be necessary to prosecute the Avoidance Actions and Insider Actions and liquidate and distribute all its property.  The Court shall retain jurisdiction to interpret and enforce the terms of the Creditor Trust.

### 7.    Additional Provisions of the Creditor Trust Agreement.

In addition to the provisions in the Plan with respect to the Creditor Trust, the Creditor Trust Agreement will provide for, among other things, other actions to be taken by the Creditor Trust and the Creditor Trustee, the removal of the Creditor Trustee or appointment of successor Creditor Trustees, the circumstances under which the Creditor Trustee, in its capacity as such, will be liable for a action or inaction, the effect of actions by the Creditor Trustee, and the indemnification of the Creditor Trustee.  The Creditor Trust Agreement shall also contain language consistent with IRS Revenue Procedure 94-95 establishing that the Creditor Trust is a liquidating trust.  To the extent not set forth in the Plan, the functions and procedures applicable to the Creditor Trust, the powers and duties of the Creditor Trustee, and the rights of the holders of beneficial interests in the Creditor Trust shall be governed by the provisions of the Creditor Trust Agreement.

### E.    Creation of the Falls Improvement Trust and Appointment of the Falls Improvement Trustee.

The Confirmation Order shall approve, effective on the Effective Date if the Phase II Landowner Settlement Condition has been satisfied, the Falls Improvement Trust Agreement, the establishment of the Falls Improvement Trust and the appointment of the Falls Improvement

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Trustee. The Falls Improvement Trust will be organized for the primary purpose of liquidating and distributing assets transferred to it, including taking all necessary action to obtain payment on account of the T-16 Improvement Payment Rights and jointly prosecuting the LID Acquisition Litigation with the Reorganized Debtors and LLV LID Loan Holder. The activities of the Falls Improvement Trust shall be reasonably necessary to, and consistent with, accomplishing that purpose. The Falls Improvement Trust's liquidation of the assets transferred to it shall not be unreasonably prolonged and its liquidating purpose shall not become so obscured by business activities that its declared purpose of liquidation is lost or abandoned. The Falls Improvement Trust will have no objective to continue or engage in the conduct of trade or business, except to the extent reasonably necessary to, or consistent with, its liquidating purpose.

### 1.    Management of the Falls Improvement Trust.

The Falls Improvement Trust Agreement shall provide for the appointment of one (1) person to act as the Falls Improvement Trustee to administer the Falls Improvement Trust. The Falls Improvement Trustee, and any successor, shall be a person not affiliated with the Reorganized Debtors, Debtors, Atalon, or persons affiliated or associated with any entity listed on Exhibit I. Any successor Falls Improvement Trustee will be selected by the Reorganized Debtors until the obligations under the Falls Improvement Trust Credit Agreement have been satisfied in full. Thereafter, the Reorganized Debtors and the Phase II Landowners with land adjacent to the remaining uncompleted T-16 LID segments in the applicable approved model shall select the successor and all subsequent Falls Improvement Trustees for successive one (1) year terms, subject to earlier death, resignation, incapacity or removal as specifically provided in the Falls Improvement Trust Agreement. The Falls Improvement Trustee shall serve without any bond and shall act in accordance with the Falls Improvement Trust Agreement and the Plan. The Falls Improvement Trustee shall be entitled to receive, on a monthly basis, payment of reasonable fees and reimbursement of reasonable expenses, without further Court approval, from the assets of the Falls Improvement Trust, in accordance with the Falls Improvement Trust Agreement.

There also will be a board of advisors for the Falls Improvement Trust, which will consist of two (2) representatives of the Reorganized Debtors, two (2) representatives of Phase II Landowners

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

1    that own real property in X-West, and one (1) representative of the T-16 Improvement Vendors.

2    Upon completion of the X-West segments of the T-16 LID and the satisfaction of the obligations

3    under the X-West Loan (other than the Supplemental Pump Station Financing) in full, and the

4    completion of the Remainder Segments, the board of advisors for the Falls Improvement Trust will

5    consist of one (1) representative of the Reorganized Debtors, and one (1) representative of Phase II

6    Landowners that own real property in X-East.  Among other things, the board of advisors may

7    (i) explore alternative means of developing the X-West and X-East segments of the T-16 LID

8    consistent with the X-West Approved Model and proposed X-East Approved Model, including

9    contracting with one or more general contractors to perform substantially all of the work related to

10   such projects; and (ii) retain a consultant to monitor issues related to the development of the

11   T-16 LID.  The Falls Improvement Trust may also consider and implement the construction or

12   completion of the Remainder Segments pursuant to the Remainder Segments Approved Model

13   provided it determines, as to any segment within the Remainder Segments, that there will be no net

14   cost to such construction, and the construction may be completed without impairing the timing or

15   completion of any segment in X-West.

16        The initial Falls Improvement Trustee and the board of advisors of the Falls Improvement

17   Trust are identified on <u>Exhibit L</u> to the Plan.  Any changes to Exhibit L shall be Filed by the Exhibit

18   Filing Date and, upon such Filing, shall become Exhibit L to the Plan.

19          **2.**    **Funding of the Falls Improvement Trust.**

20        The Falls Improvement Trust will be funded on or as soon as reasonably practicable

21   following the Effective Date with the Falls Improvement Trust Assets.  If the T-16 LID Bond

22   Trustee, under the terms of the T-16 LID Acquisition Agreement or otherwise, declines to make

23   payment to the Falls Improvement Trust and instead makes payment to Reorganized LLV-1, then

24   Reorganized LLV-1 shall accept payment from the T-16 LID Bond Trustee, shall deposit the funds

25   received from the T-16 LID Bond Trustee into an account designated by the Falls Improvement

26   Trustee, and shall irrevocably contribute those funds to the Falls Improvement Trust.

27        For federal income tax purposes, a transfer of assets to the Falls Improvement Trust for the

28   benefit of holders of Allowed Claims is treated as a transfer of assets to such holders to the extent

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

that such holders are beneficiaries of the Falls Improvement Trust. The transfer will be treated as a deemed transfer to such holders followed by a deemed transfer by such holders to the Falls Improvement Trust. Such holders will be treated as the grantors and deemed owners of the Falls Improvement Trust. The Reorganized Debtors and Creditor Trustee shall jointly determine the valuations of the transferred property by the Falls Improvement Trustee. Such valuations shall be binding on the beneficiaries of the Falls Improvement Trust, and must be used for all federal income tax purposes.

### 3.    The T-16 Improvement Project Manager.

The initial T-16 Improvement Project Manager shall be Reorganized LLV-1. Reorganized LLV-1, to the extent it is the T-16 Improvement Project Manager, shall provide a reasonable number of personnel to fulfill its obligations as T-16 Improvement Project Manager. As T-16 Improvement Project Manager, Reorganized LLV-1 shall be responsible for the incidental cost of such personnel such as office space and administrative support reasonably appropriate for managing the T-16 LID, including managing bidding, contracting, project oversight, and the submission of appropriate applications to the City of Henderson to tender completed T-16 LID-related X-West, X-East and Remainder Segments to the City of Henderson and receiving payment therefor from the T-16 LID Bond Trustee. The Falls Improvement Trustee may terminate the T-16 Improvement Project Manager for cause or if the Falls Improvement Trustee concludes in good faith that it will not be possible for the X-West Approved Model to be completed in accordance with its terms due to the T-16 Improvement Project Manager's negligence. Any replacement T-16 Improvement Project Manager shall be subject to the reasonable approval of the lender under the Falls Improvement Trust Credit Agreement so long as the obligations thereunder are outstanding.

### 4.    The Pre-Petition Lender LID Contribution.

If the LID Acquisition Settlement Event has not occurred on or before the Effective Date, then on or as soon as reasonably practicable after the Effective Date, the Pre-Petition Agent and the Pre-Petition Lenders shall assign all their right, title and interest in the Pre-Petition Lender LID Contribution to LLV LID Loan Holder. LLV LID Loan Holder shall hold and be entitled to enforce all rights and remedies in respect of the Pre-Petition Lender LID Contribution and shall be entitled to

57

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

be a party in the LID Acquisition Litigation; provided that it shall contribute any proceeds actually received to the Falls Improvement Trust.  LLV LID Loan Holder shall not be entitled to share in any distribution made to Class 1 under the Plan or to share in any other benefits or rights granted under the Plan to the holders of Pre-Petition Lender Claims.

