Honorable Mike K. Nakagawa
United States Bankruptcy Judge

Entered on Docket
March 30, 2017

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

* * * * * *

In re:

LAKE AT LAS VEGAS JOINT VENTURE, LLC,
Debtor.

LLV-1, LLC,
Debtor.

LLV HOLDCO, LLC,
Debtor.

LAKE LAS VEGAS PROPERTIES, L.L.C.,
Debtor.

LLV FOUR CORNERS, LLC,
Debtor.

NORTHSHORE GOLF CLUB, L.L.C.,
Debtor.

P-3 AT MONTELAGO VILLAGE, LLC,
Debtor.

THE GOLF CLUB AT LAKE LAS VEGAS, LLC,
Debtor.

MARINA INVESTORS, L.L.C.,
Debtor.

THE VINEYARD AT LAKE LAS VEGAS, L.L.C.,
Debtor.

LLV VHI, L.L.C.,
Debtor.

Case No.: 08-17814-MKN (Lead)
Chapter 11

Jointly Administered Under
Case No.: 08-17815-MKN
Case No.: 08-17817-MKN
Case No.: 08-17820-MKN
Case No.: 08-17822-MKN
Case No.: 08-17825-MKN
Case No.: 08-17827-MKN
Case No.: 08-17830-MKN
Case No.: 08-17832-MKN
Case No.: 08-17835-MKN
Case No.: 08-17837-MKN
Case No.: 08-17841-MKN
Case No.: 08-17842-MKN
Case No.: 08-17844-MKN
Case No.: 08-17845-MKN

Date: October 8, 2015
Time: 9:30 a.m.

TCH DEVELOPMENT, L.L.C., )
Debtor. )
_________________________________ )
TC TECHNOLOGIES, L.L.C., )
Debtor. )
_________________________________ )
SOUTHSHORE GOLF CLUB, L.L.C., )
Debtor. )
_________________________________ )
NEVA HOLDINGS, L.L.C., )
Debtor. )
_________________________________ )
AFFECTS ALL DEBTORS. )
_________________________________ )

**MEMORANDUM DECISION ON MOTION OF CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH FOR ORDER DIRECTING DISTRIBUTION OF PRE-PETITION LENDER NET LITIGATION PROCEEDS FOR APPLICATION TO INDEMNIFICATION OBLIGATIONS**[1]

An evidentiary hearing was conducted on the Indemnification Dispute[2] in the above-referenced proceeding on October 8, 2015. The appearances of counsel were noted on the record. After post-hearing briefing was completed, the matter was taken under submission.

**BACKGROUND**

On July 17, 2008, Lake at Las Vegas Joint Venture, LLC filed a voluntary Chapter 11 petition. (ECF No. 1). Separate Chapter 11 petitions were filed by fourteen affiliated entities. On July 28, 2008, an order was entered for joint administration of the fifteen proceedings, with the Lake at Las Vegas Joint Venture, LLC, proceeding serving as the lead case. (ECF No. 121). (Collectively, the entities will be referred to as the "Debtors.").

On July 30, 2008, notice was filed of the appointment of members of an Official

---

[1] In this Memorandum Decision, all references to "ECF No." are to the numbers assigned to the documents filed in the above-captioned lead bankruptcy case or the minute entries by the clerk as they appear on the docket maintained by the Clerk of the Court. All references to "Section" are to the provisions of the Bankruptcy Code, 11 U.S.C. §§ 101-1532. All references to "FRBP" are to the Federal Rules of Bankruptcy Procedure. All references to "FRCP" are to the Federal Rules of Civil Procedure.

[2] The Indemnification Dispute is a contested matter in the above-captioned proceedings encompassed by the Motion of Credit Suisse AG, Cayman Islands Branch for Order Directing Distribution of Pre-petition Lender Net Litigation Proceeds for Application to Indemnification Obligations ("Indemnification Motion"). (ECF No. 3324).

Committee of Unsecured Creditors ("UCC"). (ECF No. 150).

On September 4, 2009, Debtors, along with the UCC, filed a proposed Chapter 11 Plan of Reorganization. (ECF No. 1510).

On January 11, 2010, Debtors, along with the UCC, filed a First Amended Chapter 11 Plan of Reorganization ("FAP") on behalf of itself, the jointly administered affiliates, and the UCC. (ECF No. 1946). On the same date, a First Amended Disclosure Statement ("FAD") describing the FAP also was filed. (ECF No. 1947). A hearing on approval of the FAD was noticed for February 16, 2010. (ECF No. 1949).

On February 1, 2010, Debtor filed a Notice of Submission of Exhibits to the FAP, attaching copies of Exhibits "A" through "R" to the FAP. (ECF No. 1978).

On February 8, 2010, an objection to the FAD was filed by Carmel Land & Cattle Company (ECF No. 1985), IOTA Emerald LLC, IOTA Sixteen, LLC, and IOTA Twenty One, LLC (ECF No. 1989), Transcontinental Corporation, Inc. and Transcontinental Properties, Inc. (ECF No. 1992), and the City of Henderson, Nevada (ECF No. 1993). Creditor Gamma 4c filed a joinder in the objection filed by Carmel Land & Cattle Company (ECF No. 1990), as well as a separate joinder in the objection filed by the IOTA entities (ECF No. 1991).

On February 12, 2010, the hearing scheduled for February 16, 2010 on the disclosure statement approval was continued to March 19, 2010. (ECF No. 2013). Notice of the continued hearing was served on all parties in interest. (ECF No. 2024).

On March 16, 2010, Debtors, along with the UCC, filed a joint Second Amended Plan of Reorganization ("SAP"). (ECF No. 2061). On March 17, 2010, a Second Amended Disclosure Statement ("SAD") describing the SAP was filed. (ECF No. 2062).

On March 19, 2010, the hearing on disclosure statement approval was conducted. Subject to revisions to appear in a further amendment that also would reflect amendments to the proposed plan, the court approved the disclosure statement as containing sufficient information under Section 1125(a).

On March 26, 2010, Debtors, along with the UCC, filed a joint Third Amended Plan of Reorganization ("TAP"). (ECF No. 2097). On the same date, a Third Amended Disclosure

Statement ("TAD") describing the TAP was filed. (ECF No. 2098; Ex. No. 26).

On March 30, 2010, an order was entered approving the TAD. (ECF No. 2116). On the same date, an order was entered approving a notice setting a hearing on confirmation of the TAP for June 21, 2010, and also approving various procedures, including solicitation of ballots, for plan confirmation. (ECF No. 2118).

On April 2, 2010, fully executed copies were filed of the TAP (ECF No. 2138) and the TAD (ECF No. 2139). On the same date, the Debtors, along with the UCC, filed a "Notice of Submission of Redlined Changes" to the TAP and TAD. (ECF No. 2141).

On May 3, 2010, an order was entered authorizing the employment of McKool Smith, P.C., as special litigation counsel to the estate. (ECF No. 2274).

On May 3, 2010, Debtors, along with the UCC, also filed a motion to establish procedures for certain modifications to the proposed TAP as well as supplemental information for the TAD ("Supplement Motion"). (ECF No. 2283).

On May 12, 2010, objections to confirmation of the TAP were filed by Carmel Land & Cattle Company (ECF No. 2326), Transcontinental Corporation and Transcontinental Properties, Inc. (ECF No. 2330), and LID Acquisition, LLC (ECF No. 2331).

On May 13, 2010, Debtors, along with the UCC, filed a supplement to the TAD. (ECF No. 2332).

On May 18, 2010, an order was entered granting the Supplement Motion. (ECF No. 2343).

On May 25, 2010, an order was entered authorizing the employment of A•S•K Financial as special litigation counsel to the estate. (ECF No. 2384).

On June 17, 2010, the TAP, including the modifications requested by the Supplement Motion, was filed. (ECF No. 2461). On the same date, a notice redlining the modifications to the TAP also was filed. (ECF No. 2462).

On June 21, 2010, the plan confirmation hearing was conducted at which time the court confirmed the TAP, including additional modifications, and directed counsel to submit proposed findings of fact and conclusions of law, along with a proposed order.

On June 25, 2010, the TAP, as modified at the confirmation hearing, was filed with the court (ECF No. 2475), as well as a further notice redlining the additional modifications approved at the confirmation hearing. (ECF No. 2491). Under the TAP, the LLV Creditor Trust ("Creditor Trust") was created pursuant to a Creditor Trust Agreement ("CTA") eventually dated July 15, 2010, attached as Exhibit "E" to the TAP, with Larry Lattig ("Lattig") being appointed as the trustee of the Creditor Trust. The signatories to the CTA are the Debtors and Lattig. The beneficiaries of the Creditor Trust are the creditors whose claims are treated under Classes 1, 7, 8, and 9 of the TAP.[3] Under the CTA, Credit Suisse AG, Cayman Islands Branch f/k/a Credit Suisse, Cayman Islands Branch was appointed as the disbursing agent for payment of claims held by certain "Pre-Petition Lenders" defined under the confirmed plan. The Creditor Trust would administer certain "Creditor Trust Assets," which the TAP defined to mean the avoidance actions that the bankruptcy estate could pursue against various parties, including insiders, as well as monetary contributions from the reorganized debtors that would be distributed to general unsecured creditors.