### 5.    Powers and Duties.

The Falls Improvement Trust shall initially pursue the development of the X-West segments of the T-16 LID in accordance with the X-West Approved Model, including, if applicable, constructing the Substitute P-40 Pump Station.  To facilitate this, the Falls Improvement Trust may borrow funds under the X-West Loan and the Supplemental Pump Station Financing for the purposes specified therein.  After repayment in full of all obligations under the X-West Loan (excluding any portion attributable to the Supplemental Pump Station Financing) and the satisfaction of the other X-East Conditions, the Falls Improvement Trust may pursue the development of the Remainder Segments and/or the X-East segments of the T-16 LID in accordance with the Remainder Segments Approved Model and the X-East Approved Model, and may borrow funds under the Remainder Segments Loan and the X-East Loan, as applicable, to pursue the development of the Remainder Segments and X-East, respectively.

Consistent with the foregoing, the Falls Improvement Trust shall have the following rights, powers and duties:

a.    hold all of the Falls Improvement Trust Assets: the Falls Improvement Trust shall have full right, power and discretion to manage such property and execute, acknowledge and deliver any and all instruments as may be appropriate or necessary, as determined by the Falls Improvement Trust in its discretion;

b.    retain the services of third-party contractors, under terms and conditions which shall be at the sole discretion of the Falls Improvement Trustee and the T-16 Improvement Project Manager , to complete any and all work necessary to obtain payment from the T-16 LID Bond Trustee on account of the T-16 Improvement Payment Rights; provided, however, that the Falls Improvement Trustee shall be required to allow the City of Henderson and the T-16 LID Bond Trustee to pay for the post-Effective Date services of third-party contractors, as reasonably

58

1  necessary;

2      c.    initiate borrowings under, and make repayments of, the X-West Loan, the

3  Supplemental Pump Station Financing, the Remainder Segments Loan, and the X-East Loan for the

4  purposes, and under the conditions specified therein;

5      d.    make interim and final distributions of the Net T-16 Improvement Payment Proceeds

6  to the holders of T-16 Improvement Vendor Claims pursuant to the terms of the Plan;

7      e.    make distributions of the remaining Net T-16 Improvement Payment Proceeds, after

8  payment in full of all T-16 Improvement Vendor Claims under the Plan, to Reorganized LLV-1 as

9  reimbursement for the unreimbursed payments LLV-1 made on account of the T-16 LID prior to the

10  Petition Date;

11      f.    administer the collection from the T-16 LID, the T-16 LID Bond Trustee, and the

12  City of Henderson on account of the T-16 Improvement Payment Rights and, if necessary,

13  prosecute, settle, or abandon claims arising out of, or relating to, the T-16 Improvement Payment

14  Rights;

15      g.    jointly prosecute the LID Acquisition Litigation with the Reorganized Debtors and

16  LLV LID Loan Holder;

17      h.    file all tax and regulatory forms, returns, reports and other documents required with

18  respect to the Falls Improvement Trust; and

19      i.    file suit or any appropriate motion for relief in the Court or in any other court of

20  competent jurisdiction to resolve any claim, disagreement, conflict or ambiguity in connection with

21  the exercise of its rights, powers or duties.

22      In connection with the above, the Falls Improvement Trust and the Falls Improvement

23  Trustee shall, from the Effective Date, be a representative of the Estates, pursuant to Bankruptcy

24  Code section 1123, appointed for the purposes of, among other things, pursuing with the

25  Reorganized Debtors and LLV LID Loan Holder the LID Acquisition Litigation. In furtherance of

26  that objective, the Falls Improvement Trustee shall have the rights of a trustee under Bankruptcy

27  Code section 1106 as it relates to the LID Acquisition Litigation. The Falls Improvement Trust shall

28  have the full power and authority, either in its name or in the Creditors' Committee's name, to

59

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

prosecute with the Reorganized Debtors and LLV LID Loan Holder the LID Acquisition Litigation, subject to the approval rights of the board of advisors set forth in the Falls Improvement Trust Agreement. The Falls Improvement Trust shall be authorized to retain professionals (which professionals need not be "disinterested" and may include existing legal counsel and other professionals retained by the Debtors, the Reorganized Debtors or the Creditors' Committee) without Court approval and with reasonable professional fees, expenses and costs to be paid out of the assets of the Falls Improvement Trust.

### 6. The T-16 Improvement MAC Payments.

If the Falls Improvement Trust receives the T-16 Improvement MAC Payment, then such funds shall be used solely for the following purposes and in the following order of priority: first, to fund any remaining Plan distributions to holders of Allowed Class 9 Claims (other than distributions on account of the Class 9 Net Litigation Proceeds Share); second, to fund the construction of the Substitute P-40 Pump Station; and, third, to fund the completion of segments identified within the T-16 LID.

### 7. The Termination of the Falls Improvement Trust.

The Falls Improvement Trust shall be irrevocable. The Falls Improvement Trust shall terminate when the Falls Improvement Trustee has performed all of its duties under the Plan and the Falls Improvement Trust Agreement, including the final distribution of all the property of the Falls Improvement Trust in respect of holders of beneficial interests in the Falls Improvement Trust, which date shall not be more than five (5) years and one (1) month after the Effective Date; provided, however, the Court may, upon good cause shown, order the Falls Improvement Trust to remain open so long as shall be necessary to develop the T-16 LID pursuant to the X-West Approved Model, the X-East Approved Model, and the Remainder Segments Approved Model, as applicable, to complete segments within the T-16 LID, if there is a T-16 Improvement MAC Event, and to liquidate and distribute all its property. The Court shall retain jurisdiction to interpret and to enforce the terms of the Falls Improvement Trust.

### 8. Additional Provisions of the Falls Improvement Trust Agreement.

In addition to the provisions in the Plan with respect to the Falls Improvement Trust,

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

the Falls Improvement Trust Agreement will provide for, among other things, other actions to be taken by the Falls Improvement Trust and the Falls Improvement Trustee, the removal of the Falls Improvement Trustee or appointment of successor Falls Improvement Trustees, the circumstances under which the Falls Improvement Trustee, in its capacity as such, will be liable for a action or inaction, the effect of actions by the Creditor Trustee, the effect of actions by the Falls Improvement Trustee, and the indemnification of the Falls Improvement Trustee. The Falls Improvement Trust Agreement shall also contain language consistent with IRS Revenue Procedure 94-95 establishing that the Falls Improvement Trust is a liquidating trust. To the extent not set forth in the Plan, the functions and procedures applicable to the Falls Improvement Trust, the powers and duties of the Falls Improvement Trustee, and the rights of the holders of beneficial interests in the Falls Improvement Trust shall be governed by the provisions of the Falls Improvement Trust Agreement.

Finally, in the event the LID Acquisition Settlement Event has not occurred on or before the Effective Date, the Reorganized Debtors, LLV LID Loan Holder and the Falls Improvement Trust may jointly prosecute the LID Acquisition Litigation against LID Acquisition and, if necessary, settle or abandon claims arising out of, or relating to, the LID Acquisition Litigation for the benefit of the Falls Improvement Trust. The Reorganized Debtors and LLV LID Loan Holder shall continue to prosecute and fund the LID Acquisition Litigation unless or until (i) a T-16 Improvement MAC Event has occurred, or (ii) the Reorganized Debtors and LLV LID Loan Holder are relieved of the obligation to prosecute and fund the LID Acquisition Litigation pursuant to the terms of this section. If the Reorganized Debtors conclude, on advice of counsel, that there is not a reasonable likelihood of success on the merits of such litigation, and the Falls Improvement Trustee concurs in such assessment, then the Reorganized Debtors, LLV LID Loan Holder and the Falls Improvement Trust may abandon the LID Acquisition Litigation no earlier than thirty (30) days after filing a notice of the intended abandonment with the Bankruptcy Court and serving such notice on the Phase II Landowners, the holders of allowed Class 9 Claims and any other entity expected to have an interest as a plaintiff in the LID Acquisition Litigation. Upon the expiration of such thirty (30) day period neither the Reorganized Debtors, LLV LID Loan Holder nor the Falls Improvement Trust shall have

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

any further obligations to pursue, appear in, prosecute or fund the LID Acquisition Litigation. If the Falls Improvement Trustee does not concur in such assessment, then the Reorganized Debtors and LLV LID Loan Holder shall be permitted to file a motion or commence an action in the Court seeking a determination that there is not a reasonable likelihood of success on the merits in the LID Acquisition Litigation. If the Court makes such a determination, then the Reorganized Debtors and LLV LID Loan Holder shall have no further obligation to appear in, prosecute or fund the LID Acquisition Litigation. If the Reorganized Debtors and LLV LID Loan Holder are relieved of the obligation to appear in, prosecute and fund the LID Acquisition Litigation, then any entity with an interest in that Litigation may seek to intervene in the Litigation and prosecute and fund it; provided, however, that in such event the Reorganized Debtors and LLV LID Loan Holder shall have no obligation to assist such entity in any way.