On July 1, 2010, findings of fact and conclusions of law ("Plan Confirmation Findings")

---

[3] Under the Plan, Class 1 consists of the claims of the Pre-Petition Lenders, see Plan, Section II, C., 1., at 35:12-19, who are defined to mean the lenders under the Pre-Petition Credit Facility, see Plan, Section I, A., at 16:10-12, which in turn is defined to mean, inter alia, the "Amended and Restated Credit Agreement (originally dated May 4, 2005) dated as of June 22, 2007." See Plan, Section I, A., at 16:5-9. (Hereafter, the "2007 Credit Agreement"). Under the Plan, Class 7 consists of allowed general unsecured claims, and specifically excludes Phase II Landowner claims as well as T-16 Improvement Vendor claims. See Plan, Section II, C., 7., at 41:12 to 42:24. Class 8 consists of the claims of electing Phase II Landowners, see id. at Section II, C., 8., at 42:25 to 43:7, who are specifically identified to possibly include: Carmel Land & Cattle Company, Coleman-Toll Limited Partnership, CW Capital Fund One, LLC, Pleasant Valley Investments LLC, Strategic Capital LLV LLC, and Woodside Provence, LLC. See id. at Section I, A., at 14:6-8. Class 9 consists of the claims of electing T-16 Improvement Vendors, see id. at Section II, C., 9., at 43:8 to 44:14, who are specifically listed in Exhibit 9 to the TAD. See id. at Section I, A., at 25:22-26. That list includes Advantage Civil Design Group, Brown & Caldwell, Contri Construction Company, Inc., Cummins Rocky Mountain, LLC, Engineered Fluids, Inc., Las Vegas Paving Corp., Lochsa Surveying, Post Buckley Shuch & Jernigan, Inc., Stanley Consultants, Inc., Las Vegas Electric, Inc., Lockton Insurance Brokers, and Peridian International, Inc.

(ECF No. 2501) along with an order confirming the TAP, as modified ("Plan Confirmation Order") (ECF No. 2502), were entered. (As there were no subsequent modifications or amendments to the TAP, the confirmed version is hereafter referred to as the "Plan.").[4]

On July 16, 2010, Lattig commenced Adversary Proceeding No. 10-01284-LBR ("Adversary Proceeding") against various insiders of the Debtors to avoid certain fraudulent transfers and to obtain other relief. Reference of the Adversary Proceeding to the bankruptcy court was withdrawn to the district court and reassigned Case No. 2:11-cv-01346-GMN-PAL. Under the Plan, any cash recoveries from the Adversary Proceeding, less attorney's fees and costs, and any loans to the Creditor Trust to finance prosecution of the Adversary Proceeding, are known as "Net Litigation Proceeds."

On or about May 30, 2014, a settlement of the Adversary Proceeding was reached as a result of a mediation before Magistrate Judge Leen. On or about October 13, 2014, a settlement agreement ("Settlement Agreement") was signed. On October 15, 2014, the settlement funds ("Settlement Proceeds") were wired to Lattig and are held in Lattig's trust account.

On November 21, 2014, a Stipulation for Interim Distribution of Settlement Proceeds was submitted by Lattig, as trustee of the Creditor Trust, and Credit Suisse First Boston, Credit Suisse Cayman Islands Branch, and Credit Suisse Securities (USA) LLC (collectively "Credit Suisse"). (ECF No. 3236). The stipulation recited that the Creditor Trust and Credit Suisse had reached an impasse on the amount Credit Suisse was to be paid on the Pump Station Loan from the Net Litigation Proceeds. Credit Suisse asserted that it was entitled to $6,321,785, while the Creditor Trust maintained that $2,905,582 was sufficient. The stipulation also recited that Credit Suisse believes it is entitled to an indemnification payment in the amount of $7,929,000 pursuant to the confirmed Plan and terms of a loan agreement originally dated May 4, 2005. The Creditor Trust maintains that no indemnification payment is required at all.

On December 2, 2014, a Revised Stipulation for Interim Distribution of Settlement

---

[4] Section IV, A., of the Plan provides for the assets, claims and affairs of the various debtor entities' bankruptcy estates to be substantively consolidated as of the effective date. See TAP at 49.

Proceeds ("Distribution Stipulation") was filed. (ECF No. 3244). Under that stipulation, Lattig, as trustee of the Creditor Trust formed under the confirmed Plan, agreed with Credit Suisse that the recoveries from certain litigation prosecuted by the Creditor Trust would be withheld from distribution under the confirmed Plan. In particular, the amount of $3,416,203 would be withheld pending the determination by the court of a certain "Pump Station Dispute" while another $7,929,000 would be withheld pending the determination of a separate "Indemnification Dispute."[5] Those disputes were between the Creditor Trust on one hand, and Credit Suisse on the other hand. The parties agreed that all other proceeds of the litigation would be disbursed to other claimants[6] under the confirmed plan.

On December 3, 2014, an order was entered approving the Distribution Stipulation. (ECF No. 3252).

On January 7, 2015, the jointly administered cases were reassigned to Chief Bankruptcy Judge Bruce Beesley after the retirement of Bankruptcy Judge Linda Riegle. (ECF No. 3265).

On January 21, 2015, the Motion of Credit Suisse AG, Cayman Islands Branch to Enforce Creditor Trust Agreement and for Repayment in Full of Pump Station Loan ("Pump Station Motion") was filed by which Credit Suisse seeks to enforce certain provisions of the CTA. (ECF No. 3276).

On February 5, 2015, a motion was filed to extend the term of the CTA for a three-year period ending August 15, 2018. (ECF No. 3289).

On February 17, 2015, the jointly administered cases were again reassigned to the current bankruptcy judge. (ECF No. 3299).

On March 13, 2015, Credit Suisse filed the instant Indemnification Motion. The motion

[5] The disputed Pump Station funds are reserved in escrow by Lattig pending further order of this court, while the disputed Indemnification funds are held in an interest-bearing account by the accounting firm of Verdolino & Lowey, P.C. ("V&L"), as escrow agent, pending further order of this court.

[6] Attached as Exhibit "A" to the Distribution Stipulation was a list identifying the Pre-Petition Lenders under Class 1 of the confirmed Plan and the amounts that they would receive from the Net Litigation Proceeds, net of any indemnity claims.

was accompanied by a separate request for judicial notice (ECF No. 3325), as well as separate declarations from Elizabeth W. Walker ("First Walker Declaration") (ECF No. 3326) and T. Ray Guy ("First Guy Declaration") (ECF No. 3327).

On March 16, 2015, a status hearing was conducted with respect to both the Pump Station Dispute and the Indemnification Dispute.[7]

On March 18, 2015, as a result of the status hearing, a notice was filed continuing the hearing on the Pump Station Motion to April 1, 2015. (ECF No. 3335)[8]

On March 25, 2015, a scheduling order was entered scheduling a hearing date, discovery deadlines, and a briefing schedule for the Indemnification Motion. (ECF No. 3341).

On April 1, 2015, an evidentiary hearing on the Pump Station Motion was scheduled for May 13, 2015. (ECF No. 3365).[9]

On May 11, 2015, a stipulation was filed to continue the evidentiary hearing on the Pump Station Dispute to June 16, 2015. (ECF No. 3388). On May 12, 2015, an order was entered approving that stipulation (ECF No. 3389) and on May 13, 2015, an amended notice was filed scheduling the hearing for June 16, 2015. (ECF No. 3392).

On June 16, 2015, and June 18, 2015, the evidentiary hearing on the Pump Station Motion was held by the court. After closing arguments were presented, the matter was taken

---

[7] On March 10, 2015, counsel filed a stipulation agreeing to a deadline of March 13, 2015, for Credit Suisse to file its motion to resolve the Indemnification Dispute. (ECF No. 3320). A deadline of March 9, 2015, had been agreed when the cases were assigned to Chief Judge Beesley. On March 16, 2015, orders were entered approving that stipulation. (ECF Nos. 3329 and 3330). On March 17, 2015, an Order Vacating Order Entered in Error regarding ECF No. 3330 was entered. (ECF No. 3332). On March 25, 2015, another order was entered regarding the status hearing held on March 16, 2015 in regards to the Indemnification Motion. (ECF No. 3341).

[8] On March 30, 2015, an order was entered reflecting the results of the status hearing. (ECF No. 3363).