## 9. No Effect on T-12 LID or T-16 LID.

Nothing under the Plan is intended to alter, or shall have the effect of altering in any way, any T-12 LID document or T-16 LID document, including, but not limited to, the T-12 LID Acquisition Agreement, the T-16 LID Acquisition Agreement, the final engineer's report dated as of May 1, 1998 for the T-12 LID, the final engineer's report dated as of April 12, 2005 for the T-16 LID, or the amounts or allocations of any assessments levied thereunder. Further, neither the Plan nor the approval of the Plan shall constitute, waive or supersede any consent or approval that is required under applicable nonbankruptcy law or under any and all applicable T-12 LID or T-16 LID documents, with respect to (i) any change, modification or other alteration of any work of improvement within the T-12 LID or T-16 LID, or (ii) any replacement of Reorganized LLV-1 as the T-16 LID Contractor.

## 10. Additional Provisions in the Event of a T-16 Improvement MAC Event.

If a T-16 Improvement MAC Event occurs, and the Falls Improvement Trust, after giving effect to its then assets and the receipt of the T-16 Improvement MAC Payments, notifies the City of Henderson and LLV-1 that it lacks the funds with which to construct or complete construction of the Substitute P-40 Pump Station or acquire the P-40 Pump Station (as applicable), then Reorganized LLV-1 shall, at the duly authorized request of the City of Henderson, convey the land upon which the

Substitute P-40 Pump Station is located, free and clear of the liens of the Exit Facility, the Falls Improvement Trust Loan, and the X-West Supplemental Loan (as the same may be modified, amended, or refinanced), and shall provide the City of Henderson with such easements and access rights over or through the Reorganized Debtors' real property as reasonably necessary to construct the Substitute P-40 Pump Station on such land.

**F.    Revesting of Assets.**

Except as otherwise provided in the Plan, on the Effective Date all property of the Estates shall vest in the Reorganized Debtors, free and clear of all Claims, liens, encumbrances, and Interests.  From and after the Effective Date, the Reorganized Debtors may operate their business and use, acquire and dispose of property without supervision by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

**G.    Preservation/Revesting of Rights of Action/No Waiver of Claims.**

Except as expressly released or otherwise expressly provided in the Plan, pursuant to Bankruptcy Code section 1123(b), the Reorganized Debtors, the Creditor Trust, and the Falls Improvement Trust, as applicable, shall be vested with and shall retain and may enforce any claims, rights, and causes of action that the Debtors or the Estates may hold or have against any entity, all of which are hereby preserved, including the Avoidance Actions, the Insider Actions and the claims and causes of action listed on Exhibit 7 to the Disclosure Statement, and all rights of disallowance, offset, recharacterization and/or equitable subordination with respect to Claims, and causes of action that have been or may be brought by or on behalf of the Debtors, the Estates, the Creditors' Committee, the Creditor Trust, or the Falls Improvement Trust.  Such claims, rights and causes of action, including the Avoidance Actions, the Insider Actions and the claims and causes of action listed on Exhibit 7 to the Disclosure Statement, shall remain assets of and vest in the Reorganized Debtors, the Creditor Trust, and the Falls Improvement Trust, as applicable, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such claims, rights and causes of action, including the Avoidance Actions, the Insider Actions and the claims and causes of action listed on Exhibit 7 to the Disclosure Statement, have been listed or referred to in the

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

63

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Plan, the Disclosure Statement, or any other document filed with the Court. Neither the Reorganized Debtors, the Debtors, the Estates, the Creditor Trust, nor the Falls Improvement Trust waives, releases, relinquishes, forfeits, or abandons (nor shall they be estopped or otherwise precluded or impaired from asserting) any claims, rights and causes of action, including the Avoidance Actions, the Insider Actions and the claims and causes of action listed on Exhibit 7 to the Disclosure Statement, or defenses that constitute property of the Debtors or their respective Estates: (a) whether or not such claims, rights, causes of action, including the Avoidance Actions, the Insider Actions and the claims and causes of action listed on Exhibit 7 to the Disclosure Statement, or defenses have been listed or referred to in this Plan, the Disclosure Statement, or any other document filed with the Court, (b) whether or not such claims, rights and causes of action, including the Avoidance Actions, the Insider Actions and the claims and causes of action listed on Exhibit 7 to the Disclosure Statement, or defenses are currently known to the Debtors, and (c) whether or not a defendant in any litigation relating to such claims, rights, causes of action, including the Avoidance Actions, the Insider Actions and the claims and causes of action listed on Exhibit 7 to the Disclosure Statement, filed a proof of claim in any of the Cases, filed a notice of appearance or any other pleading or notice in any of the Cases, voted for or against this Plan, or received or retained any consideration under this Plan. Without in any manner limiting the scope of the foregoing, notwithstanding any otherwise applicable principle of law or equity, including any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, analyze or refer to any claims, rights and causes of action, including the Avoidance Actions, the Insider Actions and the claims and causes of action listed on Exhibit 7 to the Disclosure Statement, or defenses in the Plan, the Disclosure Statement, or any other document filed with the Court shall in no manner waive, eliminate, modify, release, or alter the right of the Debtors, Reorganized Debtors, the Creditor Trust, or the Falls Improvement Trust to commence, prosecute, defend against, settle, recover on account of, and realize upon any such claims, rights and causes of action, including the Avoidance Actions, the Insider Actions and the claims and causes of action listed on Exhibit 7 to the Disclosure Statement, that the Debtors, their respective Estates, or the Creditors' Committee have or may have as of the Effective Date.

The Debtors expressly reserve all their claims, rights and causes of action, including the Avoidance Actions, the Insider Actions and the claims and causes of action listed on Exhibit 7 to the Disclosure Statement, and defenses for later adjudication by the Reorganized Debtors, the Creditor Trust and the Falls Improvement Trust, as the case may be, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such claims, rights and causes of action, including the Avoidance Actions, the Insider Actions and the claims and causes of action listed on Exhibit 7 to the Disclosure Statement, and defenses upon or after the confirmation or consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order. In addition, the Reorganized Debtors, the Creditor Trust and the Falls Improvement Trust expressly reserve the right to pursue or adopt claims, rights and causes of action, including the Avoidance Actions, the Insider Actions and the claims and causes of action listed on Exhibit 7 to the Disclosure Statement, that are alleged in any lawsuits in which the Debtors are a defendant or an interested party, against any entity, including the plaintiffs or co-defendants in such lawsuits.  Any entity to whom the Debtors have incurred an obligation (whether on account of services, purchase, sale of goods or otherwise), or who has received services from the Debtors, or who has received money or property from the Debtors, or who has transacted business with the Debtors, or who has leased equipment or property from or to the Debtors should assume that such obligation, receipt, transfer or transaction may be reviewed by the Reorganized Debtors, the Creditor Trust or the Falls Improvement Trust subsequent to the Effective Date and may be the subject of an action after the Effective Date, whether or not: (a) such entity has Filed a proof of Claim against any Debtor in these Cases; (b) such entity's proof of Claim has been objected to by the Debtors; (c) such entity's Claim was included in the Debtors' Schedules; or (d) such entity's scheduled Claim has been objected to by the Debtors or has been identified by the Debtors as contingent, unliquidated or disputed.