[9] On April 9, 2015, an amended notice was filed rescheduling the hearing on the Pump Station Motion to May 13, 2015. (ECF No. 3370).

under submission.[10]

On July 13, 2015, the Creditor Trust filed its opposition to the Indemnification Motion ("Indemnification Opposition") (ECF No. 3458), accompanied by the declaration of Gary Cruciani ("Cruciani Declaration") (ECF No. 3459) and E.J. Weppler ("Weppler Declaration") (ECF No. 3460).[11] On July 31, 2015, certain Pre-Petition Lender Beneficiaries joined in the opposition filed by the Creditor Trust. (ECF No. 3494).[12]

On July 14, 2015, an order was entered approving a stipulated extension of the briefing schedule on the Indemnification Motion. (ECF No. 3463).

On July 28, 2015, a Notice of Distribution of Pre-Petition Lenders Net Litigation Proceeds; Declaration of Craig R. Jalbert in Support Thereof, was entered. (ECF No. 3485).

On July 31, 2015, the law firm of K&L Gates LLP ("K&L Gates") filed a joinder on behalf of certain Pre-Petition Lender Beneficiaries in Creditor Trustee's Opposition regarding Indemnification Motion ("K&L Gates Joinder"). (ECF No. 3494).

On August 3, 2015, Credit Suisse filed its reply in support of the Indemnification Motion ("Reply"). (ECF No. 3498). That reply was accompanied by a supplemental request for judicial notice (ECF No. 3499) as well as further declarations from Elizabeth W. Walker ("Second Walker Declaration") (ECF No. 3500), T. Ray Guy ("Second Guy Declaration") (ECF No. 3501), and Didier Siffer ("Siffer Declaration") (ECF No. 3502). In addition to the reply, Credit Suisse filed a Motion to Strike the K&L Gates Joinder. (ECF No. 3504).

On August 5, 2015, an order was entered approving a stipulation to continue the hearing on the Indemnification Motion from August 10, 2015, to October 8, 2015. (ECF No. 3510).

On September 24, 2015, an opposition was filed by K&L Gates to Credit Suisse's Motion

---

[10] On June 19, 2015, the Creditor Trust filed a supplemental exhibit list setting forth the additional exhibits that were admitted at the evidentiary hearing on the Pump Station Motion. (ECF No. 3428).

[11] On July 14, 2015, an order was entered approving a briefing schedule for the Indemnification Motion. (ECF No. 3463).

[12] Most of those Pre-Petition Lender Beneficiaries appear to have been included on Exhibit "A" to the Distribution Stipulation. See note 6, supra.

to Strike. (ECF No. 3530). On this same date, Creditor Trust filed its motion for leave to file a sur-reply to the reply of Credit Suisse to opposition along with the Declaration of Isaac Leventon in support thereof. (ECF Nos. 3498 and 3533). On September 29, 2015, an order was entered approving a stipulation allowing Creditor Trust to file its sur-reply. (ECF No. 3535).

On October 2, 2015, Creditor Trust filed a Motion to Withdraw (ECF No. 3537) the Isaac Leventon declaration ("Leventon Declaration") and to substitute the declaration of Scott Ellington ("Ellington Declaration) (ECF No. 3538) to accompany the sur-reply.[13]

On October 5, 2015, Credit Suisse filed its list of witnesses and exhibits for the evidentiary hearing on the Indemnification Motion. (ECF No. 3540). Additionally, Credit Suisse filed its reply in support of its Motion to Strike the K&L Gates Joinder. (ECF No. 3541). On the same date, Credit Suisse also filed its opposition to the Creditor Trust Motion to Withdraw the Leventon Declaration (ECF No. 3543), accompanied by a further declaration from Elizabeth W. Walker ("Third Walker Declaration").[14] (ECF No. 3545).

On October 5, 2015, Credit Suisse also filed its response to the Creditor Trust's sur-reply ("Sur-Reply Response"). (ECF No. 3546). That response was accompanied by an additional declaration from Elizabeth W. Walker ("Fourth Walker Declaration"). (ECF No. 3547).

On October 6, 2015, Credit Suisse filed a supplement to its witness list. (ECF No. 3548). On the same date, the Creditor Trust filed its exhibit list. (ECF No. 3552).

On October 7, 2015, Credit Suisse filed a designation of certain portions of a deposition previously taken of Lattig on October 1, 2015 ("Lattig Depo Designation"). (ECF No. 3556). On the same date, the Creditor Trust filed its reply in support of its motion to withdraw the Leventon Declaration. (ECF No. 3559).

On October 7, 2015, an order was entered denying Credit Suisse's Motion to Strike the

---

[13] On October 2, 2015, an errata to the Ellington Declaration was filed. (ECF No. 3539). On October 5, 2015, an additional errata to the Ellington Declaration was filed to attach an exhibit that was omitted from the prior errata. (ECF No. 3542).

[14] On October 7, 2015, Credit Suisse filed a Notice of Withdrawal of Erroneous Document [Docket No. 3544]. (ECF No. 3554).

K&L Gates Joinder. (ECF No. 3557). On the same date, an order was entered granting the Creditor Trust's Motion to Withdraw the Leventon Declaration and to substitute the Ellington Declaration. (ECF No. 3560).

On October 8, 2015, the evidentiary hearing was conducted on the Indemnification Motion at which time counsel for the parties stipulated to the admission of various declarations and exhibits.[15] Other than the admission of the four Walker Declarations, the two Guy Declarations, the Siffer Declaration, the Cruciani Declaration, the Ellington Declaration, and the Weppler Declaration, as direct testimony, <u>no cross-examination of any of the witnesses was requested</u>. After oral arguments were presented, a post-hearing briefing schedule was ordered.

On October 9, 2015, the Creditor Trust filed an objection to the Lattig Depo Designation. (ECF No. 3563).

On October 9, 2015, the Creditor Trust filed a designation of certain portions of the deposition previously taken of Didier Siffer on June 24, 2015 ("Siffer Depo Designation"). (ECF No. 3564). On October 9, 2015, Credit Suisse filed an objection to the designation. (ECF No. 3565).

On October 12, 2015, Credit Suisse filed a response in support of the Lattig Depo Designation. (ECF No. 3569).

On October 14, 2015, the Creditor Trust filed a response in support of the Siffer Depo Designation. (ECF No. 3574).

On October 23, 2015, Credit Suisse filed a stipulation concerning post-hearing briefing (ECF No. 3581), for which an order was entered on October 26, 2015 approving a stipulated extension of the briefing schedule (ECF No. 3582).

On December 1, 2015, the Creditor Trust sought leave to file a supplemental brief in opposition to the Indemnification Motion ("Supplemental Briefing Motion"). (ECF No. 3583).

---

[15] As to the Lattig Depo Designation and the Siffer Depo Designation, counsel agreed that post-hearing objections and counter-designations could be filed on an expedited basis.

On December 9, 2015, an order was entered granting the request. (ECF No. 3584).[16]

On December 14, 2015, the Creditor Trust filed its closing brief. (ECF No. 3586). On the same date, Credit Suisse filed its closing brief. (ECF No. 3592).

On December 14, 2015, Credit Suisse filed its motion to file a second supplemental request for judicial notice (ECF No. 3587), which was set for hearing on January 28, 2016 (ECF No. 3588). No opposition was filed. A notice of non-opposition and request for entry of order was filed on January 15, 2016. (ECF No. 3601). On January 26, 2016, an order was entered vacating the January 28, 2016 hearing and approving Credit Suisse's request to file a second supplemental request for judicial notice ("Second Supplemental RJN"). (ECF No. 3607).

**THE FOCUS OF THE INDEMNIFICATION DISPUTE**

On May 4, 2005, Lake at Las Vegas Joint Venture, LLC and LLV-1, LLC, along with various lenders, and Credit Suisse, as an agent in various capacities, entered into a certain credit agreement. The credit agreement provided financing for a project to develop nearly 3,600 acres of real property surrounding a man-made lake east of Las Vegas, Nevada ("Lake Las Vegas Project"). The agreement also included provisions requiring the borrowers to indemnify and hold harmless certain parties, including various agents and lenders. On July 22, 2007, the parties entered into the 2007 Credit Agreement that retained the prior indemnification obligations of the borrowers. (Ex. No. 7).[17]

On July 1, 2010, the joint Plan was confirmed encompassing all of the borrowers under the 2007 Credit Agreement. (Ex. No. 11).

On July 15, 2010, the CTA was executed in accordance with the confirmed Plan. (Ex. No. 12).

---

[16] On December 14, 2015, a stipulated order was entered vacating the order granting the Supplemental Briefing Motion inasmuch as the order was entered prior to the opposition deadline. (ECF No. 3585). On the same date, Credit Suisse filed an opposition and response to the Supplemental Briefing Motion. (ECF No. 3590).