**Neither the failure to list a Claim in the Schedules filed by the Debtors, the failure of the Debtors or any other person to object to any Claim for purposes of voting, the failure of the Debtors or any other person to object to a Claim or Administrative Claim before confirmation or consummation of the Plan or the Effective Date, the failure of any person to assert a claim**

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

65

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

**or cause of action before confirmation or consummation of the Plan or the Effective Date, the absence of a proof of claim having been filed with respect to a Claim, nor any action or inaction of the Debtors or any other person with respect to a Claim, or Administrative Claim, other than a legally effective express waiver or release, shall be deemed a waiver or release of the right of the Reorganized Debtors, the Debtors, the Creditor Trust or the Falls Improvement Trust, before or after solicitation of votes on the Plan or before or after the Confirmation Date or the Effective Date to (a) object to or examine such Claim or Administrative Claim, in whole or in part or (b) retain and either assign or exclusively assert, pursue, prosecute, utilize, otherwise act or otherwise enforce any claim or cause of action against the holder of any such Claim.**

> **H.    Objections to Claims.**

Except as otherwise provided in Section II.B, above (regarding allowance of Administrative Claims), objections to any Claims shall be Filed and served upon the holder of the affected Claim no later than the date that is the later of (a) six (6) months after the Effective Date, unless extended by the Court, and (b) six (6) months after the date on which the affected proof of Claim has been filed, unless extended by the Court.  After the Effective Date, only the Reorganized Debtors and the Creditor Trust, as applicable, shall have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims.  The Creditor Trust shall have exclusive authority to File, settle, compromise, withdraw or litigate to judgment objections to General Unsecured Claims and Phase II Landowner Claims.

> **I.    Distribution of Property Under the Plan.**

The following procedures set forth in the Plan apply to distributions made pursuant to the Plan by the Reorganized Debtors, the Falls Improvement Trust, the Creditor Trust, the Pre-Petition Agent and the DIP Agent, as applicable, which will make all distributions under the Plan, unless otherwise provided.  In connection with the Plan, to the extent applicable, the Reorganized Debtors, the Falls Improvement Trust and the Creditor Trust, in making distributions under the Plan, shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and

66

reporting requirements.

### 1.    Manner of Payments Under the Plan.

Payments to domestic entities holding Allowed Claims will be tendered in U.S. Dollars and will be made by checks drawn on a domestic bank or by wire transfer from a domestic bank. Payments made to any foreign creditors holding Allowed Claims may be paid, at the option of the Reorganized Debtors, the Falls Improvement Trust, the Creditor Trust, the Pre-Petition Agent or the DIP Agent, as applicable, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### 2.    No *De Minimis* Distributions.

Notwithstanding anything to the contrary in the Plan, no payment of less than $10 will be made to any entity pursuant to the Plan.  No consideration will be provided in lieu of the *de minimis* distributions that are not made under this Section.

### 3.    No Distribution With Respect to Disputed Claims.

No payments, distributions of other property, or other consideration of any kind shall be made on account of any Disputed Claim unless and until such Claim becomes an Allowed Claim or is deemed to be such for purposes of distribution, and then only to the extent that the Claim becomes, or is deemed to be for distribution purposes, an Allowed Claim.   Unless otherwise provided herein, any holder of a Claim that becomes an Allowed Claim after the Effective Date will receive its distribution within ten (10) days from the date that such Claim becomes an Allowed Claim.

### 4.    Distributions to Pre-Petition Lenders and DIP Lenders.

The Pre-Petition Agent and the DIP Agent, as applicable, shall make the distributions provided for under the Plan in accordance with the provisions of this Plan, the Pre-Petition Credit Facility, the DIP Facility and any other agreements among the proposed recipients of such distributions.

### 5.    Delivery of Distributions and Undeliverable/Unclaimed Distributions.

#### a.    Delivery of Distributions in General.

The Reorganized Debtors, the Falls Improvement Trust or the Creditor Trust, as applicable,

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

shall make distributions to each holder of an Allowed Claim by mail as follows: (a) at the address set forth on the proof of Claim filed by such holder of an Allowed Claim; (b) at the address set forth in any written notice of address change delivered to the Disbursing Agent after the date of any related proof of Claim; (c) at the address reflected in the Schedules if no proof of Claim is filed and the Reorganized Debtors, the Falls Improvement Trust or the Creditor Trust, as applicable, has not received a written notice of a change of address; and (d) with respect to Administrative Claims, the address provided by the holder of the Claim or, if none is provided, at the address set forth in the Debtors' books and records.

### b.    Undeliverable and Unclaimed Distributions.

If the distribution to the holder of any Allowed Claim is returned as undeliverable, no further distribution shall be made to such holder unless and until a Reorganized Debtor, the Falls Improvement Trust or the Creditor Trust, as applicable, is notified in writing of such holder's then current address. Subject to the other provisions of the Plan, undeliverable distributions shall remain in the possession of the Reorganized Debtors, the Falls Improvement Trust or the Creditor Trust, as applicable, pursuant to this Section until such time as a distribution becomes deliverable. All undeliverable cash distributions will be held in unsegregated, interest-bearing bank accounts for the benefit of the entities entitled to the distributions. These entities will be entitled to any interest actually earned on account of the undeliverable distributions. The bank account will be maintained in the name of the Reorganized Debtors, the Falls Improvement Trust or the Creditor Trust, as applicable, but it will be accounted for separately.

Any holder of an Allowed Claim who does not assert a claim in writing for an undeliverable distribution within one (1) year after the Effective Date shall no longer have any claim to or interest in such undeliverable distribution, and shall be forever barred from receiving any distributions under the Plan, or from asserting a claim against the Debtors, the Reorganized Debtors, the Estates, or their respective property, and the Claim giving rise to the undeliverable distribution will be discharged. The Reorganized Debtors, the Falls Improvement Trust or the Creditor Trust, as applicable, will be enabled and empowered to retain all such undeliverable distributions.

Nothing contained in the Plan shall require the Debtors, the Falls Improvement Trust,

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

68

1  the Creditor Trust or the Reorganized Debtors to attempt to locate any holder of an Allowed Claim.

2          **c.**      **Estimation of Disputed Claims for Distribution Purposes.**

3        The Reorganized Debtors or the Creditor Trust, as applicable, may move for a Court order

4  estimating any Disputed Claim. The estimated amount of any Disputed Claim so determined by the

5  Court shall constitute the maximum recovery that the holder thereof may recover after the ultimate

6  liquidation of its Disputed Claim, irrespective of the actual amount ultimately allowed.

7        **J.**      **Cancellation of Interests.**

8        Except as otherwise provided in this paragraph, all Interests in the Debtors will be cancelled,

9  annulled, and extinguished, and will be deemed to be of no further force or effect without any further

10 action by any party. Entities holding such Interests will retain no rights and receive no consideration

11 on account of these Interests. Notwithstanding the foregoing, with respect to each of the following

12 entities with respect to which the Class of General Unsecured Claims accepts the Plan, the Interests

13 will be preserved: Lake Las Vegas Properties, L.L.C., NorthShore Golf Club, L.L.C., P-3 at

14 MonteLago Village, LLC, The Golf Club at Lake Las Vegas, LLC, Marina Investors, L.L.C., LLV

15 VHI, L.L.C., TCH Development, L.L.C., TC Technologies, L.L.C., SouthShore Golf Club, L.L.C.,

16 and Neva Holdings, L.L.C.

17       In addition to the foregoing, 100% of the membership interests held by Neva Holdings,

18 L.L.C. in TransDen Cable, LLC shall be contributed to LLV Broadband, LLC such that Reorganized

19 LLVJV shall hold 31% of the membership interests in LLV Broadband, LLC, which shall hold

20 100% of the membership interests in TransDen Cable, LLC.

21       **K.**      **Full Satisfaction.**

22       The Disbursing Agent shall make, and each holder of a Claim or Interest shall receive, any

23 distributions provided for in the Plan in full satisfaction and discharge of such Claim or Interest.

24       **L.**      **D&O Liability Policy.**

25       On or before the Effective Date, the Reorganized Debtors shall obtain tail coverage under a

26 directors and officers' liability insurance policy for a term of six (6) years for the managers, officers

27 and directors of the Debtors that served at any time during the Cases. Any unspent portion of the

28 $1,000,000 that the Debtors have placed in escrow for the purpose of providing a source of funds for

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

any self-insured retention or deductible under such coverage shall be returned to the Reorganized Debtors: (i) upon the expiration of such coverage period in the event that no claims against such coverage have been asserted, or (ii) if claims have been asserted against such coverage, within fourteen (14) days after the compromise of all such claims or the entry of a Final Order adjudicating or dismissing all such claims.

**M.    Reserved.**

**N.    Compliance with Tax Requirements.**

The Disbursing Agent shall comply with all withholding and reporting requirements imposed on it by governmental units, if any, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.