[17] All references to "Ex. No." are to the exhibits offered by Credit Suisse and admitted into evidence. All references to "Ex. Lt." are to the exhibits offered by the Creditor Trust and admitted into evidence.

The Indemnification Dispute now before this court seeks a determination of whether Credit Suisse is entitled to indemnification for the legal expenses it incurred in connection with four separate lawsuits ("Litigated Matters"). Resolution of the dispute requires an examination of the specific language of the 2007 Credit Agreement, the confirmed Plan, and the CTA.

Resolution of the Indemnification Dispute is contemplated by the parties to be a two-part process. First, the parties seek a determination of whether the $7,929,000 of funds withheld pursuant to the Distribution Stipulation should be distributed to Credit Suisse for application to its indemnification claim made under the 2007 Credit Agreement. Second, if any funds are distributed, a further proceeding will be conducted to determine the amount paid from those funds on Credit Suisse's indemnification claim. See Indemnification Motion at ¶ 9.

**A. The Language of the Documents.**

**1. The 2007 Credit Agreement.**

The introductory paragraph of the 2007 Credit Agreement identifies Lake at Las Vegas Joint Venture, LLC, as well as LLV-1, LLC, as the "Borrowers" under the agreement. Section 9.1D of the 2007 Credit Agreement is entitled "Participations" and states in pertinent part:

> Any Lender may at any time, ***without the consent of, or notice to, the Borrowers or the Administrative Agent***, sell participations to any Person...in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrowers, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

2007 Credit Agreement at 109-10 (Emphasis added by italics; underscoring in original).

Section 9.2 of the 2007 Credit Agreement is entitled "Expenses; Indemnity; Damage Waiver" and states in pertinent part as follows:

> **B. Indemnification by the Borrowers.** Each of the Borrowers shall indemnify each Agent (and any sub-Agent thereof), the Fronting Bank, each Lender ***and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee")*** against, and hold each Indemnitee harmless from, ***any and all losses, claims, damages, liabilities and related expenses, including the reasonable fees, charges and disbursements of any***

> ***counsel for any Indemnitee*** (and fees and time charges for attorneys who may be employees of any Agent or any Lender), ***incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of*** (i) ***the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the transactions contemplated hereby or thereby***, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property, or any Environmental Claim related in any way to any Borrower or any of its Subsidiaries, ***or*** (iv) ***any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing***, whether based on contract, tort or any other theory (including, without limitation, under applicable laws relating to preference and fraudulent transfers and conveyances) ***and regardless of whether any Indemnitee is a party thereto, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted solely from the gross negligence or willful misconduct of any Indemnitee.***
>
> ***
>
> **E. Payments.** All amounts due under this <u>Section 9.2</u> shall be payable ***promptly after demand*** therefor.

2007 Credit Agreement at 111-12. (Emphasis added by italics; underscoring in original).

Section 1.1 of the 2007 Credit Agreement defines various terms used in that document. "Agents" are defined to mean, collectively, "the Paying Agent, the Administrative Agent, the Collateral Agent and the Syndication Agent." The "Fronting Bank" is defined to mean "Credit Suisse in its capacities as the Lender of the Revolving Loans hereunder, and its successors in such capacities." A "Lender" or "Lenders" is defined to mean "the Persons identified as 'Lenders' and listed on the signature pages of this Agreement, together with their successors and permitted assigns pursuant to Section 9.1; provided that the term 'Lenders', when used in the context of a particular Loan Commitment shall mean the Lenders having that Loan Commitment." Under Section 1.1, a "Person" is defined to mean any natural person, corporation, limited liability company, trust, joint venture, partnership, limited partnership, and the like. "Related Parties" are separately defined to mean a Person's "Affiliates" and the

directors, officers, employees, agents, trustees and advisors of such Person or Affiliates. "Affiliates" are separately defined to mean, with respect to a Person, another Person that directly, or indirectly "Controls" or is "Controlled" by or is under common Control with the Person specified. "Control" is separately defined to mean the direct or indirect possession of power to direct the management or policies of a Person.[18]

**2. <u>The Plan.</u>**

The Plan sets forth, among many other things, the rights, powers and duties of the Creditor Trust. Those rights, powers and duties include the right and duty to "make interim and final distributions of the Creditor Trust Assets to the holders of the beneficial interests in the Creditor Trust pursuant to the terms of the Plan." Plan, Section IV, D., 3., b. Additionally, the Creditor Trust has the right to "file suit or any appropriate motion for relief in the Court or in any other court of competent jurisdiction to resolve any claim, disagreement, conflict or ambiguity in connection with the exercise of its rights, powers, and duties..." <u>Id.</u> at 3., f. The Plan addresses how the Creditor Trust is to disburse the Net Litigation Proceeds. In the section entitled "Distribution of Litigation Proceeds," the Plan provides that "The Net Litigation Proceeds shall be distributed," in pertinent part, as follows:

> The Pre-Petition Lender Net Litigation Proceeds Share (80% of the Net Litigation Proceeds) ***shall be distributed first to the Pre-Petition Agent for application to the indemnification obligations under the Pre-Petition Credit Facility*** and the DIP Facility, and second to the Pre-Petition Lenders on account of their Pre-Petition Lender Claims.

Plan, Section IV, D., 5., a., at 53:14 to 54:19 (Emphasis added by italics; underscoring in original).

---

[18] The copy of the 2007 Credit Agreement submitted as Ex. No. 7, as well as the predecessor agreements submitted as Ex. Nos. 3, 4 and 5, do not appear to include all of the signature pages by which the identities of Lenders other than Credit Suisse can be determined. There appears to be no dispute, however, that Credit Suisse is asserting rights to indemnification as at least an Agent or a Related Party under the 2007 Credit Agreement and that other parties are asserting rights to indemnification as Lenders under the 2007 Credit Agreement, either by direct loans made pursuant to the 2007 Credit Agreement or as a participant that acquired an interest in such a loan. Presumably, the "Class 1 - Pre-Petition Lenders" identified in Exhibit "A" to the Distribution Stipulation are the signatories referenced in the 2007 Credit Agreement, or their successors or assigns.

**3. <u>The CTA.</u>**

The Creditor Trust was created by the CTA. Recital "C" to the CTA states that the "Plan provides for, among other things and in accordance with the terms thereof, the distribution of (i) the Net Litigation Proceeds of the Creditor Trust Assets to Class 1 (the Prepetition Lender Beneficiaries), Class 7 (holders of Allowed General Unsecured Claims), Class 8 (Phase II Landowners who execute the Phase II Landowner Settlement Agreement) and Class 9 (T-16 Improvement Vendors who make the T-16 Improvement Vendor Claims Election) (collectively, the "Beneficiaries") and (ii) One Million Dollars ($1,000,000) to Class 7 (the "Class 7 Payment")." CTA at 1.

Section 2.2 to the CTA is entitled "Scope of Authority" and subsection (a) addresses the authority of the trustee of the Creditor Trust. In pertinent part, the responsibility and authority of the trustee includes, "...(vii) calculating and implementing distributions to the Beneficiaries in accordance with the Plan and this Agreement" [and] "...(xii) filing any suit or any appropriate motion for relief in the Bankruptcy Court or in any other court of competent jurisdiction to resolve any claim, disagreement, conflict or ambiguity in connection with the Creditor Trusee's or the Board of Advisors' exercise of their respective rights, powers or duties...." CTA at 6.

Section 4.1 of the CTA is entitled "Priority and Method of Distributions" and states, in pertinent part, as follows:

> (a) <u>Generally</u>. ***The Creditor Trustee, on behalf of the Creditor Trust, will make all distributions of the Net Litigation Proceeds of the Creditor Trust Assets, as set forth herein and in the Plan.*** Unless the entity or person receiving a payment agrees otherwise, the Creditor Trustee will make any payment in cash to be made by the Creditor Trust by check drawn on a domestic bank or by wire transfer from a domestic bank.
>
> (b) <u>Distribution of Net Litigation Proceeds of the Creditor Trust Assets.</u> After the payment in full of all Creditor Trust Loans and the payment, or the establishment of a reserve for such payment, of the expenses, fees and other obligations of the Creditor Trust, including, without limitation, with respect to the counsel that pursued any action on behalf of the Creditor Trust, ***then all Net Litigation Proceeds of the Creditor Trust Assets shall be distributed by the Creditor Trustee as follows***:
>
> (i) The Pre-Petition Lender Net Litigation Proceeds Share (80% of the Net Litigation Proceeds) ***shall be distributed first, to Credit Suisse in its capacities as DIP Agent and Pre-Petition Agent for application to the indemnification obligations under the Pre-***

> ***Petition Lender Credit Documents*** and the DIP Facility, **and second, to the Pre-Petition Lender Beneficiaries in accordance with their respective percentage interests of the Allowed Class 1 Claims**.