**O.    Setoff, Recoupment and Other Rights.**

Notwithstanding anything to the contrary contained in the Plan, the Reorganized Debtors may, but shall not be required to, setoff, recoup, assert counterclaims or withhold against the distributions to be made pursuant to the Plan on account of any claims that the Debtors, the Estates, or the Reorganized Debtors may have against the entity holding an Allowed Claim; <u>provided</u>, <u>however</u>, that neither the failure to effect such a setoff or recoupment, nor the allowance of any Claim against the Debtors or the Reorganized Debtors, nor any partial or full payment during the Cases or after the Effective Date in respect of any Allowed Claim, shall constitute a waiver or release by Debtors, the Estates or the Reorganized Debtors of any claim that they may possess against such holder.

**P.    Conditions to Effectiveness.**

**1.    Conditions.**

The Plan shall not become binding unless and until the Effective Date occurs.  The Effective Date is the first Business Day on which all of the following conditions have been satisfied as set forth below or waived:

a.    The Confirmation Order shall have become a Final Order;

b.    No request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code has been made, or, if made, remains pending;

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

c.    Each exhibit, document or agreement to be executed in connection with the Plan shall be in final form acceptable to the Debtors, the Creditors' Committee and the DIP Agent and their respective counsel, and the Operating Agreement and the Creditor Trust Agreement shall be in final form acceptable to the Pre-Petition Agent, as well as the foregoing entities;

d.    The Falls Improvement Trust Agreement shall have been executed and delivered;

e.    The Creditor Trust Agreement shall have been executed and delivered;

f.    The Phase II Landowner Settlement Condition shall have been satisfied;

g.    Creditors holding 90% in amount of the T-16 Improvement-Related Claims shall have executed and delivered the T-16 Improvement Vendor Settlement Agreement;

h.    The Exit Facility, the T-16 LID Loan and the Pump Station Loan shall each be in full force and effect and all conditions therein to the obligations of the parties to such loans shall have been satisfied or waived as set forth in the Exit Facility Documents, the Falls Improvement Trust Credit Agreement, the Pump Station Credit Agreement, as applicable;

i.    The Court shall have found that the DIP Agent and Pre-Petition Agent and their Associated Released Parties have acted in good faith in the negotiation and development of the Plan and the compromises and settlements inherent therein and expressly entered into in connection therewith, and that the DIP Agent, the Pre-Petition Agent, the DIP Lenders, the Pre-Petition Lenders, the Creditors' Committee and the Debtors and their Associated Released Parties have each worked in good faith to compromise their respective claims and that the settlements inherent in the Plan and expressly entered into in connection therewith, and their associated releases and other consideration have been proposed in good faith;

j.    Adversary Proceeding No. 09-01198-LBR shall be dismissed with prejudice on the Effective Date;

k.    All other agreements, writings and undertakings required under the Plan shall be executed and ready for consummation; and

l.    The Class 1 Claims have been Allowed in the amount of not less than $50 million.

The Reorganized Debtors shall mail a "Notice of Occurrence of Effective Date" to all creditors and interest holders of record as of the date of entry of the Confirmation Order upon the

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

occurrence of the Effective Date.

## 2. Waiver of Conditions.

Except as specified above and except with respect to the condition that the Phase II Landowner Settlement Condition shall have been satisfied, the requirement that the conditions to the occurrence of the Effective Date be satisfied may be waived in whole or in part, and the time within which any such conditions must be satisfied may be extended, by the Debtors with the consent of the DIP Agent and the Pre-Petition Agent. Satisfaction of the Phase II Landowner Settlement Condition may be waived in whole or in part, and the time within which such condition must be satisfied may be extended, by the Debtors with the consent of the DIP Agent and the Phase II Landowners. The failure to timely satisfy or waive any of such conditions may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied, including any action or inaction by the Debtors. The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any rights and each such right shall be deemed ongoing and subject to assertion at any time.

## Q. Authorization of Entity Action.

Each of the matters provided for under the Plan involving the entity structure of the Debtors or the Reorganized Debtors or any action to be taken by or required of the Debtors or the Reorganized Debtors, including the authorization and issuance of the New Membership Interests, and the execution of the Operating Agreement, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by equityholders, creditors, or managers, officers or directors of the Debtors or the Reorganized Debtors.

## V.

## THE REORGANIZED DEBTORS

## A. Managers.

Atalon will manage the Reorganized Debtors' assets pursuant to the Atalon Management Agreement. Reorganized LLV Holdco's board of managers are identified on Exhibit A to the Plan.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Any changes thereto shall be Filed by the Exhibit Filing Date and, upon such Filing, shall become Exhibit A to the Plan.

**B.      Operating Agreement.**

The Operating Agreement shall prohibit the issuance of non-voting equity securities as required by Bankruptcy Code section 1123(a)(6), subject to amendment of such Operating Agreement as permitted by applicable law.

**C.      Issuance and Distribution of New Membership Interests and New Warrants in Reorganized LLV Holdco.**

On the Effective Date, Reorganized LLV Holdco shall issue and distribute the New Membership Interests and the New Warrants provided for in its Operating Agreement and all related instruments, certificates and other documents required to be issued or distributed pursuant to the Plan without the necessity of any further act or action under applicable law, regulation, order or rule.

The issuance and distribution of the New Membership Interests and New Warrants in Reorganized LLV Holdco in connection with the Plan shall be, and shall be deemed to be, exempt from registration under any applicable federal or state securities laws to the fullest extent permissible under applicable non-bankruptcy law and under the Bankruptcy Code, including Section 1145(a) of the Bankruptcy Code.  Without limiting the effect of Section 1145 of the Bankruptcy Code, all documents, agreements and instruments entered into on or as of the Effective Date contemplated by or in furtherance of the Plan shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto.  In addition, all of the New Membership Interests and New Warrants issued pursuant to the Plan shall be deemed to be fully paid, non-assessable and freely tradable to the fullest extent permissible under Section 1145 of the Bankruptcy Code.

**D.      Periodic Reporting.**

As of the Effective Date, the Reorganized Debtors shall not be a public reporting company under the Securities Exchange Act of 1934, as amended.

**E.      Employee Benefit Plans.**

It is anticipated that as of the Effective Date, all of the Debtors' employee benefit plans,

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

73

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

programs and benefits existing immediately prior to the Effective Date as to persons employed on the Effective Date shall be retained and constitute obligations of the Reorganized Debtors, provided that nothing herein shall preclude the Reorganized Debtors from amending, modifying or otherwise canceling such benefit plans, programs and benefits, in their discretion, to the extent permitted by law.

## VI.

## OTHER PLAN PROVISIONS

### A.    Exculpation:  No Liability for Solicitation or Prosecution of Confirmation.

Conditioned on the occurrence of the Effective Date, and to the maximum extent permitted by applicable law, none of the Debtors, the Estates, the Reorganized Debtors, the Creditors' Committee (including any member thereof acting in such capacity), the lenders and agent under the Exit Facility, Credit Suisse, the Pre-Petition Agent, the Pre-Petition Lenders, the DIP Agent, the DIP Lenders, or any of the foregoing parties' respective Associated Released Parties shall have or incur any liability to any holder of a Claim or Interest, or to one another, for any act or omission occurring on or after the Petition Date through to and including the Effective Date in connection with, related to, or arising out of the Cases, the pursuit of confirmation of the Plan, the consummation or administration of the Plan, or property to be distributed under the Plan, except to the extent that the act or omission is determined by Final Order to be solely due to its own respective willful misconduct or gross negligence, and in all respects, the Debtors, the Estates, the Reorganized Debtors, the Creditors' Committee (and any member thereof acting in such capacity) the lenders and agent under the Exit Facility, Credit Suisse, the Pre-Petition Agent, the Pre-Petition Lenders, the DIP Agent, the DIP Lenders, or any of the foregoing parties' respective Associated Released Parties shall be entitled to rely on the advice of their respective counsel with respect to their duties and responsibilities during the Cases and under the Plan.

### B.    Releases by, and Among, the Debtors, the Creditors' Committee, Present Management, Credit Suisse, the DIP Lenders, and the Pre-Petition Lenders.