CTA at 10 and 11. (Emphasis added by italics; underscoring in original).

Section 6.4(d) to the CTA is entitled "Indemnification" and states as follows:

> The Creditor Trust, solely out of the proceeds of the Pre-Petition Lender Group Net Litigation Proceeds Share, shall indemnify and defend the Pre-Petition Agent, DIP Agent, Prepetition Lenders and DIP Lenders and all of their respective affiliates and other indemnified parties against any and all costs, fees, expenses, claims and damages arising out of or in any way related to any claims or actions brought by the Creditor Trust, except to the extent such costs, fees, expenses, claims and damages are determined by a court of competent jurisdiction by Final Order to have resulted solely from the gross negligence or willful misconduct of the applicable indemnitee. ***The indemnities in Sections 9.2 and 9.4 of the DIP Facility and Sections 9.2 and 9.4 of the Pre-Petition Credit Documents shall continue in full force and effect; provided however, that the Debtors' obligations to fund any such indemnity shall be satisfied solely from the proceeds of the Pre-Petition Lender Group Net Litigation Proceeds.***

CTA at 15 and 16. (Emphasis added by italics; underscoring in original).

**B. The Four Litigated Matters.**

**1. First American Title Insurance Co. v. Credit Suisse, Cayman Islands, Case No. 2:09-cv-01743 (D. Nev.). ("FATCO Litigation")**.

This action for declaratory relief was commenced in 2009 in the United States District Court for the District on Nevada against Credit Suisse, Cayman Islands. Plaintiff First American Title Insurance Co. ("FATCO") provided title insurance in connection with the various loans made by Credit Suisse to the developers of the Lake Las Vegas Project. FATCO alleged that Credit Suisse concealed information material to the issuance of the policy. Because of the failure to disclose the information, FATCO alleged that its defense and indemnity of various claims covered by the policy was excused. On or about July 27, 2010, FATCO voluntarily dismissed the action.

**2. L. J. Gibson, et al. v. Charles and Susan L. Barker, et al., Case No. 1:10-cv-00001 (D. Idaho). ("Gibson Litigation").**

This action for damages was commenced in 2010 in the United States District Court for the District of Idaho by various parties against Credit Suisse and related entities concerning four different real estate developments, including the Lake Las Vegas Project. Plaintiffs' original

complaint asserted various claims under theories of fraud, negligent misrepresentation, breach of fiduciary duty, conspiracy, and unjust enrichment, as well as violations of the federal civil racketeering statute. On February 11, 2015, a fourth amended complaint was filed asserting claims under theories of tortious interference with contractual relations, negligence and gross negligence, fraud, and negligent misrepresentation concerning the same four developments. On March 10, 2015, Credit Suisse answered the fourth amended complaint. As of the date of the hearing on the Indemnification Motion, the Gibson Litigation is still proceeding.

**3. Hillcrest IV, LLC v. CBRE, Inc., Case No. DC-11-13282-I (162nd Jud. Dist., Dallas County, Texas). ("CBRE Litigation")**.

This action for damages was commenced in 2011 in a district court for the State of Texas located in Dallas County against an entity that provided services to Credit Suisse. Plaintiff Hillcrest IV, LLC ("Hillcrest") was an assignee of various claims asserted by certain lenders to the Lake Las Vegas Project. Hillcrest alleged that the loans were made based on inflated appraisals that were fraudulently or negligently prepared by defendant CBRE, Inc. ("CBRE"). Hillcrest also alleged that CBRE participated in a civil conspiracy with Credit Suisse and other lenders to the Lake Las Vegas Project, but the petition sought damages only against CBRE. On or about April 26, 2013, a stipulated order was entered dismissing the action with prejudice.

**4. Claymore Holdings, LLC v. CS AG, Cayman Islands Branch, et al., Case No. DC-13-07858 (134th Jud. Dist., Dallas County, Texas). ("Claymore Litigation")**.

This litigation was commenced in 2013 in a district court for the State of Texas located in Dallas County against Credit Suisse, Cayman Islands Branch as well as Credit Suisse Securities. On September 4, 2015, a final judgment was entered awarding damages in the amount of $211,863,998.56, plus prejudgment interest in the amount of $75,644,154.22 ("Claymore Judgment"). As of the date of the hearing on the Indemnification Motion, the time for Credit Suisse to appeal the Claymore Judgment has not expired.[19]

---

[19] Through its post-hearing Second Supplemental RJN, Credit Suisse provided a copy of Defendants' Notice of Appeal, dated December 1, 2015, filed on behalf of Credit Suisse AG, Cayman Islands Branch and Credit Suisse Securities (USA) LLC, from the final judgment in the Claymore Litigation.

## THE EVIDENTIARY RECORD

Fifty-three (53) exhibits were admitted into evidence and six witnesses testified by declaration.[20] None of these witnesses were subject to cross-examination. Portions of the deposition testimony of Didier Siffer as well as Lattig also were designated by the parties.

### A. The Exhibits Admitted.

#### 1. Credit Suisse.

| Number | Date | Document |
|---|---|---|
| 1 | 9/28/1983 | Certificate of Registration for Credit Suisse |
| 2 | 3/21/1997 | Certificate of Registration on Change of Name of "Credit Suisse" to "Credit Suisse First Boston" |
| 3 | 11/1/2004 | Lake Las Vegas First Lien Credit Agreement |
| 4 | 11/4/2004 | Lake Las Vegas Second Lien Credit Agreement |
| 5 | 5/4/2005 | Lake Las Vegas Amended and Restated Credit Agreement |
| 6 | 5/23/2005 | Certificate of Registration on Change of Name of "Credit Suisse First Boston" to "Credit Suisse" |
| 7 | 7/22/2007 | Lake Las Vegas Amended and Restated Credit Agreement |
| 8 | 9/2/2009 | First American Title Ins. Co. v. Credit Suisse Complaint |
| 9 | 4/24/2009 | Certificate of Registration on Change of Name of "Credit Suisse" to Credit Suisse AG" |
| 10 | 11/9/2009 | Category "B" Banking License for Credit Suisse |
| 11 | 6/25/2010 | Third Amended Plan of Reorganization, etc. |
| 12 | 7/15/2010 | LLV Creditor Trust Agreement |
| 13 | 7/27/2010 | First American Title Ins. Co. Notice of Voluntary Dismissal |

[20] The First, Second, Third and Fourth Walker Declarations, the First and Second Guy Declarations, the Siffer Declaration, the Ellington Declaration, the Cruciani Declaration, and the Weppler Declaration were admitted into evidence.

| | | |
|---|---|---|
| 14 | 10/14/2011 | Hillcrest IV, LLC v. CBRE, Inc., et al. Amended Original Petition |
| 15 | 4/26/2013 | Hillcrest IV, LLC v. CBRE, Inc., et al. Order of Dismissal with Prejudice |
| 16 | 8/2/2013 | Claymore Holdings, LLC v. Credit Suisse Amended Petition & Request for Disclosure |
| 17 | 9/15/2014 | Credit Suisse Amended Answer, Special Exceptions and Counterclaim |
| 18 | 10/17/2014 | Letter from Cruciani to Walker |
| 19 | 10/29/2014 | Letter from Walker to Cruciani |
| 20 | 10/30/2014 | Letter from Asfour to Cruciani |
| 21 | 11/5/2014 | Letter from Asfour to Cruciani |
| 22 | 11/7/2014 | Letter from Walker to Cruciani |
| 23 | 12/2/2014 | Revised Stipulation for Interim Distribution of Settlement Proceeds |
| 24 | 12/3/2014 | Order re Revised Interim Distribution of Settlement Proceeds |
| 25 | 12/4/2014 | Notice to Holders of Class 1 |
| 26 | 12/4/2014 | Email from Walker to Asfour and copied to Cruciani and Jalbert |
| 27 | 1/22/2015 | Transcript of Telephonic Status Conference before the Honorable Bruce T. Beesley |
| 28 | 2/11/2015 | Gibson, et al. v. Credit Suisse Fourth Amended Complaint |
| 29 | 3/10/2015 | Credit Suisse Answer to Fourth Amended Complaint |
| 30 | 5/19/2015 | Letter from Walker to Holders of Class 1 |
| 31 | 5/20/2015 | Email from Wong to McMahon and Webber |
| 32 | 6/4/2015 | Plaintiff's Notice of Videotaped |
| 33 | 6/25/2015 | Email from Mow to Guy and copied to Fritz and Cruciani |
| 34 | 7/6/2015 | Notice of Motion to Quash Deposition Subpoena to Nonparty Richard Levine |
| 35 | 7/6/2015 | Memorandum of Law in support of Motion to Quash, etc. |
| 36 | 7/6/2015 | Declaration of T. Ray Guy in support of Motion to Quash, etc. |

| | | |
|---|---|---|
| 37 | 7/28/2015 | Notice of Distribution of Pre-Petition Lenders Net Litigation Proceeds; Declaration of Craig R. Jalbert in support thereof |
| 38 | 9/18/2015 | Email from Walker to Cruciani |
| 39 | 10/1/2015 | Deposition Transcript of Larry Lattig |
| 40 | 10/4/2015 | Email from Walker to Cruciani |