Conditioned on the occurrence of the Effective Date, and except for obligations created by, arising under or expressly preserved by the Plan, (a) the Debtors, (b) the Reorganized Debtors, (c) Atalon and Present Management, (d) the Creditors' Committee, (e) members of the Creditors'

74

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Committee in their capacity as such, on behalf of themselves and, (f) in the case of all Estate representatives and potential Estate representatives, such as the Debtors and the Creditors' Committee, the Estates, on behalf of themselves and their respective Associated Released Parties shall be deemed to have forever, fully, and irrevocably released and discharged each of Credit Suisse, the DIP Agent, the DIP Lenders, the Pre-Petition Agent and the Pre-Petition Lenders, and their respective Associated Released Parties from any and all Released Claims.   In addition, conditioned on the occurrence of the Effective Date, and except for obligations created by, arising under or expressly preserved by the Plan, each of Credit Suisse, the DIP Agent, the DIP Lenders, the Pre-Petition Agent and the Pre-Petition Lenders shall be deemed to have forever, fully, and irrevocably released and discharged, as applicable, each of the following parties from any and all Released Claims: (a) the Debtors and their Estates, (b) the Reorganized Debtors, (c) Atalon and Present Management, (d) the Creditors' Committee, (e) members of the Creditors' Committee in their capacity as such, and, in each case, their respective Associated Released Parties.

### C.    Additional Plan Releases.

#### 1.    Optional Opt-Out Releases.

All Ballots for Pre-Petition Lender Claims and the DIP Lender Solicitation shall contain optional opt-out releases.  Each Pre-Petition Lender and DIP Lender shall be deemed to and hereby does forever, fully, and irrevocably release and discharge each of the following specific categories of Optional Released Persons from the specified Released Claims, effective on the Effective Date, unless either (a) with respect to each specific category of Optional Released Persons such Pre-Petition Lender or DIP Lender affirmatively elects on its Ballot or DIP Lender Solicitation not to release the specified Optional Released Persons from the specified Released Claims by checking the appropriate boxes on the Ballot or DIP Lender Solicitation and by timely returning that Ballot or DIP Lender Solicitation or (b) such Optional Released Person does not grant such Pre-Petition Lender or DIP Lender a reciprocal release of the specified Released Claims.  The Optional Released Persons and the associated Released Claims are as follows:

a.    Post-June 22, 2007 Restructuring and Bankruptcy Releases.

The DIP Lenders, the Pre-Petition Lenders, the DIP Agent, the Pre-Petition Agent and Credit

Suisse, and each of their Associated Released Parties, with respect to any and all Released Claims related to any act, omission, transaction, event or other occurrence arising on or after June 22, 2007 through to the Effective Date, except to the extent that the act, omission, transaction, event or other occurrence is determined by a Final Order to be solely due to its own respective willful misconduct or gross negligence.

                b.        Pre-June 22, 2007 Pre-Petition Lender Releases.

The Pre-Petition Lenders and their respective Associated Released Parties in their capacities as Pre-Petition Lenders only (including Credit Suisse in its capacity as a Pre-Petition Lender and a lender under any of the Pre-Petition Credit Agreements but not in its capacity as the Pre-Petition Agent, which capacity shall be excluded from this category of Optional Released Persons), from any and all Released Claims related to any act, omission, transaction, event or other occurrence arising prior to June 22, 2007, except to the extent that the act, omission, transaction, event or other occurrence is determined by a Final Order to be solely due to its own respective willful misconduct or gross negligence.

                c.        Pre-June 22, 2007 Credit Suisse Releases.

The Pre-Petition Agent and Credit Suisse, and each of their Associated Released Parties, in all capacities, from any and all Released Claims related to any act, omission, transaction, event or other occurrence arising prior to June 22, 2007, except to the extent that the act, omission, transaction, event or other occurrence is determined by a Final Order to be solely due to its own respective willful misconduct or gross negligence.

                d.        Phase II Landowner Releases.

The Phase II Landowners and their respective Associated Released Parties (other than Associated Released Parties of Carmel, which, except to the extent expressly agreed to by the Debtors or the Reorganized Debtors, as applicable, and consented to by the Pre-Petition Agent, shall not receive a release of Released Claims if Carmel becomes a Phase II Landowner) from the Released Claims (excepting only such claims or obligations as arise out of or are expressly preserved by the Phase II Landowner Settlement Agreement or the Plan).

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

e.      T-16 Improvement Vendor Releases.

The T-16 Improvement Vendors that make the T-16 Improvement Vendor Claims Election and their respective Associated Released Parties with respect to the Released Claims that relate in any way to a T-16 Improvement-Related Claim or any other claim arising out of the provision of goods or services to or for the benefit of the T-16 LID (excepting only such claims or obligations as arise out of or are expressly preserved by the T-16 Improvement Vendor Settlement Agreement or the Plan).

## 2.      Agent Reciprocal Releases.

Conditioned on the occurrence of the Effective Date, the DIP Agent, the Pre-Petition Agent and Credit Suisse (other than in its capacity as a Pre-Petition Lender or a lender under any of the Pre-Petition Credit Agreements) shall be deemed to, and hereby do, forever, fully and irrevocably release and discharge each of:

a.      Post-June 22, 2007 Restructuring and Bankruptcy Releases.

The DIP Lenders and the Pre-Petition Lenders, and each of their Associated Released Parties with respect to any and all Released Claims related to any act, omission, transaction, event or other occurrence arising on or after June 22, 2007 through to the Effective Date, except to the extent that the act, omission, transaction, event or other occurrence is determined by a Final Order to be solely due to its own respective willful misconduct or gross negligence, to the extent that such DIP Lender or Pre-Petition Lender does not opt out of the releases provided for in Section VI.C.1.a.

b.      Pre-June 22, 2007 Pre-Petition Lender Releases.

The Pre-Petition Lenders and their Associated Released Parties with respect to any and all Released Claims related to any act, omission, transaction, event or other occurrence arising prior to June 22, 2007, except to the extent that the act, omission, transaction, event or other occurrence is determined by a Final Order to be solely due to its own respective willful misconduct or gross negligence, to the extent that such Pre-Petition Lender does not opt out of the releases provided for in Sections VI.C.1.c.

c.      Phase II Landowner Releases.

The Phase II Landowners and their respective Associated Released Parties (other than Associated Released Parties of Carmel, which, except to the extent expressly agreed to by the

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

Debtors or the Reorganized Debtors, as applicable, and consented to by the Pre-Petition Agent, shall not receive a release of Released Claims if Carmel becomes a Phase II Landowner) with respect to any and all Released Claims (excepting only such claims or obligations as arise out of or are expressly preserved by the Phase II Landowner Settlement Agreement or the Plan).

### d.    T-16 Improvement Vendor Releases.

The T-16 Improvement Vendors that make the T-16 Improvement Vendor Claims Election and their respective Associated Released Parties with respect to the Released Claims that relate in any way to a T-16 Improvement-Related Claim or any other claim arising out of the provision of goods or services to or for the benefit of the T-16 LID (excepting only such claims or obligations as arise out of or are expressly preserved by the T-16 Improvement Vendor Settlement Agreement or the Plan).

Notwithstanding the foregoing, the releases and exculpations provided for in this Section VI shall not result in or include waivers or releases by Credit Suisse, the DIP Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Lenders or any of their respective Associated Released Parties of any rights any of them may have amongst themselves with respect to Sections 9.2 and 9.4 of the DIP Facility or Sections 9.2 and 9.4 of the Pre-Petition Credit Facility, as applicable.

### D.    **Indemnification of Present Management**.

The Reorganized Debtors shall indemnify Present Management to the fullest extent permitted by applicable state law if Present Management is a party to or threatened to be made a party to or otherwise involved in any threatened, pending, or completed action, suit, arbitration, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or any other actual, threatened or completed proceeding, whether brought in the right of the Debtors, the Estates, the Reorganized Debtors or otherwise and whether of a civil, criminal, administrative or investigative nature, whether formal or informal in any case, and whether the events upon which liability is alleged occurred prior to, during or following the Debtors' bankruptcy cases, in which Present Management was, is or will be involved as a party or otherwise by reason of:  (i) the fact that Present Management is or was a director or officer of the Debtors; (ii) any action or inaction taken or failed to be taken by Present Management while acting as director, officer, employee or agent of the Debtors; or (iii) the fact that Present Management is or was serving at the request of the Debtors as a

director, officer, employee or agent of another corporation, partnership, joint venture, trust, association, common-interest organization, employee benefit plan or other enterprise (including the MPOA), and in any such case described above, whether or not serving in any such capacity at the time any liability or expense is incurred for which indemnification, reimbursement, or advancement of expenses may be provided. The Reorganized Debtors shall indemnify Present Management for any and all direct and indirect costs of any type or nature whatsoever (including all attorneys', witness, or other professional fees and related disbursements, and other out-of-pocket costs of whatever nature), actually and reasonably incurred by Present Management in connection with the investigation, defense or appeal of a such a proceeding or one establishing or enforcing a right to indemnification, and amounts paid in settlement by or on behalf of Present Management, but shall not include any judgments, fines or penalties actually levied against Present Management for such individual's violations of law.