**2. LLV Creditor Trust.**

| Letter | Date | Document |
|---|---|---|
| A | 10/11/2012 | Plaintiffs' Fourth Amended Complaint filed in Lattig v. 820 Management Trust et al |
| B | 7/12/2013 | Claymore Operating Agreement |
| C | 9/17/2013 | Credit Suisse . . . Plea to Jurisdiction in Case No. DC-13-07858 |
| D | 12/16/2013 | Excerpts of transcript from oral argument on Plea to Jurisdiction . . . |
| E | 1/6/2014 | Order denying Plea to Jurisdiction . . . (limited purpose only) |
| F | 6/24/2014 | Transcript from deposition of Didier Siffer |
| G | 10/16/2014 | Email from Cruciani to Walker |
| H | 11/12/2014 | Letter from Cruciani to Walker |
| I | 11/13/2014 | Email chain between Cruciani and Walker |
| J | 12/17/2014 | Jury Verdict filed in Case No. DC-13-07858 |
| K | 6/4/2015 | LLV Creditor Trustee's Deposition Notice of Corporate Representative of Credit Suisse entities re BK-S-08-17814 |
| L | 6/8/2015 | Excerpt from trial transcript in Case No. DC-13-07858 |
| M | 9/4/2015 | Final Judgment in Case No. DC-13-07858 |

**B. The Witness Testimony.**

**1. Elizabeth Walker ("Walker").**

Walker is an attorney at the lead law firm representing Credit Suisse in the Debtors' bankruptcy proceeding.

Paragraph 6 of the First Walker Declaration attests that the FATCO Litigation was commenced on September 2, 2009, by the entity that issued a title insurance policy in favor of

Credit Suisse in connection with the 2007 Credit Agreement. She attests that in May 2009, Credit Suisse tendered a claim brought by a contractor in the Debtors' bankruptcy proceeding affecting the priority of Credit Suisse's deed of trust received under the 2007 Credit Agreement.

Paragraph 7 of the First Walker Declaration attests that the title insurer in the FATCO Litigation sought to bar Credit Suisse's claim for defense and indemnity based on misconduct in connection with Credit Suisse's loans to the Debtors encompassed by the 2007 Credit Agreement. She further attests that Credit Suisse incurred and paid legal fees in response to the insurer's complaint until the FATCO Litigation was voluntarily dismissed on July 27, 2010.

**2. <u>T. Ray Guy ("Guy").</u>**

Guy is an attorney at Weils, Gotshal & Manges LLP, the lead law firm representing Credit Suisse in connection with the Gibson Litigation, the CBRE Litigation, and the Claymore Litigation.

Paragraph 2 of the First Guy Declaration attests that the Gibson Litigation was commenced on January 3, 2010, as a class action against Credit Suisse and an entity named Cushman & Wakefield, Inc.

Paragraph 3 of the First Guy Declaration attests that the Gibson plaintiffs allegedly purchased club memberships and homes in four developments, one of which was the Debtors' project. Guy attests that the Gibson plaintiffs asserted claims based on alleged misconduct by Credit Suisse and Cushman in inducing the developer to borrow funds from Credit Suisse for the Debtors' project.

Paragraph 4 of the First Guy Declaration attests that the Gibson Litigation asserts theories of tortious interference with contractual relations, fraud, negligence, and negligence misrepresentation. Guy attests that Credit Suisse has actively litigated the dispute for over five years and that Credit Suisse has denied all liability.

Paragraph 5 of the First Guy Declaration attests that the CBRE Litigation was commenced on October 14, 2011, against an appraisal firm used by Credit Suisse in connection with the 2007 Credit Agreement. Guy attests that the plaintiff in the CBRE Litigation is a lender who participated in the 2007 Credit Agreement who claims to have been induced to participate

through an inflated real estate appraisal that had been prepared by CBRE.

Paragraph 6 of the First Guy Declaration attests that claims for fraud and fraudulent inducement, negligent misrepresentation and civil conspiracy were asserted in the CBRE Litigation, but Credit Suisse was not named as a defendant. Guy attests that Credit Suisse was the subject of extensive discovery, however, and was involved in significant motion practice, until the CBRE Litigation was settled and dismissed with prejudice on April 26, 2013.

Paragraph 7 of the First Guy Declaration attests that the Claymore Litigation was commenced on July 16, 2013, against Credit Suisse based on the 2007 Credit Agreement. Guy describes plaintiff Claymore as an entity created to be an assignee of the manager of a fund that participated in the 2007 Credit Agreement. He attests that the Claymore Litigation alleges a conspiracy between Credit Suisse and CBRE to inflate the appraisals of the Debtors' property to induce participation. Guy attests that claims for breach of contract, breach of duty of good faith and fair dealing, fraud by non-disclosure, fraudulent inducement, aiding and abetting fraud, civil conspiracy, and unjust enrichment are alleged in the Claymore Litigation.

Paragraph 8 of the First Guy Declaration attests that Credit Suisse engaged in significant discovery and motion practice during the Claymore Litigation.

Paragraph 9 of the First Guy Declaration attests that the Claymore Litigation proceeded to a jury trial in December 2014, only on the fraudulent inducement claims. Guy attests that the jury determined Credit Suisse to be liable for fraudulent inducement by affirmative representation, but not for fraudulent inducement by omission, after a two-week trial. He attests that $40 million in damages were awarded, sixty-five percent of which was attributed to Credit Suisse. Guy further attests that on February 20, 2015, Credit Suisse filed a motion for judgment notwithstanding the verdict ("JNOV Motion") that was scheduled to be heard on April 20, 2015.

Paragraph 10 of the First Guy Declaration attests that Credit Suisse incurred and paid no less than $7,929,000 in legal expenses as a result of the Gibson Litigation, CBRE Litigation, and Claymore Litigation.

Paragraph 5 of the Second Guy Declaration attests that the remaining claims in the Claymore Litigation were the subject of a bench trial that was conducted between May 26, 2015

and June 9, 2015.

**3. Didier Siffer ("Siffer").**

Siffer is a managing director of Credit Suisse Securities (USA) LLV and an authorized signatory for Credit Suisse AG, Cayman Islands Branch. Since March 2008, prior to the commencement of the Debtor's Chapter 11 proceeding, Siffer has had primary administrative responsibility for Credit Suisse in connection with the Debtors' real estate development project.

Paragraph 5 of the Siffer Declaration attests that since entry of the order confirming the Debtors' Chapter 11 plan, neither he nor Credit Suisse as pre-petition agent received any written notice that any beneficiary of the Creditor Trust had transferred its interest to Claymore.

Paragraph 6 of the Siffer Declaration attests that since entry of the order confirming the Debtors' Chapter 11 plan, neither he nor Credit Suisse as pre-petition agent received any written notice that any rights or obligations under the prepetition credit facility had been transferred to Claymore.

Paragraph 9 of the Siffer Declaration attests that Credit Suisse AG is organized under the laws of Switzerland and is licensed to conduct banking business in the Cayman Islands through its Cayman Islands branch. Siffer attests that the equity interest in Credit Suisse Securities (USA) LLC is "ultimately 100% owned by Credit Suisse AG.

**4. Scott Ellington ("Ellington").**

Ellington is general counsel for Highland Capital Management, L.P., that provides services to various affiliates, including NextPoint Credit Strategies Fund and Highland Floating Rate Opportunities Fund. Both of these funds are prepetition lenders and are the members of Claymore Holdings, LLC, which is the plaintiff in the Claymore Litigation.

Paragraph 4 of the Ellington Declaration attests that the aforementioned funds own and control Claymore.

Paragraph 5 of the Ellington Declaration attests that a final judgment in the Claymore Litigation was entered on September 4, 2015, in the amount of over $287,500,000.

**5. Gary Cruciani ("Cruciani").**

Cruciani is an attorney at one of the law firms representing the Creditor Trust.

Paragraph 5 of the Cruciani Declaration attests that on October 16, 2014, counsel for Credit Suisse was emailed a form letter from the Creditor Trust establishing an October 31, 2014, deadline for prepetition lenders to submit claims for all indemnity obligations. Cruciani attests that Credit Suisse's counsel did not notify him of any objection to the deadline.