To the extent not prohibited by law, the Reorganized Debtors shall advance the direct and indirect costs incurred by Present Management in connection with any such proceeding, and such advancement shall be made within ten (10) days after the receipt by the Reorganized Debtors of a statement or statements requesting such advances (which shall include invoices received by Present Management in connection with such expenses but, in the case of invoices in connection with legal services, any references to legal work performed or to expenditures made that would cause Present Management to waive any privilege accorded by applicable law shall not be included with the invoice). Advances shall be unsecured, interest free and without regard to Present Management's ability to repay the expenses. Advances shall include any and all direct and indirect costs actually and reasonably incurred by Present Management pursuing an action to enforce Present Management's right to indemnification pursuant to the Plan or otherwise. Present Management shall repay the advance if and to the extent that it is ultimately determined by a court of competent jurisdiction in a final judgment, not subject to appeal, that Present Management is not entitled to be indemnified by the Reorganized Debtors. The right to advances under this section shall continue until final disposition of any proceeding, including any appeal therein.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

1  Notwithstanding the foregoing, the Reorganized Debtors shall not be obligated to indemnify

2  Present Management on account of any proceeding with respect to:  (i) remuneration paid to Present

3  Management if it is determined by final judgment or other final adjudication that such remuneration

4  was in violation of law; (ii) a final judgment rendered against Present Management for an

5  accounting, disgorgement or repayment of profits made from the purchase or sale by Present

6  Management of securities of the Debtors or in connection with a settlement by or on behalf of

7  Present Management to the extent it is acknowledged by Present Management and the Debtors that

8  such amount paid in settlement resulted from Present Management's conduct from which Present

9  Management received monetary personal profit, pursuant to the provisions of Section 16(b) of the

10  Securities Exchange Act of 1934, as amended, or other provisions of any federal, state or local

11  statute or rules and regulations thereunder; (iii) a final judgment or other final adjudication that

12  Present Management's conduct was in bad faith, knowingly fraudulent or deliberately dishonest or

13  constituted willful misconduct (but only to the extent of such specific determination); or (iv) on

14  account of conduct that is established by a final judgment as constituting a breach of Present

15  Management's duty of loyalty to the Debtors or resulting in any personal profit or advantage to

16  which Present Management is not legally entitled.

17  Present Management's rights under this section shall continue after Present Management has

18  ceased acting as an agent of the Debtors and shall inure to the benefit of the heirs, executors,

19  administrators and assigns of Present Management.  The obligations and duties of the Reorganized

20  Debtors to Present Management under this Agreement shall be binding on the Reorganized Debtors

21  and their successors and assigns.  The Reorganized Debtors shall require any successor (whether

22  direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the

23  business or assets of the Reorganized Debtors, expressly to assume and agree to indemnify Present

24  Management and advance their direct and indirect costs in the same manner and to the same extent

25  that the Reorganized Debtors would be required to perform if no such succession had taken place.

26  **E.    Revocation of Plan/No Admissions.**

27  The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.

28  Notwithstanding anything to the contrary in the Plan, if the Plan is not confirmed or the Effective

80

Date does not occur, the Plan will be null and void, and nothing contained in the Plan or the Disclosure Statement will: (a) be deemed to be an admission by the Debtors with respect to any matter set forth in the Plan, including liability on any Claim or the propriety of any Claim's classification; (b) constitute a waiver, acknowledgment, or release of any Claims against, or any Interests in, the Debtors, or of any claims of the Debtors; or (c) prejudice in any manner the rights of any party in any further proceedings. The Creditors' Committee reserves the right to withdraw its support of the Plan and to withdraw as a co-proponent of the Plan if there is not a determination favorable to the Debtors in the LID Acquisition Litigation on or about March 30, 2010. The Debtors have made no decision regarding their continued pursuit of the Plan in the event the Creditors' Committee withdraws its support for the Plan and withdraws as a co-proponent of the Plan; provided, however, that in such event the Debtors reserve the right to prosecute this or any other Plan.

**F.    Modifications of the Plan.**

The Plan may be modified at any time before or after confirmation, subject to sections 1125 and 1127 of the Bankruptcy Code. Provided the proposed modification does not materially and adversely affect either (i) the treatment and recovery by holders of General Unsecured Claims or Phase II Landowners under the Plan or (ii) the prospects for confirming the Plan, such a modification does not require the consent of the Creditors' Committee. Any proposed modification that materially and adversely affects the treatment and recovery by holders of General Unsecured Claims or Phase II Landowners under the Plan is subject to the written consent of the Creditors' Committee. If the Creditors' Committee does not consent to such a proposed modification, then each of the Debtors and the Creditors' Committee may separately seek confirmation of the Plan, with or without modification, subject to the requirements of sections 1125 and 1127 of the Bankruptcy Code.

**G.    Dissolution of Creditors' Committee.**

On the Effective Date, the Creditors' Committee shall be released and discharged from the rights and duties arising from or related to the Cases, except with respect to final applications for professionals' compensation. The professionals retained by the Creditors' Committee and the members thereof shall not be entitled to compensation or reimbursement of expenses for any services rendered or expenses incurred after the Effective Date, except for services rendered and

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

expenses incurred in connection with any applications by such professionals or Creditors' Committee members for allowance of compensation and reimbursement of expenses pending on the Effective Date or timely Filed after the Effective Date as provided in the Plan, as approved by the Court.

**H.**    **No Effect on TOUSA Supplement to Settlement and Release Agreement or Dorfinco Stipulation and Order.**

The rights and duties of the parties under and pursuant to that certain Supplement to Settlement and Release Agreement, by and between LLV-1, TOUSA Homes, Inc., and Credit Suisse AG, Cayman Islands Branch (formerly known as Credit Suisse, Cayman Islands Branch) in its own and in its affiliates' capacities, and as Pre-Petition Agent and DIP Agent as approved by the Court by Order entered December 22, 2009, shall survive confirmation of this Plan and be binding on Reorganized LLV-1.  In addition, each of the provisions of the "Stipulation Resolving Amended Motion for Relief from Stay" filed on August 4, 2009 as Docket No. 1433 and the "Order Approving Stipulation Resolving Amended Motion for Relief from Stay" entered on August 10, 2009 as Docket No. 1450 shall survive confirmation of this Plan and be binding on the Reorganized Debtors.

**I.**    **Exemption from Certain Transfer Taxes.**

In accordance with Bankruptcy Code section 1146(c), the issuance, transfer or exchange of a security, or the making or delivery of an instrument of transfer under the Plan may not be taxed under any law imposing a stamp tax or similar tax.  The Confirmation Order shall direct all governmental officials and agents to forego the assessment and collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without payment of such tax or other governmental assessment.

**J.**    **Successors and Assigns.**

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity.

**K.**    **Saturday, Sunday or Legal Holiday.**

If any payment or act under the Plan is required to be made or performed on a day that is not a Business Day, then the payment or act may be completed on the next day that is a Business Day, in

82

1  which event the payment or act will be deemed to have been completed on the required day.

2  **L.  Headings.**

3  The headings used in the Plan are inserted for convenience only and do not constitute a

4  portion of the Plan or in any manner affect the provisions of the Plan or their meaning.

5  **M.  Governing Law.**

6  Unless a rule of law or procedure is supplied by (a) federal law (including the Bankruptcy

7  Code and Bankruptcy Rules), or (b) an express choice of law provision in any agreement, contract,

8  instrument, or document provided for, or executed in connection with, the Plan, the rights and

9  obligations arising under the Plan and any agreements, contracts, documents, and instruments

10  executed in connection with the Plan shall be governed by, and construed and enforced in

11  accordance with, the laws of the State of Nevada without giving effect to the principles of conflict of

12  laws thereof.

13  **N.  Form of Agreements and Documents.**

14  All documents and agreements to be Filed with the Court as part of the Plan or which are to

15  become Exhibits to the Plan or the Disclosure Statement or which are to be executed or delivered in

16  connection with the Plan, and any revisions or amendments thereto prior to the Effective Date, shall

17  be in form and substance acceptable to the DIP Agent in its sole discretion prior to any Filing,

18  execution, delivery or amendment; and the form and substance of the Creditor Trust Agreement and

19  the Operating Agreement shall also be in form and substance acceptable to the Pre-Petition Agent.