Paragraph 7 of the Cruciani Declaration attests that Credit Suisse's counsel first advised the Creditor Trust on October 28, 2014, that Credit Suisse would assert indemnity claims under Sections 9.2 and 9.4 of the 2007 Credit Agreement for legal expenses incurred in the FATCO, Gibson, CBRE and Claymore matters, in addition to indemnity claims under Section 6.4(d) of the CTA.

Paragraph 8 of the Cruciani Declaration attests that on October 29, 2014, Credit Suisse's counsel provide an indemnity demand for $3,867.522.25 under Section 6.4(d) of the CTA, and that the full amount of that indemnity demand was paid by the Creditor Trust.

Paragraph 12 of the Cruciani Declaration attests that on November 13, 2014, Credit Suisse's counsel first provided written notice of the amount of Credit Suisse's indemnity claim under Section 9.2 of the 2007 Credit Agreement.

**6. <u>E. J. Weppler ("Weppler").</u>**

Weppler is an employee of the Weil, Gotshal & Manges LLP, law firm, who is familiar with the maintenance of the law firm's website.

Paragraph 4 of the Weppler Declaration attests that the law firm's website was renovated and "re-launched" on July 10, 2010.

Paragraph 5 of the Weppler Declaration attests that an article entitled "Indemnifying Claims Between Contracting Parties" authored by Richard Levine and S. Christian Wickwire originally had been posted to the firm website in 2006 or earlier, and was not re-posted to the website after the website was re-launched.

**C. <u>The Deposition Designations.</u>**

**1. <u>Siffer Deposition.</u>**

The Siffer Deposition transcript was admitted as Ex. Lt. F. That deposition was taken on June 24, 2014. In the Siffer Depo Designation, the Creditor Trust offered certain testimony

appearing at pages 5, 6, 8, 9, 74, 75, 103, 104, 105, 106, 118, 122, 124, 125, 140, 148, 154, 185, 186, 187, 188, 202, 203, 223, 224, 225, 231, 233, 241, 303, 312, and 313. Among other things, the testimony addressed the various Credit Suisse entities represented by the deponent, the various roles and responsibilities of Credit Suisse under the 2007 Credit Agreement, the demands for indemnification made by Credit Suisse on any parties to the 2007 Credit Agreement, and the indemnification demand made in the Claymore Litigation.

Credit Suisse makes two objections to the designation. First, it objects to admission of certain portions of the designated testimony based on the relevance of whether Credit Suisse demanded indemnification from the lenders rather than borrowers encompassed by the 2007 Credit Agreement. Second, it objects to certain portions of the designated testimony asking the deponent to discuss legal arguments and theories.

The court overrules the first objection inasmuch as the testimony is relevant to understanding the language of Section 9.2B of the 2007 Credit Agreement. The court sustains the second objection inasmuch as the validity of the legal theories and positions advanced by Credit Suisse, rather than the facts underlying such theories and positions, is not the appropriate subject of the witness's testimony.

**2. <u>Lattig Deposition.</u>**

The Lattig Deposition transcript was admitted as Ex. No. 39. That deposition was taken on October 1, 2015. In the Lattig Depo Designation, Credit Suisse offered certain testimony appearing at pages 5, 6, 8 through 10, 11, 14, 15 through 17, 18, 19, 20 through 29, 30 through 54, 55 through 66, 66 through 81, 81 through 94, and 95 through 105. Among other things, the testimony addressed the witness's preparation for the deposition, his relationship to other parties involved in the case, his familiarity with the 2007 Credit Agreement, the CTA and the Plan, his familiarity with Credit Suisse's indemnification demand, his familiarity with the K&L Gates indemnity demand, his familiarity with the four Litigated Matters, and his familiarity with the Creditor Trust's procedures and deadline for the submission of indemnity claims.

The Creditor Trust objects to the designation in its entirety as it encompasses almost all of the deposition transcript. Alternatively, the Creditor Trust seeks to limit the designation to

certain portions of pages 70 through 71, 77 through 78, and 87 through 88, inasmuch as only those pages were previously cited by Credit Suisse in its Sur-Reply Response.

The court overrules the general objection to the entire designation as the testimony is relevant to the witness's execution of his duties under the CTA. The court rejects the alternative request for the same reason. As the witness's personal knowledge of the factual and legal basis for the Creditor Trust's legal positions are subject to the assertion of attorney-client privilege, however, the court gives limited weight to the testimony.

**DISCUSSION**

The written and oral arguments of the parties essentially are based on two threshold issues and two substantive issues. The threshold issues are whether the Creditor Trust has standing to dispute Credit Suisse's claim for indemnification under Section 9.2B of the 2007 Credit Agreement, and whether Credit Suisse in this bankruptcy proceeding is the proper party to demand indemnity under the 2007 Credit Agreement. The substantive issues are whether the four Litigated Matters are encompassed by Section 9.2B of the 2007 Credit Agreement at all, and whether Credit Suisse is barred from indemnification in connection with the Claymore Litigation. These issues have been well-briefed by the parties and are capable of resolution, but only up to a certain point.

As an initial matter, it appears that the most significant aspect of this dispute cannot be resolved at this juncture due to the status of the Claymore Litigation. Credit Suisse's indemnification claim apparently includes approximately $6.5 million in legal expenses incurred in defending the Claymore Litigation that ultimately resulted in a $287 million judgment entered against Credit Suisse.[21] The amount reserved from the Net Litigation Proceeds is $7,929,000, so the largest portion of Credit Suisse's indemnification claim apparently is based on the Claymore Litigation. Because Section 9.2B of the 2007 Credit Agreement specifies that indemnification is not available if the claimant's expenses "are determined by...final and nonappealable judgment

[21] Credit Suisse's JNOV Motion, referenced by attorney Guy, presumably was denied. The $6.5 million legal expense estimate was referenced in correspondence between counsel for the Creditor Trust and Credit Suisse. (Ex. Lt. H).

to have resulted solely from the gross negligence or willful misconduct of any Indemnitee," the Creditor Trust's objection is, inter alia, that the majority of Credit Suisse's claim is barred by the very agreement on which the claim is asserted.[22] However, both the Creditor Trust and Credit Suisse agree that final resolution of this objection, if otherwise valid, must await the outcome of the appeal of the Claymore Judgment that was commenced in Texas on December 1, 2015.[23]

Having considered the evidence and arguments presented, the court concludes that the Creditor Trust is not the real party in interest with respect to the indemnification claims of any party under the 2007 Credit Agreement. The court also concludes, however, that the Creditor Trust's objection to the release of the indemnification portion of the Net Litigation Proceeds to Credit Suisse was permitted by the CTA. The interplay between the 2007 Credit Agreement, the CTA, and the language of the confirmed Plan leads to these conclusions.

In connection with the Pump Station Dispute, Credit Suisse took the position that it was entitled to be paid the portion of the Net Litigation Proceeds that otherwise would go to Class 7 general unsecured creditors because the relevant distribution language in the confirmed Plan was clarified in Credit Suisse's favor by the distribution language in the CTA. The court has concluded, however, that the language in the CTA does not simply clarify the distribution language in the Plan but would alter its meaning. The court has concluded that the distribution methodology for the Net Litigation Proceeds set forth in Section IV, D., 5., b. of the Plan is in conflict with the distribution methodology set forth in Section 4.1(b)(ii)(B) of the CTA. In the

---

[22] The Supplemental Briefing Motion and proposed exhibits filed by the Creditor Trust addresses whether the Claymore Judgment was based on a finding of knowing misrepresentation by Credit Suisse to support conclusions that Credit Suisse committed several intentional torts amounting to willful misconduct within the meaning of Section 9.2B of the 2007 Credit Agreement. Credit Suisse's response asserts, in part, that at least a portion of the Claymore Judgment is based on a breach of contract theory for which indemnity would not be barred by the same language of Section 9.2B. Until the appeal of the Claymore Judgment is decided, these additional arguments need not be resolved. The Supplemental Briefing Motion, therefore, is denied without prejudice.

[23] Although the Lake Las Vegas Project is only one of the four developments that are the subject of the Gibson Litigation, the complexity of that proceeding may result in legal expenses that approach the amounts incurred in the Claymore Litigation. Whether Credit Suisse can claim additional legal expenses in connection with the Gibson Litigation is not before the court.

event of a conflict between the language of the confirmed Plan and the language of the CTA, the parties are in agreement that the provisions of the Plan must govern pursuant to Section 18.11 of the CTA. Inasmuch as the Creditor Trust already has distributed the amount of the Net Litigation Proceeds due to Credit Suisse under Section IV, D., 5., b. of the Plan, the court has entered an order denying the Pump Station Motion. (ECF No. 3635).