20  **VII.**

21  **EFFECT OF CONFIRMATION OF THE PLAN**

22  **A.  Discharge and Injunction.**

23  **The rights afforded in the Plan and the treatment of all Claims and Interests shall be in**

24  **exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of**

25  **any nature whatsoever arising prior to the Effective Date, including any interest accrued on**

26  **such Claims from and after the Petition Date, against the Debtors, the Estates and their**

27  **property.**

28

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067-6049
Telephone: (310) 407-4000

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

1    **Except as otherwise provided in the Plan or the Confirmation Order, the Plan and**

2    **Confirmation Order shall, on the Effective Date:  (a) discharge and release the Debtors, the**

3    **Estates, the Reorganized Debtors, and their property to the fullest extent permitted by**

4    **Bankruptcy Code sections 524 and 1141, from all Claims and Interests, including all debts,**

5    **obligations, demands, liabilities, Claims, and Interests that arose before the Effective Date, and**

6    **all debts of the kind specified in Bankruptcy Code sections 502(g), 502(h), or**

7    **502(i) (collectively, "Discharged Liabilities"), regardless of whether or not (i) a proof of Claim**

8    **or Interest based on such Discharged Liability is filed or deemed filed, (ii) a Claim or Interest**

9    **based on such Discharged Liability is allowed pursuant to Bankruptcy Code section 502, or**

10   **(iii) the holder of a Claim or Interest based on such Discharged Liability has or has not**

11   **accepted the Plan; (b) void any judgment underlying a Discharged Liability discharged**

12   **hereunder; and (c) preclude all entities from asserting against the Debtors, the Estates, the**

13   **Reorganized Debtors, or their respective property any Discharged Liability based upon any**

14   **act or omission, transaction, or other activity of any kind or nature that occurred prior to the**

15   **Effective Date.**

16   **Except as otherwise provided in the Plan or the Confirmation Order, on and after the**

17   **Effective Date, all entities who have held, currently hold, or may hold a Discharged Liability**

18   **against the Debtors, the Estates, the Reorganized Debtors, or their respective property that is**

19   **based upon any act or omission, transaction, or other activity of any kind or nature that**

20   **occurred prior to the Effective Date, that otherwise arose or accrued prior to the Effective**

21   **Date, or that is otherwise discharged pursuant to the Plan, shall be permanently enjoined from**

22   **taking any of the following actions on account of any such Discharged Liability (the**

23   **"Permanent Injunction"):  (a) commencing or continuing in any manner any action or other**

24   **proceeding against the Debtors, the Estates, the Reorganized Debtors, the Creditor Trust, the**

25   **Falls Improvement Trust or their respective property that is inconsistent with the Plan or the**

26   **Confirmation Order; (b) enforcing, attaching, collecting, or recovering in any manner any**

27   **judgment, award, decree, or order against the Debtors, the Estates, the Reorganized Debtors,**

28   **the Creditor Trust, the Falls Improvement Trust or their respective property other than as**

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

1   **specifically permitted under the Plan or the Confirmation Order; (c) creating, perfecting, or**

2   **enforcing any lien or encumbrance against the Debtors, the Estates, the Reorganized Debtors,**

3   **the Creditor Trust, the Falls Improvement Trust or their respective property; and**

4   **(d) commencing or continuing any action, in any manner, in any place that does not comply with**

5   **or is inconsistent with the provisions of the Plan, the Confirmation Order, or the discharge**

6   **provisions of Bankruptcy Code section 1141.  Any entity injured by any willful violation of such**

7   **Permanent Injunction shall recover actual damages, including costs and attorneys' fees, and, in**

8   **appropriate circumstances, may recover punitive damages, from the willful violator.**

9           Notwithstanding the discharge of the Debtors' obligations under the DIP Facility and the Pre-

10  Petition Credit Facility, obligations between and among Credit Suisse, the DIP Lenders, the DIP

11  Agent and their respective Associated Released Parties, and between and among Credit Suisse, the

12  Pre-Petition Lenders, the Pre-Petition Agent and their respective Associated Released Parties set

13  forth in Sections 9.2 and 9.4 of the DIP Facility or Sections 9.2 and 9.4 of the Pre-Petition Credit

14  Facility, as applicable, shall be preserved and shall survive the confirmation of the Plan and the

15  releases and discharge injunctions set forth in the Plan and the Confirmation Order.  The obligations

16  set forth in Sections 9.2 and 9.4 of the DIP Facility and Sections 9.2 and 9.4 of the Pre-Petition

17  Credit Facility shall remain in full force and effect notwithstanding that (a) the obligations and

18  indemnities contained therein shall not be enforceable against the Debtor obligors thereunder

19  following the Effective Date, and (b) the amounts paid by the DIP Lenders or Pre-Petition Lenders

20  thereunder shall not constitute protective advances by any such lender and shall not be deemed

21  secured by any liens against any collateral formerly securing the obligations under the DIP Facility

22  or the Pre-Petition Credit Facility.

23          **B.      Payment of U.S. Trustee Fees.**

24          The Reorganized Debtors shall pay all U.S. Trustee Fees in accordance with Section II.B.1.

25          **C.      Retention of Jurisdiction.**

26          Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date,

27  the Court shall retain jurisdiction over the Cases after the Effective Date to the fullest extent

28  provided by law, including the jurisdiction, consistent with the Confirmation Order, to:

1.     Allow, disallow, determine, liquidate, classify, establish the priority or secured or unsecured status of, estimate, or limit any Claim or Interest;

2.     Grant or deny any and all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.     Resolve any motions to assume, assume and assign, or reject any executory contract or unexpired lease (including with respect to any Deferred Agreements) to which one or more of the Debtors is a party or with respect to which one or more of the Debtors may be liable and to hear, determine and, if necessary, liquidate, any and all Claims arising therefrom;

4.     Ensure that distributions to holders of Allowed Claims, including but not limited to Administrative Claims, are accomplished pursuant to the provisions of the Plan;

5.     Adjudicate, determine and resolve any and all applications, motions, adversary proceedings, and contested or other matters involving the Debtors, including any relating to the Avoidance Actions, the Insider Actions or the LID Acquisition Litigation, that may be pending on the Effective Date or that may be instituted thereafter in accordance with the terms of the Plan, the Creditor Trust Agreement or the Falls Improvement Trust Agreement;

6.     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan, the Creditor Trust Agreement and the Falls Improvement Trust Agreement and all contracts, instruments, releases, and other agreements or documents entered into in connection with the Plan;

7.     Resolve any and all controversies, suits, or issues that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any entity's rights or obligations in connection with the Plan;

8.     Modify the Plan before or after the Effective Date pursuant to Bankruptcy Code section 1127, or modify the Disclosure Statement or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement; or remedy any defect or omission or reconcile any inconsistency in any order of the Court, the Plan, the Disclosure Statement or any contract, instrument, release, or other agreement or document created in

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

connection with the Plan or the Disclosure Statement, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

9.       Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan;

10.      Adjudicate, determine and resolve any claims and causes of action provided for and retained under the Plan or pursuant to the Confirmation Order, including the Avoidance Actions and the Insider Actions;

11.      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.      Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan; and

13.      Enter orders extending the expiration of the Creditor Trust or the Falls Improvement Trust; and

14.      Enter orders closing the Cases.

If the Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter, this section shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## VIII.

## RECOMMENDATION AND CONCLUSION

The Debtors and the Creditors' Committee believe that Plan confirmation and implementation are preferable to any alternatives available to creditors and results in the greatest recovery for the greatest number of constituents under the circumstances.  Accordingly, the Debtors and the Creditors' Committee submit that confirmation of the Plan should be supported by creditors as the most favorable alternative.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

DATED:  June 17, 2010

Lake at Las Vegas Joint Venture, LLC
and its Jointly-Administered Chapter 11 Affiliates

By:  Frederick E. Chin
Their:  President and Chief Executive Officer

Official Committee of Creditors Holding Unsecured
Claims

By: John Cork
Its: Chair

SUBMITTED BY:

*/s/ David M. Guess*

David M. Guess, an Attorney with
KLEE, TUCHIN, BOGDANOFF & STERN LLP
Reorganization Counsel for
Debtors and Debtors in Possession

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000