In connection with the instant Indemnification Dispute, Credit Suisse takes the initial position that the Creditor Trust's role is very limited under the language of the confirmed Plan as well as the CTA. The court agrees. There is no dispute that the indemnification obligations at issue arose prior to commencement of the Debtors' proceedings under Chapter 11. The 2007 Credit Agreement identifies the "Borrowers" as Lake at Las Vegas Joint Venture, LLC, and LLV-1, LLC. Those Borrowers are two of the fifteen Debtors that subsequently commenced the instant Chapter 11 proceedings. As Borrowers, those entities had indemnification obligations under Section 9.2B of the 2007 Credit Agreement. Under that provision, the Borrowers' are obligated not only to Credit Suisse as an Agent and the Fronting Bank, but also to each Lender under the 2007 Credit Agreement (including Credit Suisse).[24]

As written, Section 9.2B of the 2007 Credit Agreement places no limit on the amount that the Borrowers might have to pay to satisfy their indemnification obligations. As relevant to the

[24] Ex. No. 20 submitted by Credit Suisse consists of a copy of a letter dated October 30, 2014, from K&L Gates on behalf of numerous lenders addressed to counsel for the Creditor Trust. The letter ("K&L Gates Demand") sets forth the indemnification claims under Section 9.2B of the 2007 Credit Agreement from two lenders for legal fees incurred in connection with the Claymore Litigation. Some of the lenders included in the K&L Gates Demand also were included in the K&L Gates Joinder to the Creditor Trust's opposition to the Indemnification Motion. As previously mentioned, Credit Suisse sought to strike that joinder, but the Motion to Strike was denied. In light of that K&L Gates Joinder, there arguably are competing claims to the portion of the Net Litigation Proceeds being held in escrow by V&L pending resolution of the Indemnification Dispute. Under Section 2.2(a)(xii) of the CTA, Lattig appears to have authority to file an interpleader action in the bankruptcy court or any other court having jurisdiction. Given that the most significant portion of the withheld funds apparently pertain to the Claymore Litigation, and that Credit Suisse previously asserted a claim for indemnity in that proceeding, it appears that the Creditor Trust had authority to commence an interpleader action in this bankruptcy court or even in the Texas court.

instant dispute, Section VII of the confirmed Plan[25] as well as Section 6.4(d) of the CTA specify that the Borrowers' indemnification obligations under Section 9.2 of the 2007 Credit Agreement remain in force after confirmation of the Plan. Section 6.4(d) of the CTA also specifies, however, that any indemnification obligations under Section 9.2B of the 2007 Credit Agreement must be satisfied solely from the Net Litigation Proceeds. In other words, satisfaction of the indemnification obligations of the Borrowers under the 2007 Credit Agreement is now limited to the available amount of the Net Litigation Proceeds.

There is no dispute that those Net Litigation Proceeds were held only by the Creditor Trust because the funds result from litigation of claims that only the Creditor Trust was created and authorized to pursue under Sections IV, D. and IV, D., 1. of the confirmed Plan. The confirmed Plan also addresses how those Net Litigation Proceeds are to be used to satisfy the indemnification obligations under the 2007 Credit Agreement. Section IV, D., 5., a. of the Plan directs that 80% of the Net Litigation Proceeds are to be distributed "first" to Credit Suisse for application to the Borrowers' indemnification obligations under the 2007 Credit Agreement. That provision of the Plan next provides that the funds remaining after the indemnification obligations are satisfied are to be distributed "second" to the prepetition lenders in satisfaction of their claims. The payment sequence language in Section IV, D., 5., a. of the confirmed Plan is mirrored in Section 4.1(b)(i) of the CTA.

This payment sequence never existed at the time the 2007 Credit Agreement was reached because no restrictions had been placed on the Borrowers' access to payment sources to satisfy both the indemnification claims and the lenders' claims. Instead, this sequence is a creation solely of the language of the confirmed Plan and CTA, with the true impact created by the payment source restriction under the CTA. Given this sequence, any Pre-Petition Lender whose prepetition claim has not been paid in full has a direct financial stake in limiting payment of the indemnity claims of other parties (including Credit Suisse) under Section 9.2B of the 2007

[25] See Plan, supra, at 85:17-27.

Credit Agreement.[26]

Unlike the Pump Station Dispute, there is no conflict between the relevant language of the Plan and the CTA. As mentioned above, both the confirmed Plan and the CTA preserve the indemnification obligations of the Borrowers under the 2007 Credit Agreement, but the CTA also limits the satisfaction of those obligations to the Net Litigation Proceeds. As the only authorized holder of the Net Litigation Proceeds, the Creditor Trust also is the only source of the funds that will be applied to the indemnification obligations remaining under the 2007 Credit Agreement. Section IV, D., 5., a. of the Plan imposes an unambiguous requirement on the Creditor Trust to distribute the Net Litigation Proceeds first to Credit Suisse for application to the indemnification obligations under the 2007 Credit Agreement, and second to the Prepetition lender claims.

It is clear that the Plan and the CTA require the Creditor Trust to distribute the Net Litigation Proceeds in a sequence that was never contemplated by the 2007 Credit Agreement. It also is clear that neither the Plan nor the CTA obligates the Creditor Trust to satisfy the indemnification obligations under the 2007 Credit Agreement.[27] Moreover, it is clear that the Plan imposes no obligation on the Creditor Trust to generate additional funds if the Net Litigation Proceeds are insufficient to pay any prepetition lender claims remaining after the indemnification obligations under the 2007 Credit Agreement are satisfied.[28] If there are any Net

---

[26] Some Pre-Petition Lenders might not have indemnification claims to assert under Section 9.2B of the 2007 Credit Agreement, but might otherwise object to the indemnification claims asserted by other parties, including Credit Suisse. Compare Exhibit "A" to Distribution Stipulation with K&L Gates Demand.

[27] Section 2.2(a)(vii) of the CTA imposes on the Creditor Trust the responsibility and authority, inter alia, of "calculating and implementing distributions to the Beneficiaries in accordance with the Plan and this Agreement." As previously discussed, the payment sequence and source restrictions created by the Plan and CTA were never contemplated by the 2007 Credit Agreement. At the very least, it appears that the Creditor Trust's responsibility to calculate the distributions to Beneficiaries required that the Indemnification Dispute be brought before the bankruptcy court. It also appears that the Creditor Trust is akin to a neutral stakeholder that could have commenced an interpleader action.

[28] After the Plan was confirmed, the parties may have overlooked the ramifications of this newly created distribution scheme perhaps because no one really thought the Creditor Trust

Litigation Proceeds remaining after the indemnification claims are satisfied, the same provision of the Plan requires the funds to be distributed to the Class 1 Pre-Petition Lender claims, presumably on a pro rata basis.

As it currently stands, under the Distribution Stipulation the only Net Litigation Proceeds that are the subject of this Indemnification Dispute are now held in an interest-bearing account by V&L, as escrow agent, pending further order of this court. As it currently stands, at least some of the Class 1 Pre-Petition Lenders apparently object to the indemnification claims asserted by Credit Suisse. As it currently stands, the substantive issues raised in connection with Credit Suisse's claim for indemnification for the Claymore Litigation (and perhaps the Gibson Litigation) cannot be resolved at this time.

Under these circumstances, the court concludes that the Indemnification Motion should be granted on a limited basis. The Net Litigation Proceeds withheld in connection with the Indemnification Dispute will remain in escrow with V&L until further order of this court. A status hearing will be held to determine a mechanism for the resolution of objections by the Pre-Petition Lenders to the basis and amount of the indemnification claims asserted by Credit Suisse.[29] A joint status report must be filed by the parties no later than one week before the hearing. The joint report must include an update on the current status of the Claymore Litigation and the Gibson Litigation, and the parties' efforts, if any, to settle the instant matter.

**CONCLUSION**

The foregoing discussion constitutes the court's findings of fact and conclusions of law entered pursuant to FRBP 9014 and FRBP 7052, and FRCP 52. A separate order has been

---

would be succeed in prosecuting the Adversary Proceeding, or perhaps did not think that the indemnification claims under Section 9.2B of the 2007 Credit Agreement would exceed the available Net Litigation Proceeds. In hindsight, this priority scheme may have assured that there would be competing claims to the Net Litigation Proceeds between the Pre-Petition Lenders and the parties asserting indemnity claims, including Credit Suisse.

[29] Prior to reaching the Distribution Stipulation, Credit Suisse apparently had developed a "dispute resolution protocol" for Pre-Petition Lenders to object to its indemnification claim. (Ex. No. 22 at p. 2). The details of that protocol are not part of the record, but may be included as part of any mechanism proposed to the court.

entered contemporaneously with this Memorandum Decision.

Copies sent to all parties via CM/ECF ELECTRONIC FILING

Copies sent via BNC to:

GARY CRUCIANI, ESQ.
MCKOOL SMITH
300 CRESCENT COURT, #1500
DALLAS, TX 75201

# # #